**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Aceto Corporation Securities Litigation | Master File No.: 2:18-cv-02425-JFB-AYS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| This Document Relates to:<br><br>ALL ACTIONS | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Michael Bonine ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aceto Corporation ("Aceto" or "Company"), analysts' reports and advisories about the Company, and other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. Plaintiff brings this class action on behalf of a class, consisting of all persons other than Defendants and related parties who purchased or otherwise acquired Aceto securities between

August 25, 2017 and April 18, 2018, both dates inclusive ("Class Period"). Plaintiff pursues remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, seeking to recover from Defendants for himself and the Class damages that Defendants' Exchange Act violations caused.

2. After the market closed on April 18, 2018, Aceto issued a press release ("April 18 Press Release"), stunning the market by disclosing that it was (a) impairing virtually the entirety of the goodwill of two, recent relatively large acquisitions, (b) attempting to renegotiate debt covenants with lenders, and (c) informing the market no longer to rely on the Company's financial guidance. It was only on February 1, 2018, that Aceto had issued guidance for the fiscal year ended June 30, 2018 ("FY 2018") for total revenues, diluted "GAAP"[1] earnings per share, and diluted non-GAAP earnings per share. On this news, investors sent the price of Aceto common stock tumbling by $4.71, or more than 64%, damaging investors.

3. Prior to that, Defendants had failed to disclose that the Company's internal controls were ineffective. It failed to disclose that it knew it was unable to forecast financial results because of the combination of persistent adverse industry conditions and a lack of visibility related generally to its Rising operating unit and specifically related to the threat of losing valuable government contracts. It failed to disclose that as a result of this same toxic combination, no later than December 31, 2017, it should have impaired goodwill and other intangible assets that rendered its balance sheet materially inaccurate, overstating assets and shareholders' equity. As a result of the impairment Aceto should have taken, it also should have posted a loss of more than $252 million for the quarter ended December 31, 2017. Defendants knew or recklessly disregarded these facts causing the price of Aceto common stock to be inflated during the Class Period.

[1] GAAP are generally accepted accounting principles.

4. As a result of Defendants' wrongful conduct and the resulting decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

7. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

8. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9. Plaintiff Michael Bonine, as set forth in the certification attached to the Memorandum of Law in Support of Motion of Michael Bonino to: (1) Consolidate Related Actions; (2) Appoint Lead Plaintiff; and (3) Approve Lead Plaintiff's Selection of Counsel (ECF No. 14-2), purchased Aceto securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

10. Defendant Aceto is incorporated in New York, with its principal executive offices located at 4 Tri Harbor Court, Port Washington, New York 11050. Aceto's securities trade on the NASDAQ under the ticker symbol "ACET."

11. Defendant Salvatore Guccione ("Guccione") served as Aceto's President and Chief Executive Officer ("CEO") from January, 2013 through September 27, 2017. About the CEO position, the Company stated, "Our Chief Executive Officer assumes leadership for all aspects of Aceto Corporation's operations. Our Chief Executive Officer concentrates on strategic issues, long range planning, acquisition activity and day-to-day operations." Defendant Guccione signed Aceto's Annual Report on Form 10-K for the fiscal year ended June 30, 2017, filed with the SEC on August 25, 2017 ("2017 10-K"). In addition, pursuant to 18 U.S.C. §1350, Defendant Guccione certified the 2017 10-K, stating, in part, that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Still further, Defendant Guccione signed a Sarbanes-Oxley ("SOX") Certification, acknowledging his responsibility for establishing and maintaining the Company's controls and procedures and internal control over financial reporting and certifying that he had evaluated those internal controls and caused the Company to disclose all material weaknesses in the Company's internal controls.

12. Defendant William C. Kennally ("Kennally") has served as the Company's President and CEO since October 2, 2017. About the CEO position, the Company stated, "Our Chief Executive Officer assumes leadership for all aspects of Aceto Corporation's operations. Our Chief Executive Officer concentrates on strategic issues, long range planning, acquisition activity and day-to-day operations." Defendant Kennally signed Aceto's Quarterly Report on Form 10-Q for the periods ended September 30, 2017 ("1Q 10-Q")and December 31, 2017 ("2Q 10-Q"), filed with the SEC respectively on November 3, 2017 and February 2, 2018. In addition, pursuant to 18

U.S.C. §1350, Defendant Kennally certified the 1Q 10-Q and the 2Q 10-Q, stating, in part, that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Still further, Defendant Kennally signed a Sarbanes-Oxley ("SOX") Certifications, acknowledging his responsibility for establishing and maintaining the Company's controls and procedures and internal control over financial reporting and certifying that he had evaluated those internal controls and caused the Company to disclose all material weaknesses in the Company's internal controls.

13. Defendant Douglas Roth ("Roth") served as the Company's Senior Vice President and Chief Financial Officer ("CFO") from March 2010 to March 2018. He was a Vice President of the Company from May, 2001 to March 2010. Defendant Roth signed Aceto's 2017 10-K and the 1Q 10-Q and the 2Q 10-Q. In addition, pursuant to 18 U.S.C. §1350, Defendant Roth certified the 2018 10-K, the 1Q 10-Q and the 2Q 10-Q, stating, in part, that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Still further, Defendant Roth signed a Sarbanes-Oxley ("SOX") Certifications, acknowledging his responsibility for establishing and maintaining the Company's controls and procedures and internal control over financial reporting and certifying that he had evaluated those internal controls and caused the Company to disclose all material weaknesses in the Company's internal controls.

14. Defendants Guccione, Kennally, and Roth are sometimes referred to herein as the "Individual Defendants."

15. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

16. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

17. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

18. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

***Background***

19. Aceto touts itself as "an international company engaged in the development, marketing, sales and distribution of finished dosage form generic pharmaceuticals, nutraceutical products, pharmaceutical active ingredients and intermediates, specialty performance chemicals inclusive of agricultural intermediates and agricultural protection products." The Company organizes its business along product lines into three principal segments: Human Health, Pharmaceutical Ingredients, and Performance Chemicals.

20. About its Human Health Division, the Company stated:

> Products that fall within the Human Health segment include finished dosage form generic drugs and nutraceutical products. Aceto sells generic prescription products and over-the-counter pharmaceutical products to leading wholesalers, chain drug stores, distributors and mass merchandisers. On December 21, 2016, Aceto's Rising Pharmaceuticals subsidiary ("Rising") completed the acquisition of certain generic products and related assets of entities formerly known as Citron Pharma LLC ("Citron"), and its affiliate Lucid Pharma LLC ("Lucid"). Rising formed two subsidiaries to consummate the product acquisition – Rising Health, LLC (which acquired certain products and related assets of Citron) and Acetris Health, LLC (which acquired certain products and related assets of Lucid). Citron is a privately-held New Jersey-based pharmaceutical company focused on developing and marketing generic pharmaceutical products in partnership with leading generic pharmaceutical manufacturers based in India and the U.S. Lucid is a privately-held New Jersey-based generic pharmaceutical distributor specializing in providing cost-effective products to various agencies of the U.S. Federal Government including the Veterans Administration and the Defense Logistics Agency. Lucid services 18 national contracts with the Federal Government, nearly all of which have 5-year terms.
>
> Aceto and Rising Health possess complementary asset-light business models, drug development and manufacturing partnerships and product portfolios. We believe that, consistent with our strategy of expanding Rising's portfolio of finished dosage form generic products through product development partnerships and

> acquisitions of late stage assets, abbreviated new drug applications ("ANDAs") and complementary generic drug businesses, this product acquisition significantly expanded our roster of commercialized products and pipeline of products under development. In addition, we believe that this transaction greatly enhanced our size and stature within the generic pharmaceutical industry, expanded our partnership network and offers us opportunities to realize meaningful cost and tax efficiencies, as well as representing an integral component of Aceto's continued strategy to become a Human Health oriented company.

***Market Conditions for the Company***

21. With respect to existing market conditions during the Class Period, the Company discussed certain headwinds it faced. In its public statements issued well prior to the April 18 Press Release, however, Aceto had recognized the existence of adverse market conditions in the generics industry that pre-dated the Company's guidance issued in the February 1 Press Release.

22. In announcing Aceto's results for the first fiscal quarter of 2018 in a press release issued on November 2, 2017, the Company advised investors that "our current view of industry conditions is now indicating greater than previously expected headwinds in terms of both competitive intensity," and that the Company would be forced to weather what it described as "a prolonged generics industry downturn."

23. In an earnings conference call held the next day, on November 3, 2017, Aceto reiterated that it was facing "adverse market conditions." The Company stated: "Our assessment of the current generic market conditions indicate the annual price erosion is now a bit higher, in the low-double-digit percent range, and new competitive entrants and other market pressures are weighing in our outlook for fiscal 2018." In answering an analyst's question regarding the generics cycle, Defendant Kennally stated, "I think for those us who have been around for a little while and can remember back when the Indian companies first came into the marketplace, there was a really

significant downturn to the pricing environment, and that lasted similar to what we're seeing now." Kennally stated that "this particular turn has, I think, been especially painful but not inconsistent with what we're seeing in the market."

24. In the February 1 Press Release, the Company's management stated: "Our second fiscal quarter results reflect primarily the persistence of generic industry headwinds marked by greater competitive intensity…." The February 1 Press Release continued, "As we look to the second half of fiscal 2018, our operating assumption is the generic industry headwinds will not ease in the near term …. Adverse market conditions are impacting the sales, profitability and market share of certain Rising products to a greater degree than anticipated."

25. During the earnings conference call held on February 2, 2018 to discuss the Company's results for the second fiscal quarter of 2018, Aceto's management warned investors that "market conditions in the generics market have been and continue to be challenging," as the Company was facing "increased competition," and that "we don't expect to see any easing of adverse generic market conditions in the near term. We'll continue to deal with the market dynamics."

26. The Company's public statements made at the end of the Class Period and thereafter indicated that the market conditions contributing to Aceto's failure to meet its guidance for FY 2018 were a continuance of those market conditions that had persisted prior to February 1.

27. In the April 18 Press Release, the Company referred to "the persistent adverse conditions in the generics market," "continued intense competitive and pricing pressures" and the "continued headwinds in the generics market" as contributing to the "difficult industry environment."

28. During the earnings conference call held on May 4, 2018 to discuss the Company's results for the third fiscal quarter of 2018, Aceto's management stated that they had "continued to deal with intense price erosion on Rising's mature products, new entrants into our markets and softer average selling prices on newly launched products." In addition, the Company referred to "continued pricing pressure" and "intense competition" in the generics market, and to the "prolonged adverse conditions in the generics market" and the "headwinds that we have faced in the generic business."

29. Thus, even after the Class Period, Defendants did not describe the conditions in the generics market as being materially different from the market conditions that prevailed prior to the Class Period.

***Non-Compliance with Certain Provisions in Government Contracts***

30. As a result of its acquisition of Lucid, Aceto became a party to a number of government supply contracts. These contracts require that Aceto comply with the country-of-origin clauses mandated by the federal Trade Agreements Act ("TAA"), which requires that the products sold to government agencies be made in the United States. At the time of the acquisition, Lucid had 18 such supply contracts with federal agencies, including the Veterans Administration ("VA") and the Defense Logistics Agency ("DLA").

31. No later than June, 2017, the federal government advised the Company that it was reviewing whether the Company's products complied with the country-of-origin provisions, and threatened to terminate those contracts for noncompliance. In the 2017 10-K, the Company stated:

> In connection with the 2016 acquisition of certain products and related assets by Aceto from Lucid, the government contracting business of Citron, Aceto acquired through the government's novation process Lucid's government contracts. The U.S. government has advised Lucid that it is reviewing whether Lucid's supply of certain products under its government contracts complied

> with the contracts' country-of-origin clauses as mandated by the federal Trade Agreements Act ("TAA"). Aceto is not named in this matter. If the products are found to not have complied with the country-of-origin clauses, then the government could exercise remedies, including termination of one or more of the subject contracts or other statutory damages. By virtue of Aceto's assumption of these contracts, Aceto could be liable for some of these damages. Aceto is entitled to indemnification under the terms of the product purchase agreement governing that transaction from the sellers for damages it may suffer as a result. In order to protect its position and without commenting on the merits of the U.S. government's claim, Aceto has submitted an indemnification claim to the sellers under the product purchase agreement, covering damages that Aceto may suffer as a result of this matter. Aceto has offset rights under the product purchase agreement with respect to future payment obligations that, in Aceto's view, substantially exceed any damages that Aceto may suffer as a result of this matter.

32. By June, 2017, then, Defendants knew, or were reckless in not knowing, that the Company risked losing those federal contracts. The eleven contracts the Company had with the VA, for example, accounted for approximately 10% of the Company's revenue, and approximately 15% of revenue for the Company's Rising subsidiary.

***Forecasting Financial Results***

33. With respect to its forecasting of financial results, for several of the quarters preceding the quarter ended December 31, 2017, the Company had settled into a pattern of overpromising and underdelivering to investors in terms of its financial performance, failing to meet the market's expectations—especially late in Roth's tenure.

34. In a November 5, 2015 press release, for example, Aceto provided investors with the following forecast for the fiscal year ended June 30, 2016 ("FY 2016"): "After a good start to the year, we are reiterating our earnings outlook for fiscal 2016. We continue to project sales growth in the mid-single digit range and net income growth in the low double-digit range."

35. In an August 25, 2016 press release announcing Aceto's results for FY 2016, however, the Company reported only a low single-digit increase in net sales of 2.1% and net income growth of only 5.4%.

36. Similarly, in a May 4, 2017 press release, Aceto provided investors with the following guidance for the fiscal year ended June 30, 2017 ("FY 2017"): "[W]e now expect … non-GAAP Adjusted EPS to be flat to 10% below fiscal 2016, largely dependent upon the timing and success of a particular anticipated new product launch. On a GAAP basis, which reflects costs related to the strategic acquisition and non-cash purchase accounting charges, EPS is expected to be below last year by approximately 50% to 60%."

37. In an August 24, 2017 press release announcing Aceto's results for FY 2017, however, the Company reported that non-GAAP Adjusted EPS was 20.7% below FY 2016, while diluted GAAP EPS was 70.3% below FY 2016.

38. Aceto also repeatedly lowered its guidance for FY 2018. In the August 24, 2017 press release, the Company issued the following guidance for FY 2018: "Total revenues to increase approximately 20% to 25%; reported diluted GAAP earnings per share to increase to between $0.55 and $0.70; and diluted Non-GAAP earnings per share to increase to between $1.25 and $1.40." The Company based its FY 2018 guidance on the following assumptions: "Generic products annual price erosion in the upper single digits percentage; R&D expense of $10 to $13 million; and total generic product launches of 15 to 20."

39. In a November 2, 2017 press release, however, the Company lowered its FY 2018 guidance, even while revising only its prior assumption regarding price erosion from "upper single digits percentage" to "low double digits percentage." Aceto projected "total revenues to increase

approximately 15% to 20%," "reported diluted GAAP earnings per share between $0.23 and $0.33," and "diluted Non-GAAP earnings per share between $1.05 and $1.15."

40. In a February 1, 2018 press release ("February 1 Press Release"), Aceto again lowered its FY 2018 guidance, even while revising only its prior assumption regarding R&D expense from $10 million to $9 million. The Company projected "total revenues to increase approximately 10% to 15%," "reported diluted GAAP loss per share between $(0.22) and $(0.32)," and "diluted Non-GAAP earnings per share between $1.00 and $1.05." The Company noted that "reported diluted GAAP loss per share includes an additional tax expense of $0.39 related to the TCJA."

41. As a result of Aceto's recent history of missed projections and lowered guidance, analysts decried management's lack of visibility. *See, e.g.,* "ACET Reported a Large Miss," by Greg Eisen, CFA, Singular Research (Oct. 18, 2017) ("ACET has a lack of visibility evidenced by earnings misses in recent quarters, and forecast price erosion higher than we had been expecting"); "We are Terminating Coverage of ACET," by Greg Eisen, CFA, Singular Research (Dec. 13, 2017) ("We are terminating coverage of ACET. Based on industry pressures and lack of visibility, as well as managerial change we are dropping coverage and reallocating resources to other opportunities with greater visibility"); "ACET Fighting Leaky Bucket Syndrome," by Matt G. Hewitt and Charlie Edison, CPA, Craig-Hallum Capital Group LLC (Feb. 2, 2018) ("Should the company take on the manufacturing of their own generic drugs, we would view that as a positive step since it would provide better visibility into launch timing and would help generate better margins and profitability").

42. Aceto had filed with the SEC on October 27, 2017 a Form 8-K announcing that Roth would retire from his role as Senior Vice President and CFO, effective March 31, 2018.

43. Analysts responded positively to Roth's anticipated departure. *See, e.g.,* "Leadership Changes Continue; Not Concerned with CFO Departure," by Dewey Steadman, CFA, US Equity Research (Oct. 29, 2017) (stating that "the planned retirement of Aceto's CFO, Doug Roth, is not concerning to us and the long transition time should allow the company to field a strong finance leader to drive the organization continue shift toward human health products").

44. In a February 16, 2018 press release, Aceto announced the arrival of Borkowski as the Company's new CFO, touting his "nearly 20 years of executive financial and strategic leadership in healthcare and the specialty and generics pharmaceutical industry," as well as his prior service as CFO "at several healthcare companies including Concordia, where he was also a member of the board, Carefusion and Mylan," after having begun his career at Arthur Andersen, one of the "Big 6" accounting firms.

45. Analysts warmly greeted the arrival of Borkowski as Roth's replacement. *See, e.g.,* "Well-Seasoned CFO Hire a Positive for the Story as Solid Execution is Needed," by Dewey Steadman, CFA, US Equity Research (Feb. 16, 2018) ("We are pleased with the appointment of Ed Borkowski as chief financial officer, as he brings a breadth of generics knowledge and experience that will likely help Aceto's continued transition into a human health company. We like the turnaround potential for Aceto, but believe management will need to execute for a number of quarters before generating meaningful investor interest").

46. By no later than February 1, 2018, Defendants knew or recklessly disregarded he acquisition of Lucid and Citron, or were reckless in not knowing of the persistent adverse conditions in the generics market and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, such that they should have impaired goodwill and other intangible assets.

47. In addition, given the operational challenges and industry headwinds of which Defendants were aware and their persistent inability to forecast financial results, Defendants knew that their February 1, 2018 forecast of financial results for fiscal 2018 was materially false when they made it.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

48. On August 25, 2017, Defendants filed with the SEC the 2017 10-K in which they disclosed

> Section 404 of the Sarbanes-Oxley Act requires us to evaluate annually the effectiveness of our internal controls over financial reporting as of the end of each fiscal year and to include a management report assessing the effectiveness of our internal controls over financial reporting in our Annual Report on Form 10-K . Section 404 also requires our independent registered public accounting firm to report on our internal controls over financial reporting. If we fail to maintain the adequacy of our internal controls, we cannot assure you that we will be able to conclude in the future that we have effective internal controls over financial reporting. If we fail to maintain effective internal controls, we might be subject to sanctions or investigation by regulatory authorities, such as the Securities and Exchange Commission or NASDAQ. Any such action could adversely affect our financial results and the market price of our common stock and may also result in delayed filings with the Securities and Exchange Commission.

49. The foregoing risk disclosure was materially false and misleading because Defendants knew or recklessly disregarded that material weaknesses already existed in Aceto's internal controls that would cause it to restate its financial results. Aceto identified that it had misapplied cash in the year ended June 30, 2015, leading it to believe:

> that adjustments related to the misapplication of cash in the year ended June 30, 2015 demonstrated that there was a material weakness in the design and effectiveness of our internal control over financial reporting, in that our system of internal control did not generate a report that could be used by management to assure that precision in the review of the aging of trade receivables was adequate. As a result of this material weakness, a reasonable

> possibility existed that a material misstatement in trade receivables in our annual or interim financial statements could occur and not be prevented or detected on a timely basis and, therefore, that we did not maintain effective internal control over financial reporting as of June 30, 2017.

50. In addition, in the 2017 10-K, with respect to internal controls, the 2018 10-K included Defendants statement about the effectiveness of the Company's internal controls, stating:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as that term is defined in Rule 13a-15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our principal executive and principal financial officers, we assessed, as of June 30, 2017, the effectiveness of our internal control over financial reporting. This assessment was based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment using those criteria, management concluded that our internal control over financial reporting as of June 30, 2017, was effective.

51. The foregoing statement about the effectiveness of Defendants internal control over financial reporting as of June 30, 2017 was false and misleading because Defendants knew or recklessly disregarded that material weaknesses existed in Aceto's internal controls that would cause it to restate its financial results. Aceto identified that it had misapplied cash in the year ended June 30, 2015, leading "management [to] determine[] that there was a material weakness in its internal control over financial reporting as of June 30, 2017." As such, "there was a material weakness in the design and effectiveness of our internal control over financial reporting in that our system of internal control did not generate a report that could be used by management to assure its precision of the review of the aging of trade receivables was adequate." Therefore, Defendants knew or recklessly disregarded that Aceto's "internal control over financial reporting was not effective as of June 30, 2017."

52. Defendants appended to the 2017 10-K Defendant Guccione's and Defendant Roth's signed Sarbanes-Oxley ("SOX") Certifications, certifying, in relevant part with respect to the Company's internal controls that:

> 4. The Registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:
>
> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and
>
> 5. The Registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
>
> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

53. The foregoing SOX certifications were false and misleading disclosure about the effectiveness of the Company's internal controls because Defendants knew or recklessly disregarded that material weaknesses existed in Aceto's internal controls that would cause it to restate its financial results. Aceto identified that it had misapplied cash in the year ended June 30, 2015, leading "management [to] determine[] that there was a material weakness in its internal control over financial reporting as of June 30, 2017." As such, "there was a material weakness in the design and effectiveness of our internal control over financial reporting in that our system of internal control did not generate a report that could be used by management to assure its precision of the review of the aging of trade receivables was adequate." Therefore, Defendants knew or recklessly disregarded that Aceto's "internal control over financial reporting was not effective as of June 30, 2017."

54. On November 3, 2017, at 7:30 a.m. eastern time, Aceto filed with the SEC a Current Report on Form 8-K, disclosing that the market should no longer rely on its previously issued financial statements, stating:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statement or a Related Audited Report or Completed Interim Review.**

> The Registrant has identified and recorded an adjustment related to the misapplication of cash in the year ended June 30, 2015. The correction resulted in a $4.0 million decrease to trade receivables as of June 30, 2015, a $1.4 million increase to other receivables as of June 30, 2015 and a $4.0 million reduction in net sales for the year ended June 30, 2015. The Registrant has performed a qualitative and quantitative analysis of this misapplication and has determined that it is not material to fiscal year 2015. The Registrant expects to file an amendment (the "10-K Amendment") to its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K") to reflect this matter.
>
> A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. After discussion with the Registrant's Audit Committee and BDO USA, LLP, the Registrant's independent registered accounting firm ("BDO"), the Registrant has determined that the above-mentioned adjustment demonstrated that there was a material weakness in the design and effectiveness of the Registrant's internal control over financial reporting in that the Registrant's system of internal control did not generate a report that could be used by management to assure that the aging of trade receivables was accurate. The Registrant believes that it has remediated the underlying causes of this material weakness, as will be more fully described in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2017. The Company will continue to monitor and test the remediation to ensure its effectiveness.
>
> After further discussion with the Registrant's Audit Committee and BDO on November 1, 2017 and November 2, 2017, the Registrant has also determined that because of the existence of the above-mentioned material weakness as of June 30, 2017, the Management's Report on Internal Control over Financial Reporting (the "Management's Report") and the related Report of Independent Registered Accounting Firm on internal control over financial reporting (the "BDO Internal Control Report") included in the 2017 10-K should no longer be relied upon. In the 10-K Amendment, the Management's Report and the BDO Internal Control Report will be amended to refer to the above-mentioned material weakness. (Emphasis in original).

55. On this news Aceto common stock opened the trading day at $8.45 per share, non-adjusted, down $0.78 or 8.5% from the previous day's close, non-adjusted, of $9.23.

56. On November 9, 2017, the Company filed an amendment to the 2017 10-K ("2017 10-K/A"). In the 2017 10-K/A, the Company disclosed that:

> As previously reported in a Form 8-K filed on November 3, 2017, Aceto Corporation (the "Company," "we," "us," or "our") has identified and recorded an adjustment related to the misapplication of cash in the fiscal year ended June 30, 2015. The correction resulted in a $4,007 decrease to trade receivables as of June 30, 2015, 2016 and 2017, a $1,402 increase to other receivables as of June 30, 2015, 2016 and 2017, a $4,007 reduction in net sales for the year ended June 30, 2015 and a $2,605 reduction in net income for the year ended June 30, 2015. We have performed a qualitative and quantitative analysis of this misapplication and have determined that it is not material to fiscal year 2015.
>
> A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. Also as previously reported, after discussion with the Company's Audit Committee and BDO USA, LLP ("BDO"), the Company's independent registered accounting firm, the Company determined that the above-mentioned adjustment demonstrated that there was a material weakness in the design and effectiveness of our internal control over financial reporting, in that our system of internal control did not generate a report that could be used by management to assure that precision in the review of the aging of trade receivables was adequate. As a result of this material weakness, a reasonable possibility existed that a material misstatement in trade receivables in our annual or interim financial statements could occur and not be prevented or detected on a timely basis.
>
> We are filing this Amendment No. 1 on Form 10-K/A (this "Amendment") to our annual report on Form 10-K for the fiscal year ended June 30, 2017, which was originally filed on August 25, 2017 (the "Original Filing"), in order to:
>
> - amend Item 1A, "Risk Factors", to modify our risk related to internal controls to refer to the above-mentioned material weakness;
>
> - amend Item 8, "Financial Statements and Supplementary Data" for the change in the Report of Independent Registered Public Accounting Firm, in relation to the

> independent registered public accounting firm's report on our internal control over financial reporting;
>
> - make revisions for immaterial errors in the consolidated financial statements previously issued in the Original Filing relating to the corrections noted in the first paragraph of this Explanatory Note, in Item 1, "Business", Item 6, "Selected Financial Data", Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 8, "Financial Statements and Supplementary Data"; and
>
> - amend Item 9A, "Controls and Procedures" with respect to (i) our conclusions regarding the effectiveness of our disclosure controls and procedures and our internal control over financial reporting and (ii) BDO's related attestation report due to the material weakness described above identified subsequent to the issuance of our Original Filing.
>
> As required by Rule 12b-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), new certifications of our principal executive officer and principal financial officer are also being filed as exhibits to this Amendment. Similarly, revised XBRL exhibits are being filed as exhibits to this Amendment. As a result, Item 15, "Exhibits, Financial Statement Schedules", has also been modified.

57. On February 1, 2018, fully one month into the third quarter of fiscal 2018, Aceto issued the February 1 Press Release, announcing the Company's financial and operating results for the second fiscal quarter ended December 31, 2017. The Company reported total assets of $1.014 billion with goodwill of $237 million and intangible assets of $270 million. Of the Company's results and balance sheet, Defendant Kennally stated:

> Our second fiscal quarter results reflect primarily the persistence of generic industry headwinds marked by greater competitive intensity and the impact from customer consolidations. Even as sales benefited from the addition of Citron and Lucid products, pricing pressures on our more mature Rising products and softer than expected contributions from new product launches caused a contraction in Human Health's gross margin. Notwithstanding these pricing pressures, a 35% increase in Human Health gross profit

> more than offset gross profit declines reported by our Pharmaceutical Ingredients and Performance Chemicals segments.
>
> As we look to the second half of fiscal 2018, our operating assumption is the generic industry headwinds will not ease in the near term and we now have greater clarity on the impact of harmonization from customer consolidations. Adverse market conditions are impacting the sales, profitability and market share of certain Rising products to a greater degree than anticipated and a number of API projects which were scheduled to be monetized in the second half of the year have been discontinued. As a result of these factors, although we remain on track to launch 15-20 generic products this year, we are reducing our outlook for fiscal year sales and profitability and now expect our overall results for the second half of the year to be only modestly better than the first half.
>
> Our healthy balance sheet and solid operating cash generation support our ability to weather the generic industry storm. At the same time, we continue to focus on optimizing Rising's commercialized portfolio of products and pipeline of projects to improve profitability in the future; we're advancing operational initiatives designed to enhance efficiencies; and, identifying ways to take costs out of the system. We continue to expect to have our new warehouse facility fully functional and our new ERP system implemented by the end of the year, at which point we will realize the full synergy value of $4 million on an annualized basis. With an integrated platform in place at Rising and a healthy flow of products to be launched, we firmly believe we are taking the right steps to ensure ACETO is properly positioned to improve the company's growth rate and profitability.

58. The foregoing statement regarding the health of the Company's balance sheet was false and misleading because Defendants knew or recklessly disregarded that as result of a decline of the Company's Rising Pharmaceuticals' actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or 7.8%, for a total impairment of over $256 million. As such,

Defendants knew or recklessly disregarded that the Company's total assets were $755 million and not $1.014 billion, as the Company reported. In addition, had Defendants timely and properly impaired goodwill and other intangible assets, instead of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million.

59. About the Company's guidance, the February 1 Press Release stated in relevant part:

> Fiscal 2018 Guidance
>
> For the fiscal year ended June 30, 2018, at current exchange rates, ACETO is providing financial guidance as follows:
>
> > Total revenues to increase approximately 10% to 15%;
> >
> > Reported diluted GAAP loss per share between $(0.22) and $(0.32);
> >
> > Diluted Non-GAAP earnings per share between $1.00 and $1.05.
>
> The Company's fiscal 2018 financial guidance is based upon the following assumptions:
>
> > Generic industry headwinds continued in our second fiscal quarter and we are expecting annual price erosion in the low double digits percentage;
> >
> > Reported diluted GAAP loss per share includes and additional tax expense of $0.39 related to the TCJA;
> >
> > R&D expense of approximately $9.0 million; and,
> >
> > Total generic product launches of 15 to 20.

60. The foregoing statements about Defendants' guidance were false and misleading because Defendants knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance because serious flaws and inadequacies coupled with the industry headwinds of which Defendants were aware disabled them from accurately forecasting financial results.

61. On February 2, 2018, Aceto held an earnings conference call ("February 2 Earnings Call") with investors and analysts to discuss the Company's financial and operating results for the second fiscal quarter ended December 31, 2017. During the February 2 Earnings Call, Defendant Kennally stated in relevant part:

> [W]e expect net sales growth of 10% to 15%, with Pharmaceutical Ingredients accounting for more than half of the revision; reported GAAP earnings per share to be in the range of a loss of $0.22 to $0.32; and diluted non-GAAP earnings per share to be between $1 and $1.05. Our results for the second half of fiscal 2018 are expected to be modestly better than the first half of the year.

62. The foregoing was false and misleading because Defendants knew that the FY 2018 guidance provided in the February 2 Earnings Call was materially false and misleading when made. Defendants knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance because serious flaws and inadequacies coupled with the industry headwinds of which Defendants were aware disabled them from accurately forecasting financial results.

**THE TRUTH EMERGES**

63. On April 18, 2018, after the market closed, Aceto issued the April 18 Press Release, in which it disclosed that CFO Borkowski had resigned to "pursue another opportunity," "the financial guidance issued on February 1, 2018 should no longer be relied upon," and that the Company had suspended the provision of "further financial guidance for at least the balance of the fiscal year." The April 18 Press Release stated in relevant part:

> PORT WASHINGTON, N.Y., April 18, 2018 (GLOBE NEWSWIRE) -- ACETO Corporation (Nasdaq: ACET), an international company engaged in the development, marketing, sale and distribution of Human Health products, Pharmaceutical Ingredients and Performance Chemicals, announced, in light of the persistent adverse conditions in the generics market, it is negotiating with its bank lenders a waiver of its credit agreement with respect to its total net leverage and debt service coverage financial covenants

in the fiscal third quarter, and that the financial guidance issued on February 1, 2018, should no longer be relied upon. In addition, the Company anticipates recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures.

Al Eilender, Chairman, said, "Given continued headwinds in the generics market, the Board has taken decisive action by bolstering the Company's senior leadership, engaging in proactive discussions with its secured lenders, and initiating a thorough evaluation of strategic alternatives. The Board looks forward to working with and supporting management throughout this process and appreciates the continued dedication of its employees and other stakeholders while it navigates this difficult industry environment."

ACETO's Board of Directors has taken several immediate and proactive steps to address these developments:

- The Company is having productive discussions with its secured lenders regarding implementation of a covenant waiver for the third fiscal quarter of 2018.

- To provide appropriate assurances to its lenders, to fortify the balance sheet and to preserve the Company's liquidity position, the Board anticipates a significant reduction of the Company's dividend going forward.

- The Board announced the appointment of Rebecca Roof as Interim CFO and the resignation of CFO Edward Borkowski, who has decided to pursue another opportunity. Ms. Roof is a highly experienced finance professional and a Managing Director at AlixPartners LLP. While at AlixPartners, Ms. Roof has served as Interim Chief Financial Officer of the Eastman Kodak Company, Atkins Nutritionals, Anchor Glass Corporation, Fleming Foods, and several privately held entities. Her pharmaceutical and specialty chemicals experience includes leadership roles at Taro Pharmaceuticals and LyondellBasell, also while at AlixPartners.

- The Board has named Director Alan Levin as Non-Executive Vice Chairman of the Board effective today. Alan Levin first joined the ACETO Board in December 2015 and became Lead Independent Director in July 2016. Prior to joining the ACETO Board, Mr. Levin held various financial positions

of increasing responsibility with Pfizer, Inc. including Chief Financial Officer (2005-2007), and was Chief Financial Officer at Endo Health Solutions from 2009-2013.

- The Board is directing that the Company suspend providing further financial guidance for at least the balance of the fiscal year.

- The Board has initiated a process to identify and evaluate a range of strategic alternatives. Strategic alternatives to be considered may include the sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives.

- The Company has retained PJT Partners as its financial advisor and Lowenstein Sandler LLP as its legal counsel to assist in this strategic review process.

ACETO cautions that there can be no assurance that the strategic review process will result in any transaction. The Company has not set a timetable for completion of the review of strategic alternatives, and it does not intend to make any further announcements related to its review unless and until the Board has approved a transaction or otherwise has determined that further disclosure is appropriate or required by law.

The Company is in the process of finalizing the actual amount of the impairment charges. The Company expects that the analysis supporting the impairment will be completed in time to allow for its recording in the third quarter of FY18.

64. On this news, shares of ACET fell $4.71 per share, or over 64%, to close at $2.64 per share on April 19, 2018, damaging investors.

65. At the same time, Aceto announced that its newly hired CFO, Edward Borkowski ("Borkowski"), had resigned after only two months on the job. Despite innocuous statement that Borkowski had "decided to pursue another opportunity," Borkowski resigned after just over two months as Aceto's CFO. Meanwhile, the Company did not revise or issue new guidance. Rather, Aceto failed to provide any further guidance whatsoever for FY 2018 – even though less than two months remained in the fiscal year – and failed to explain its suspending of guidance.

66. On May 3, 2018, Aceto issued a press release, reporting, among other things, fiscal 2018 third quarter results and informing the market that it had obtained a waiver of certain financial covenants. Defendant Kennally stated:

> We enter the final quarter of fiscal 2018 with $65.1 million of available cash and our Pharmaceutical Ingredients and Performance Chemicals segments remain stable cash-generating businesses. For the first nine months of fiscal 2018, we generated free cash flow of $50.0 million, $10.6 million in excess of the $39.4 million we used for debt repayments. Finally, we secured a waiver on our financial covenants for the third quarter and we are continuing to work collaboratively with our lenders on developing long-term solutions to strengthen our balance sheet.
>
> Our third quarter results reflect continued adverse conditions in the generics market partially offset by highly effective portfolio management in our Performance Chemicals segment and a rebound in sales in our Pharmaceutical Ingredients segment. In addition, while we have been proactively addressing supply chain challenges in the generics business for the past few quarters, we received notification of failure to supply penalties during the quarter totaling $10.1 million. We expect that by the end of the fiscal year we will have made significant progress toward resolving these previously identified supply chain challenges.
>
> Although we are facing a prolonged generics industry down cycle, we remain intensely focused on executing our game plans in all of the company's businesses. At Rising, we have launched 15 products since the beginning of fiscal 2018, with plans to meet our previously announced goal of launching 15 to 20 products this fiscal year, and we expect to spend approximately $9 million in R&D for fiscal 2018. Our operational initiatives are also proceeding on schedule: we expect to finish phasing in a new ERP system during the fourth quarter and our new warehouse facility to be fully functional before the end of the calendar year, at which point we will begin to realize $4 million in annualized savings resulting from the new facility. At the same time, we are continuing to pursue our longer-term goal of balancing our asset-light model with more ownership and enhancing the company's profitability.

67. On May 7, 2018, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2018, about goodwill and the Company's impairment of goodwill and intangible assets, the Company stated:

> GAAP defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly fashion between market participants at the measurement date. GAAP establishes a fair value hierarchy for those instruments measured at fair value that distinguishes between assumptions based on market data (observable inputs) and the Company's assumptions (unobservable inputs). The hierarchy consists of three levels:
>
> Level 1 – Quoted market prices in active markets for identical assets or liabilities;
>
> Level 2 – Inputs other than Level 1 inputs that are either directly or indirectly observable; and
>
> Level 3 – Unobservable inputs that are not corroborated by market data.
>
> On a recurring basis, Aceto measures at fair value certain financial assets and liabilities, which consist of cash equivalents, investments and foreign currency contracts. The Company classifies cash equivalents and investments within Level 1 if quoted prices are available in active markets. Level 1 assets include instruments valued based on quoted market prices in active markets which generally include corporate equity securities publicly traded on major exchanges. Time deposits are very short-term in nature and are accordingly valued at cost plus accrued interest, which approximates fair value, and are classified within Level 2 of the valuation hierarchy. The Company uses foreign currency futures contracts to minimize the risk caused by foreign currency fluctuation on its foreign currency receivables and payables by purchasing futures with one of its financial institutions. Futures are traded on regulated U.S. and international exchanges and represent commitments to purchase or sell a foreign currency at a future date and at a specific price. Aceto's foreign currency derivative contracts are classified within Level 2 as the fair value of these hedges is primarily based on observable futures foreign exchange rates. At March 31, 2018, the Company had foreign currency contracts outstanding that had a notional amount of $62,350. Unrealized (losses) gains on hedging activities for the three and nine months ended March 31, 2018 was ($34) and $227, respectively. Unrealized

gains (losses) on hedging activities for the three and nine months ended March 31, 2017 was $353 and ($230), respectively, and are included in interest and other income, net, in the consolidated statements of operations. The contracts have varying maturities of less than one year.

In conjunction with its existing credit agreement (see Note 6), the Company entered an interest rate swap on March 21, 2017 for an additional interest cost of 2.005% on a notional amount of $100,000, which has been designated as a cash flow hedge. The expiration date of this interest rate swap is December 21, 2021. The remaining notional balance of this derivative as of March 31, 2018 is $87,500. The unrealized gain to date associated with this derivative, which is recorded in accumulated other comprehensive income in the consolidated balance sheet at March 31, 2018, is $1,539. Aceto's interest rate swaps are classified within Level 2 as the fair value of this hedge is primarily based on observable interest rates.

At March 31, 2018, the Company had accrued $752 of contingent consideration, $663 of which related to the acquisition of certain products and related assets of Citron and Lucid, which was completed in December 2016 (see Note 2) and $89 of contingent consideration related to a previously acquired company in France. At June 30, 2017, the Company had accrued $2,952 of contingent consideration, $2,807 of which related to the acquisition of certain products and related assets of Citron and Lucid and $145 of contingent consideration related to a previously acquired company in France. The contingent consideration was calculated using the present value of a probability weighted income approach.

The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"). ASC 350 requires that goodwill and other intangibles with indefinite lives be tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of an asset has decreased below its carrying value. During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary (part of the Rising reporting unit which is part of the Human Health segment) in a product purchase agreement with an entity formerly known as Lucid Pharma LLC are not in compliance with the federal Trade Agreement Act country-of-origin provisions

of a clause contained in the government supply contracts acquired from Lucid. Based on these indicators, the Company determined that it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit.

Long-lived assets and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If it is determined such indicators are present and the review indicates that the assets will not be fully recoverable, based on undiscounted estimated cash flows over the remaining amortization periods, their carrying values are reduced to estimated fair value. Measurements based on undiscounted cash flows are Level 3 inputs. As noted above, during the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings and therefore the Company performed an impairment test on the related intangibles. The projected undiscounted cash flows for certain intangibles were determined to be less than the carrying value, and as a result, the Company recognized an impairment charge of $5,745 in the third quarter of fiscal 2018. Additionally, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary in a product purchase agreement with an entity formerly known as Lucid Pharma LLC are not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on this, the Company performed an impairment test on the related intangible asset and recognized an impairment charge of $15,411 on the customer relationships intangible asset in the third quarter of fiscal 2018.

> The total impairment charges for goodwill and intangibles recorded in the third quarter of fiscal 2018 was $256,266, all of which related to the Rising reporting unit which is part of the Human Health segment.

68. In the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2018, filed with the SEC on September 28, 2018 ("2018 10-K") the Company stated about the impairment of goodwill and long lived assets:

> *The material impairment charge that we recorded in fiscal 2018 was based on several adverse factors, certain of which could materially adversely impact the Company in subsequent fiscal quarters.*
>
> In the third quarter of fiscal 2018, we recorded impairment charges for goodwill and intangible assets of $256,266, all of which related to the Rising Pharmaceuticals reporting unit which is part of the Human Health segment. During the third quarter of fiscal 2018, our Rising Pharmaceuticals reporting unit had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, the U.S. government made a determination (which was subsequently reversed) that 11 generic drug products we acquired through our Acetris Health subsidiary (part of the Rising Pharmaceuticals reporting unit) in a product purchase agreement with Lucid were not in compliance with the country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. As a result of the foregoing, we conducted an impairment test and recognized a significant goodwill and intangible asset impairment charge.
>
> Many of the market and industry factors that led to the March 31, 2018 impairment charges could continue to impact us in future fiscal periods. Such factors could materially and adversely impact our business, financial condition, results of operations, liquidity and cash flows and could lead to additional impairment charges in the future.
>
> ***
>
> Goodwill and Other Indefinite-Lived Intangible Assets
>
> Goodwill is calculated as the excess of the cost of purchased businesses over the value of their underlying net assets. Other indefinite-lived intangible assets principally consist of trademarks.

Goodwill and other indefinite-lived intangible assets are not amortized.

The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"). ASC 350 requires that goodwill and other intangibles with indefinite lives be tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of an asset has decreased below its carrying value. During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary (part of the Rising reporting unit which is part of the Human Health segment) in a product purchase agreement with an entity formerly known as Lucid Pharma LLC were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on these indicators, the Company determined that it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit.

Long-Lived Assets

Long-lived assets and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If it is determined such indicators are present and the review indicates that the assets will not be fully recoverable,

> based on undiscounted estimated cash flows over the remaining amortization periods, their carrying values are reduced to estimated fair value. Measurements based on undiscounted cash flows are Level 3 inputs. As noted above, during the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings and therefore the Company performed an impairment test on the related intangibles. The projected undiscounted cash flows for certain intangibles were determined to be less than the carrying value, and as a result, the Company recognized an impairment charge of $5,745 in the third quarter of fiscal 2018. Additionally, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary in a product purchase agreement with an entity formerly known as Lucid Pharma LLC were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on this, the Company performed an impairment test on the related intangible asset and recognized an impairment charge of $15,411 on the customer relationships intangible asset in the third quarter of fiscal 2018.

69. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES AND REGULATIONS

### *GAAP and SEC Rules and Regulations - Generally*

70. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

71. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). A Statement of Financial Accounting Standards ("SFAS") is a formal document issued

by the FASB which details accounting standards and guidance of the FASB's accounting policies. A SFAS is issued with the expectation that companies listed on a stock exchange in the United States will adhere to it.

72. SEC rules and regulations require that publicly traded companies such as Aceto include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X.

73. The Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental accounting principles:

a. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

b. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

c. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibility for

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

d. The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

e. The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

f. The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶79); and

g. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶95, 97).

74. Aceto's financial statements failed to comply with GAAP for its failure properly and time to impair for goodwill and other intangible assets.

***Aceto Violated SEC Regulations and GAAP by Failing to Impair Goodwill***

75. During the entire Class Period, Defendants violated GAAP by knowingly or recklessly failing to impair goodwill.

76. ASC 350-20 addresses GAAP as it applies to financial accounting and reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets in a business combination. ASC 350-20-20.

77. Goodwill is tested for impairment at the reporting unit level. ASC 350-20-20.Aceto recorded $169 million in goodwill attributable to the Lucid and Citron acquisitions in its Rising reporting unit, according to the 2017 10-K.

78. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of goodwill exceeds its implied fair value." ASC 350-20-35-2.

79. Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28. It was Aceto's policy to perform this evaluation during the fourth quarter of each fiscal year.

80. "[G]oodwill of a reporting unit," however, "shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-3. The "totality" of events and circumstances, including a non-exclusive list of factors included in GAAP, must be evaluated. ASC 350-20-35-3C, 3E.

81. In the 2017 10-K, Aceto stated that it assesses whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount.

82. Aceto violated GAAP by knowingly or recklessly failing to consider obvious triggering events it admits existed, by failing to conclude that an interim goodwill impairment analysis was required, and by knowingly or recklessly failing to impair goodwill.

83. By no later than February 1, 22018, Defendants knew or recklessly disregarded he acquisition of Lucid and Citron, or were reckless in not knowing of the persistent adverse conditions in the generics market and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions.

84. The test for goodwill impairment is a two-step process. In the first step, the fair value of a reporting unit is compared to its carrying amount, also known as the net book value, including goodwill. ASC 350-20-35-4. If the carrying amount, recorded on the books, exceeds the fair value of the reporting unit, then goodwill is considered impaired and the second step of the impairment test is performed. If the fair value of a reporting unit exceeds its carrying amount, goodwill is not impaired and the second step of the impairment test is unnecessary. ASC 350-20-35-6 and 8.

85. In its annual report for the fiscal year ending June 30, 2017, Aceto wrote that it performed the first step in the test, found no impairment, and did not move on to the second step, stating that "In fiscal 2017, the Company performed step one of the two-step process and in fiscal 2016 the Company performed a qualitative assessment. There was no impairment of goodwill and other intangible assets in fiscal 2017 and fiscal 2016."

86. Defendants violated GAAP by knowingly or recklessly failing to conclude that the carrying amount of the reporting unit exceeded its fair value, by failing to proceed to the second step of the impairment test, and by knowingly or recklessly failing to impair goodwill.

87. In the 2017 10-K, Aceto states, among other things, that it determined the fair value of a reporting unit based on "industry accepted valuation models." This analysis, however, ignored the persistent adverse market conditions discussed above, as well as the notification from the Veterans Administration that eleven supply contracts were at risk of termination.

88. The second step of the two-step process, which Aceto never conducted prior to the third quarter of 2018, is to determine the amount of impairment. Aceto should have subtracted the "implied value of goodwill" (which is the previously calculated fair value of the reporting unit minus the assigned value of tangible and intangible assets other than goodwill and liabilities) from the carrying amount of goodwill. The difference is the amount of goodwill impairment. ASC 350-20-35-9, 10, 16. As described in detail above, the persistent adverse market conditions and country-of-origin issues in the Lucid VA contracts caused the fair value of Aceto's goodwill to be significantly lower than the goodwill recorded in Aceto's books, and Aceto was required to impair goodwill.

89. Defendants violated GAAP by knowingly or recklessly failing to perform the second step of the goodwill impairment test, failing completely to consider the adverse conditions discussed above in its goodwill evaluation process, and by knowingly or recklessly failing to impair goodwill.

***Aceto Violated SEC Regulations and GAAP by Failing to Impair Intangible Assets***

90. During the Class Period, Defendants knowingly or recklessly violated GAAP by failing to impair its intangible assets.

91. For the quarter ended December 31, 2017, Aceto recorded $270 million in "intangible assets" attributable to the acquisition of Lucid and Citron.

92. With respect to intangible assets, as with goodwill, GAAP requires an annual test for impairment, and interim tests if it is "more likely than not" that the asset is impaired. ASC 350-30-35-18.

93. GAAP provides a non-exclusive list of qualitative factors for use in deciding whether to undertake an interim assessment. ASC 350-30-35-18B. As with goodwill, several of these factors apply to Aceto, including "the negative effect of future expected earnings and cash flow," "contractual… business or other factors," and "changes in… customers." ASC 350-30-35-18B.

94. Defendants violated GAAP by failing to conduct an interim impairment analysis prior to the third quarter of 2018, and proceed to a full impairment analysis. Defendants knew, or were reckless in not knowing, events or changes in circumstances indicated that the carrying amount of those Lucid and Citron assets may not be recoverable.

95. Had Defendants conducted such a review, it would have indicated that the assets would not be fully recoverable, as the Company determined when it belatedly conducted an impairment assessment during the third quarter of the 2018 fiscal year. At least as early as the fourth quarter of 2017, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings, requiring the Company performed an impairment test on the related intangibles. When the Company finally conducted an impairment assessment during the third quarter of 2018, the Company recognized an impairment charge of $5.745 million based on the decline in revenue and earnings.

96. With respect to "customer relationships," Aceto similarly violated GAAP by failing to conduct an impairment analysis, and failing to impair the asset.

97. As with goodwill, an impairment analysis for customer relationships must be conducted if there is a triggering event. GAAP provides a non-exclusive list of the types of issues considered triggering events. ASC 360-10-35-21. Here, the Company's knowledge of the country-of-origin issues in the Lucid VA supply contracts, were triggering events requiring an impairment analysis.

98. Had Defendants conducted such a review, it would have indicated that the assets would not be fully recoverable, as the Company determined when it belatedly conducted an impairment assessment during the third quarter of the 2018 fiscal year. At least as early as the fourth quarter of 2017, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings, requiring the Company performed an impairment test on the related intangibles. When the Company finally conducted an impairment assessment during the third quarter of 2018, the Company recognized an impairment charge of $15.411 million on the customer relationships intangible asset, based on the Company's noncompliance with the TAA country-of-origin requirements in the Lucid VA supply contracts.

99. Defendants violated GAAP and filed false and misleading financial statements by failing, knowingly or recklessly, to impair the intangible asset of "customer relationships."

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

100. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired Aceto securities publicly traded on the NASDAQ during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the

Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

101. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aceto securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Aceto shares were traded publicly during the Class Period on the NASDAQ. As of January 22, 2019, Aceto had approximately 30,766,000 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Aceto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

103. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

104. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to make false and misleading statements in the Company's press releases and other public statements issued during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

105. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

106. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g) Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h) unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

107. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

108. The market for Aceto securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose, Aceto securities traded at artificially inflated prices during the Class Period. On February 1, 2018, the Company's stock price closed at a Class Period adjusted high of $10.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Aceto securities and market information relating to the Company, and have been damaged thereby.

109. During the Class Period, the artificial inflation of Aceto stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Aceto's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Aceto and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

110. At all relevant times, the market for Aceto securities was an efficient market for the following reasons, among others:

(a) Aceto stock met the requirements for listing, and was listed and actively traded on the NASDAQ;

(b) As a regulated issuer, Aceto filed periodic public reports with the SEC; the Company regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(c) Aceto was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

111. As a result of the foregoing, the market for Aceto securities promptly digested current information regarding Aceto from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Aceto securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

112. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

113. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aceto who knew that the statement was false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

114. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

116. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aceto securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Aceto securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

117. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aceto securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

118. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

119. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

120. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity or of the misleading nature of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

121. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

122. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

123. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

124. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's current financial position and future business prospects.

126. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

127. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

128. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

129. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: January 28, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg (admitted *pro hac vice*)
Keith Lorenze (KL 0216)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: klorenze@rosenlegal.com

and

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2019, I electronically filed the foregoing ***Consolidated Amended Class Action Complaint*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg