UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>**NOT FOR PUBLICATION**</u>

---

In re Aceto Corporation Securities Litigation

---

This Document Relates to: ALL ACTIONS

---

<u>**MEMORANDUM & ORDER**</u>

Master File No. 2:18-cv-2425-ERK-AYS

KORMAN, *J.*:

Plaintiff Michael Bonine brings this securities class action against Aceto Corporation and individual defendants Salvatore Guccione, William C. Kennally, and Douglas Roth, following a 64% decline in Aceto's stock price on April 19, 2018. The individual defendants move to dismiss.

## BACKGROUND

Aceto Corporation is an international pharmaceutical company incorporated and headquartered in New York. Am. Compl. ¶¶ 10, 19. Its business consists of three product lines: "Human Health, Pharmaceutical Ingredients, and Performance Chemicals." *Id.* The Human Health segment includes Aceto's generic pharmaceuticals business, which accounted for 49.4% of Aceto's total revenue in 2016-17. *Id.* ¶ 20; Chiueh Decl., Ex. A, ECF No. 46-1, at 33. Key to Aceto's generic pharmaceuticals business was its 2016 acquisition of Citron Pharma, LLC and its affiliate Lucid Pharma, LLC. Am. Compl. ¶ 20. With its acquisition of Lucid, Aceto acquired eighteen five-year contracts with the federal government to provide generic pharmaceuticals—a major revenue source. *Id.*

In June 2017, "the federal government advised [Lucid] that it was reviewing whether [Lucid's] products complied with the [contracts'] country-of-origin provisions, and threatened to terminate those contracts for noncompliance." *Id.* ¶ 31. Aceto disclosed this fact in its 2017 10-K, noting that "[i]f the products are found to not have complied with the country-of-origin clauses,

1

then the government could exercise remedies, including termination of one or more of the subject contracts or other statutory damages." *Id.*; *see* 2017 Form 10-K, Aceto Corp., http://investor.aceto.com/static-files/b94c8e39-f3d7-461e-9523-3cb401cca883 (filed Aug. 25, 2017). This development affected eleven contracts Lucid had with the Veterans Administration, which alone comprised approximately 10% of Aceto's revenue. *Id.* ¶ 32.

Aside from the potential loss of its government contracts, Aceto was struggling more generally. On November 2, 2017, Aceto issued a press release with its results for the first quarter of 2018, noting "greater than previously expected headwinds" and "a prolonged generics industry downturn." Am. Compl. ¶ 22. In an earnings call the next day, Aceto confirmed it faced "adverse market conditions" in its generics business, and CEO William C. Kennally noted that "this particular turn has . . . been especially painful but not inconsistent with what we're seeing in the market." *Id.* ¶ 23.

On November 9, 2017, Aceto filed an amendment to its 2017 Form 10-K, which was originally filed on August 25. *Id.* ¶¶ 48, 56. The amendment disclosed that Aceto had misapplied cash in 2015 due to "a material weakness in the design and effectiveness of our internal control over financial reporting, in that our system of internal control did not generate a report that could be used by management to assure that precision in the review of the aging of trade receivables was adequate" and "[a]s a result of this material weakness, a reasonable possibility existed that a material misstatement in trade receivables in our annual or interim financial statements could occur and not be prevented or detected on a timely basis." *Id.* ¶ 49. The initial August 25, 2017 10-K filing had contained disclosures that Aceto was required by law to maintain effective internal controls, *id.* ¶ 48, and certified that adequate controls were in place, *id.* ¶ 52. There is no indication, however, that Aceto had discovered the "material weakness" in its controls at the time of its initial

filing in August. Defendants Salvatore Guccione and Douglas Roth certified the 2017 10-K and signed the accompanying Sarbanes-Oxley (SOX) certification. *Id.* ¶¶ 11, 13.

Throughout the class period, which spans from August 25, 2017 to April 18, 2018, Aceto continuously cautioned that "generic industry headwinds" would persist. *See id.* ¶¶ 24-25, 27, 28. And Aceto's financial performance often failed to meet its forecasted guidance. *See id.* ¶¶ 33-40. It also lowered its 2018 guidance on several occasions. For example, Aceto projected on August 24, 2017 that total revenues would increase "approximately 20% to 25%" based on "[g]eneric products annual price erosion," among other factors. *Id.* ¶ 38. But on November 2, 2017, Aceto lowered that estimate to 15% to 20%. *Id.* ¶ 39. And on February 1, 2018, Aceto again revised that estimate downward to 10 to 15%. *Id.* ¶ 40.

On February 1, 2018, in addition to lowering its projected revenue, Aceto's announced its "financial and operating results for the second fiscal quarter end[ing] December 31, 2017." *Id.* ¶ 57. Kennally noted that the results "reflect primarily the persistence of generic industry headwinds marked by greater competitive intensity and the impact from customer consolidations" and that "our operating assumption is the generic industry headwinds will not ease in the near term," leading Aceto to "reduc[e] our outlook for fiscal year sales and profitability." *Id.* At the same time, Kennally reported a "healthy balance sheet" and informed investors that "we firmly believe we are taking the right steps to ensure [Aceto] is properly positioned to improve the company's growth rate and profitability." *Id.* During Aceto's February 2, 2018 earnings call, Kennally reported the 10% to 15% growth projection and predicted "results for the second half of fiscal year 2018 are expected to be modestly better than the first half of the year." *Id.* ¶ 61.

Aceto's outlook took a turn for the worse on April 18, 2018, when it issued a press release announcing that "the financial guidance issued on February 1, 2018 should no longer be relied

upon" and suspended "further financial guidance for at least the balance of the fiscal year." *Id.* ¶ 63. Aceto cited "persistent adverse conditions in the generics market," which caused it to "negotiat[e] with its bank lenders a waiver of its credit agreement with respect to its total net leverage and debt service coverage financial covenants in the fiscal third quarter." *Id.* It also announced the resignation of its CFO, Edward Borkowski, who had only been hired two months prior. *Id.* ¶¶ 63, 65. "On this news, [Aceto] shares . . . fell $4.71 per share, or over 64%, to close at $2.64 per share on April 19, 2018 . . . ." *Id.* ¶ 64.

On May 3, 2018, Aceto issued another press release "informing the market that it had obtained a waiver of certain financial covenants." *Id.* ¶ 66. And on May 7, 2018, Aceto filed its Form 10-Q with the SEC, disclosing that it was notified by the federal government that eleven of its eighteen contracts were not in compliance with the country-of-origin provisions, making it "necessary to perform an interim goodwill impairment analysis." *Id.* ¶ 67.[1] In total, Aceto recorded impairment charges for goodwill and intangibles in excess of $256 million for the third quarter of 2018. *Id.* Aceto's 2018 Form 10-K filed on September 28, 2018 noted that "[t]he material impairment charge that we recorded in fiscal 2018 was based on several adverse factors, certain of which could materially adversely impact the Company in subsequent fiscal quarters." *Id.* ¶ 68. Shortly thereafter, Aceto declared bankruptcy.[2]

---

[1] The United States Court of Federal Claims would later invalidate the government's interpretation of the contracts that led to their termination. *See* Chiueh Aff., Ex. O, ECF No. 46-15, at 3; *Acetris Health, LLC v. United States*, 138 Fed. Cl. 579 (2018).

[2] For this reason, the claim against Aceto Corporation has been stayed. *See* ECF No. 41. "Because plaintiff[] ha[s] also sued the individual defendants in their capacity as controlling persons of [Aceto]," and no party has requested that the stay be extended to individual defendants, I "will address the pending motion to dismiss as against the individual defendants." *See In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 746 n.1 (D. Conn. 1994); *see also In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *1 (S.D.N.Y. May 10, 2012).

Drawing on these events, plaintiff Michael Bonine, a holder of Aceto securities, *id.* ¶ 9, alleges that Aceto and individual defendants Salvatore Guccione (CEO from January 2014 to September 2017), William C. Kennally (CEO from October 2, 2017 to present), and Douglas Roth (CFO from March 2010 to March 2018), are liable for securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act. *Id.* ¶¶ 11-13, 114-29. Specifically, plaintiff relies on alleged material misrepresentations regarding (1) Aceto's internal controls, as described in Aceto's 2017 Form 10-K; (2) Aceto's earnings forecast contained in the February 1, 2018 press release; and (3) Aceto's valuation of goodwill and intangible assets contained in the February 1, 2018 press release.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), I must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

"A complaint alleging securities fraud under § 10(b) of the Exchange Act must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the 'PSLRA')." *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). Rule 9(b) requires a party to state "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA provides "the

complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). While Rule 9(b) allows a party to plead state of mind with generality, the PSLRA raises the bar: "[T]he complaint shall, with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

## DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). In turn, SEC Rule 10b-5 enforces § 10(b) by making it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. "Section 20(a) of the Act establishes joint and several liability subject to a good faith exception for every person who, directly or indirectly, controls any person liable under any provision of the Act." *Slayton v. Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010). An action under Rule 10b-5 requires proving six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Here, the first two elements are at issue.[3]

---

[3] While the motion to dismiss also argues that plaintiff failed to adequately plead the element of reliance, *see* Opening Br., ECF No. 45, at 19-21. I need not reach that issue because the elements of falsity and scienter are not met.

# I.  Plaintiff Fails to Plead Any Actionable Misstatement or Omission

A securities fraud plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). "A statement believed to be true when made, but later shown to be false, is insufficient. In such a circumstance, there is a lack of actionable falsity. Put another way, without *contemporaneous* falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812-13 (2d Cir. 1996)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *see also In re Omega Healthcare Inv'rs, Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 506 (S.D.N.Y. 2019). Here, plaintiff attempts to allege falsity with respect to Aceto's August 25, 2017 10-K disclosures regarding its internal controls and its February 1, 2018 press release containing financial projections and an accounting of Aceto's goodwill and intangible assets.

## A.  *August 2017 Statements*

Plaintiff fails to allege falsity with respect to Aceto's August 25, 2017 10-K and accompanying Sarbanes-Oxley certification. According to plaintiff, Aceto's disclosure that (1) it was required by law to have and maintain adequate internal controls, (2) Aceto had those controls in place, and (3) its controls were adequate, evaluated, and properly maintained was materially false because Aceto disclosed later in 2017 that it had identified a "material problem" with its internal controls. In November 2017—months after its initial 10-K filing—Aceto filed an amendment to its 10-K explaining that a "material problem" had caused it to misappropriate cash in 2015. But there is no non-conclusory allegation that Aceto knew of this problem at the time it filed its initial 10-K in August. Rather, the amended complaint assumes that because a problem was disclosed in November, defendants must have known of the problem in August, making the representations false. But this is a classic example of "fraud by hindsight" insufficient to support

a 10(b) claim. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."). Accordingly, plaintiff fails to plead falsity with respect to the August 2017 statements.

It is also worth noting that the problem with Aceto's internal controls affected less than one percent of its 2015 sales figures. *See* Am Compl. ¶ 54; Chiueh Aff., Ex. P, ECF No. 46-16, at 22. While it is not necessary to reach the question of materiality because plaintiff has failed to plead falsity, errors affecting less than five percent of earnings are presumed to be immaterial. *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 554 F.3d 187, 204 (2d Cir. 2009). In any event, Aceto's November 2017 disclosure of the issue with its internal controls predates by nearly five months plaintiff's alleged "revealing of the truth" in April 2018 that caused a severe decline in Aceto's stock price.

### B.     February 2018 Statements

According to plaintiff, Aceto's February 1 press release was materially false and misleading in two respects: first, there was no basis for Aceto's optimistic guidance, and second, the estimated value of Aceto's goodwill and intangible assets was unduly high.

#### 1.     Financial Guidance

Aceto's financial guidance falls within the PSLRA's safe harbor. Under the PSLRA's safe harbor provision, a defendant is not liable for a forward-looking statement if it "is identified and accompanied by meaningful cautionary language." *Slayton*, 604 F.3d at 766. A forward-looking statement includes "a statement containing a projection of revenues, income (including income

loss), earnings (including earnings loss) per share, . . . or other financial items," 15 U.S.C. § 78u-5(i)(1)(A), and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management," *id.* § 78u-5(i)(1)(C). Here, plaintiff challenges Aceto's "forecasted earnings" contained in the February 1, 2018 press release. Such guidance is a forward-looking statement under the PSLRA. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016).

The press release also contained the following cautionary language:

> This news release contains forward-looking statements as that term is defined in the federal securities laws. . . . Generally, these statements relate to our business plans or strategies, financing plans, projected or anticipated benefits or other consequences of ACETO's plans or strategies, financing plans, projected or anticipated benefits from acquisitions that ACETO may make including the recently announced acquisition of products from Citron Pharma, LLC, or a projection involving anticipated revenues, earnings or other aspects of ACETO's operating results or financial position, and the outcome of any contingencies. Any such forward-looking statements are based on current expectations, estimates and projections of management. . . . Factors that could cause actual results to differ materially from those set forth or implied by any forward-looking statement include, but are not limited to, risks and uncertainties discussed in ACETO's reports filed with the [SEC] . . . and other filings.

Chiueh Aff., Ex. H, ECF No. 46-8, at 5. In turn, Aceto's Amended 2017 Form 10-K enumerates specific risk factors, including the following examples:

- "We may experience declines in sales volumes or prices of certain of our products as the result of the concentration of sales to wholesalers and the continuing trends towards consolidation of such wholesalers . . . ." Chiueh Aff., Ex. D, ECF No. 46-4, at 10.
- "If brand pharmaceutical companies are successful in limiting the use of generics through their legislative and regulatory efforts, our sales of generic products may suffer." *Id.* at 11.
- "A proposed FDA rule allowing generic companies to distribute revised labels that differ from the corresponding reference listed drug . . . could have an adverse effect on our operations because of a potential increase in litigation exposure." *Id.*
- "The distribution and sale of some of our products are subject to prior governmental approvals and thereafter ongoing governmental regulation." *Id.* at 16.

- "We have significant goodwill and other intangible assets. Consequently, potential impairment of goodwill and other intangibles may significantly impact our profitability." *Id.* at 21.
- "We source many of our products in China and changes in the political and economic policies of China's government could have a significant impact upon . . . operating results and cash flows." *Id.* at 17.
- "Making interest and principal payments on our Convertible Senior Notes due 2020 . . . , which were issued in November 2015, requires and will continue to require a significant amount of cash, and we may not have sufficient cash flows from our business to make future interest and principal payments." *Id.* at 19.
- "Failure to maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act could have material adverse effect on our business and stock price. . . . For example, in connection with the revisions made in this form 10-K/A, management re-evaluated the effectiveness of our internal control . . . and concluded that adjustments related to the misapplication of cash in the year ended June 30, 2015 demonstrated that there was a material weakness in the design and effectiveness of our internal control over financial reporting . . . ." *Id.* at 24.

The press release also disclosed:

> As we look to the second half of fiscal 2018, our operating assumption is the generic industry headwinds will not ease in the near term . . . . Adverse market conditions are impacting the sales, profitability and market share of certain Rising products [("Rising" includes the Lucid government contracts)] to a greater degree than anticipated . . . . As a result of these factors, . . . we are reducing our outlook for fiscal year sales and profitability . . . .

Chiueh Aff., Ex. H, ECF No. 46-8, at 1.

This cautionary language—"which need not include the particular factor that ultimately causes [the] projection not to come true"—goes beyond "mere boilerplate" by identifying "important factors that could realistically cause results to differ materially." *See Slayton*, 604 F.3d at 772-73 (warning that "potential deterioration in the high-yield sector . . . could result in further losses in [company's] portfolio" was too vague). The press release also permissibly incorporates by reference the specific risks identified in the Form 10-K. *See In re Aetna, Inc.*, 617 F.3d 272, 282 (3d Cir. 2010) ("Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements."

(internal quotation marks omitted)); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 193 (D. Conn. 2014) (similar); *Kuriaskose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 179 (S.D.N.Y. 2012) (similar). Because the forecasted earnings contained in the February 1, 2018 press release are forward-looking and accompanied by meaningful cautionary language, they are protected by the safe harbor.

Plaintiff attempts to circumvent the safe harbor by characterizing Aceto's projections as mixed statements containing present and historical fact. Specifically, plaintiff alleges that Aceto failed to disclose that it lacked the foresight needed to make a valid projection due to uncertain market conditions and the "likely termination" of Lucid's government contracts. Yet it is implicit in any projection is that the issuer has *some* ability to prognosticate. Thus, courts have rejected the notion that a future projection later proven inaccurate becomes a material misstatement of present fact based on "an assertion [that] is necessarily implicit in every future projection." *See Gissin v. Endres*, 739 F. Supp. 2d 488, 505-06 (S.D.N.Y. 2010) (quoting *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)). That is precisely what plaintiff attempts to do here. He argues that by offering guidance, defendants "implicitly assured investors that [they] had sufficient visibility to forecast the Company's year-end results." Opp. Br., ECF No. 50, at 12. Such an "implied" present fact is logically indistinct from the forward-looking projection. *See Gissin*, 739 F. Supp. 2d at 505-06. And even assuming a statement of present fact, plaintiff's reasoning is entirely circular: because the forecast did not materialize, there must have been a problem with the forecasting mechanism.

Untangling plaintiff's argument reveals just another attempt to plead fraud by hindsight. Aceto disclosed to investors that it faced both persistent industry headwinds and possible termination of its government contracts. In response, plaintiff argues that Aceto's guidance should

have assumed a crippling industry downturn and termination of its government contracts. But the law did not require Aceto to assume the worst. *See Rombach v.* Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future . . . ." (quoting *Shields v. Citytrust Bancorp., Inc.*, 23 F.3d 1124, 1129-30 (2d Cir. 1994))). And there is no evidence that defendants knew, as of February 1, 2018, that the government contracts would in fact be terminated or that Aceto knew of a flaw in its forecasting mechanism.

Plaintiff is left to rely on the "temporal proximity" between the February 1 guidance and the April 18 press release disclaiming that guidance to prove falsity. Some courts have suggested that temporal proximity may "provide[] some circumstantial evidence of . . . falsity." *See Elliott Assoc., L.P. v. Covance, Inc.*, 2000 WL 1752848, at *7 n.10 (S.D.N.Y. Nov. 28, 2000); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (pre-PSLRA). But the subsequent disclosure of contrary information—even within a matter of weeks—does not necessarily render a prior statement false. *See San Leandro*, 75 F.3d at 812; *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998) ("The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made.") Without more, plaintiff has failed to allege falsity with respect to the February 1, 2018 guidance.

### 2. Goodwill and Intangible Assets Impairment

Plaintiff's argument with respect to Aceto's goodwill and intangible assets valuation fares no better. "Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). As such, "a plaintiff must 'plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them' to plead

a material misstatement or omission." *City of Omaha v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012); *see also Fait*, 655 F.3d at 112 ("Requiring plaintiffs to allege a speaker's disbelief in, and the falsity of, the opinions or beliefs expressed ensures that their allegations concern the factual components of those statements."). Because the calculation of a goodwill impairment is a statement of opinion, not of fact, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015). In other words, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1327). But "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.*

Here, plaintiff's contention that Aceto should have impaired its goodwill and intangible assets valuation earlier than it did amounts to mere disagreement with Aceto's accounting judgment. To recap, Aceto reported an impairment of $256 million for the third quarter of 2018, which plaintiff claims should have been assessed by the time of its February 1, 2018 press release.[4]

---

[4] The amended complaint also alleges that "Aceto violated GAAP by . . . failing to conclude that an interim goodwill impairment analysis was required." Am. Compl. ¶ 82. Plaintiff's brief explains, however, that "[t]he Complaint does not simply pick an arbitrary date on which Defendants should have conducted impairment testing," but rather "disputes the basis for the Company's statements regarding goodwill," citing paragraphs 57 and 58 of the amended complaint, which pertain to the February 1, 2018 press release. Opp. Br. 16 n.6. Thus, it appears that plaintiff disputes only the propriety of the impairment figures published on February 1, 2018 and does not allege that Aceto should have performed an interim impairment test. In any event, any claim based on the failure to conduct impairment testing would fail here for the reasons described in *City of Omaha v. CBS Corp.*, 679 F.3d 64, 68-69 (2d Cir. 2012).

Am. Compl. ¶ 67. Courts have routinely rejected this type of allegation as a basis for securities fraud. *See, e.g.*, *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymoth Cty. Retirement Assoc. v. MDC Partners, Inc.*, 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) ("Plaintiffs' assertion that MDC failed to record a 'necessary' $48.0 million goodwill impairment for Zyman Group after Zyman Group's revenues declined or fell below targets and Sergio Zyman and one of the firm's significant clients departed alleges nothing more than disagreement with MDC's accounting judgments, which cannot support a fraud claim." (citations omitted)); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("The allegations regarding CIBC's write-downs amount to fundamental disagreements with Defendants' business judgments in a tumultuous economic downturn—claims that are not actionable under Section 10(b) and Rule 10b-5.").

At bottom, plaintiff contends that Aceto should have disclosed its "lack of visibility concerning the assets to which that goodwill attached." Opp. Br. 15. But Aceto *did* disclose that it risked losing its government contracts. And the fact that the federal government indicated that Aceto's contracts *might* be terminated did not require Aceto to assume the worst and impair its goodwill before learning the government's final position on compliance. *Cf. Tongue*, 816 F.3d at 211 (explaining that an "ongoing" dialogue with the government over drug approval "did not prevent Defendants from expressing optimism, even exceptional optimism, about the likelihood of drug approval"). In the end, Aceto's "statement of opinion is not misleading just because external facts [later] show[ed] the opinion to be incorrect." *Omnicare*, 135 S. Ct. at 1328. And in reality, Aceto did not turn out to be wrong—the United States Court of Federal Claims later rejected the government's theory of contractual interpretation upon which it invalidated Lucid's contracts. *See supra* note 1.

## II.     Plaintiff Fails to Plead a Strong Inference of Scienter

The PSLRA requires plaintiffs to state scienter with particularity, "*i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). In *Tellabs*, the Supreme Court set forth the framework for establishing scienter at the pleading stage in a § 10(b) action. "*First*, . . . courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id.* at 322. "*Second*, courts must consider the complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322-23. "*Third*, . . . the court must take into account plausible opposing inferences. . . . A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323-24. A plaintiff can establish scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

The allegations must establish scienter on a defendant-by-defendant basis. *See, e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). As explained above, defendant Salvatore Guccione was Aceto's CEO from January 2014 through September 27, 2017. The only misrepresentations attributed to Guccione relate to his certification of the 2017 10-K and signing of the accompanying Sarbanes-Oxley (SOX) Certification. Am. Compl. ¶ 11. Defendant Douglas Roth was Aceto's CFO from March 2010 to March 2018. Like Guccione, the only misrepresentations directly attributed to Roth arise out of his certification of the 2017 10-K and signing of the SOX certification. *Id.* ¶ 13. Defendant William C. Kennally became CEO on October

2, 2017. *Id.* ¶ 12. The alleged misrepresentations in Aceto's February 1, 2018 press release and the February 2, 2018 earnings call are attributed to Kennally. *Id.* ¶¶ 57, 61.

At the outset, with respect to the August 2017 10-K, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak*, 216 F.3d at 309. And a "plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l, N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases); *N. Collier Fire Control*, 2016 WL 5794774, at *22 ("Similarly insufficient are Plaintiffs' bare allegations that certain defendants signed SEC filings."). Accordingly, plaintiff fails to adequately allege scienter with respect to defendants Guccione and Roth, who are merely alleged to have signed the 2017 10-K and SOX certification, without factual allegations to show they were aware of or reckless to any alleged misstatements contained therein.

With respect to the February 1, 2018 statements, plaintiff does not purport to allege that Kennally (or Roth—Guccione had departed by this time) had the motive and opportunity to commit fraud, which requires showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged" and "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 307, 311 (quoting *Shields*, 25 F.3d at 1130). For example, "[t]he Amended Complaint does not allege that any Defendant sold [Aceto] stock at an inflated price during the Class Period, received performance-based incentives, or otherwise had a specific motive to commit fraud." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *29 (S.D.N.Y. Oct. 10, 2018). Rather, the allegations of defendants' fraudulent intent are entirely conclusory. *See, e.g.*, Am. Compl. ¶ 119 ("Individual Defendants, who are the senior

officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and other members of the Class.").

Instead, plaintiff relies on circumstantial evidence of recklessness. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc)). To survive dismissal, plaintiff must allege conduct "which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Honeyman v. Hoyt (In re Cater-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000)). To that end, plaintiff relies upon (1) the temporal proximity between the February 1, 2018 guidance and the April 18, 2018 announcement disavowing that guidance; (2) the resignation of non-party CFO Edward Borkowski on April 18, 2018; (3) the relative size of Aceto's goodwill and intangible assets impairment; and (4) the core operations theory.

First, "temporal proximity alone does *not* raise a circumstantial inference of fraud." *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) (quoting *Fant v. Perelman*, 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 1999)); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017). In similar circumstances, the Second Circuit has rejected the argument that a two-month gap between the issuance of guidance and a contrary disclosure necessarily indicates recklessness. *See Shields*, 25

F.3d at 1129 ("This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud."). Without more, Aceto's disavowal of its February 1, 2018 guidance relatively shortly after its issuance does not support an inference of recklessness.

Second, plaintiff's reliance on the resignation of Edward Borkowski is unpersuasive. Significantly, Borkowski did not join Aceto until *after* the alleged February 1, 2018 misstatements were made. Am. Compl. ¶ 44. Plaintiff maintains that Aceto's announcement of Borkowski's resignation on April 18, 2018, just two months after he started and the same day the alleged "truth" was revealed was "highly unusual and suspicious." Opp. Br. 21. "But the complaint includes no allegations that the executive[] resigned because the company was behaving fraudulently." *Gregory v. ProNAi Therapeutics, Inc.*, 757 F. App'x 35, 38 n.4 (2d Cir. 2018). And "there are any number of reasons that an executive might resign, most of which are not related to fraud." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 & n.85 (S.D.N.Y. 2005) (collecting cases). Indeed, the press release indicates that Borkowski left "to pursue another opportunity." Am. Compl. ¶ 63. Because Borkowski is not alleged to have been involved in the fraud and plaintiff "make[s] no attempt to challenge the[] non-fraud related explanation" for Borkowski's resignation, this allegation "do[es] not support an inference of conscious misbehavior or recklessness." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 447.

Third, plaintiff relies on the size of the impairment of Aceto's goodwill and intangible assets to establish a strong inference of scienter. Here, Aceto impaired its goodwill and intangible assets by more than $256 million, "all of which related to the Rising reporting unit," which contained the Lucid government contracts. Am. Compl. ¶ 67. But without more, the magnitude of the impairment does not support an inference of recklessness and "must be presented in tandem

with other circumstantial evidence to suggest scienter." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *32 (citation omitted); *see also City of Omaha v. CBS Corp.*, 2011 WL 2119734, at *2, *9 (S.D.N.Y. May 24, 2011) (granting motion to dismiss, even considering $14 billion write down representing "one-third of CBS's overall assets"), *aff'd*, 679 F.3d 64 (2d Cir. 2012). Unlike *Rothman v. Gregor*, 220 F.3d 81, 90-92 (2d Cir. 2000), upon which plaintiff relies, plaintiff has not alleged additional circumstantial evidence that strongly supports an inference of recklessness.

Finally, plaintiff cites the "core operations" theory as supporting a strong inference of scienter. "[T]he 'core operations' theory allows courts to draw an inference of scienter where the misrepresentations and omissions allegedly made by defendants were about their 'core operations.'" *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.10 (S.D.N.Y. 2015). Under this theory, "if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions within the company." *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (quoting *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018)). Yet—assuming the doctrine applies—plaintiff does not explain what "contradictory facts of critical importance," *id.*, should be imputed to the individual defendants' knowledge beyond vague "adverse conditions" reflecting Aceto's "true financial condition." *See* Opp. Br. 23. In any event, the core operations doctrine has been cast into doubt by the Second Circuit following the enactment of the PSLRA. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356-57 (2d Cir. 2012) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter."). At most, it "constitutes 'supplemental support' for alleging scienter but does not independently establish

scienter." *Lipow*, 131 F. Supp. 3d at 163 (collecting cases). "Where, as here, [p]laintiff's other scienter allegations . . . are not persuasive, [I] decline[] to find that [p]laintiff's reliance on the core operations theory yields the cogent and compelling inference required." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 624 (S.D.N.Y. 2017)).

"[T]aken collectively," plaintiff's allegations do not "give rise to a strong inference of scienter." *See Tellabs*, 551 U.S. at 322-23. As in *Supercom Inc.*, which involved a similar collection of circumstantial theories of scienter, plaintiff "ha[s] not provided any basis for [me] to conclude that [d]efendants had a motive to commit fraud, and [plaintiff's] allegations of conscious recklessness, even considered together, are extremely thin." 2018 WL 4926442, at *31-32 (declining to find recklessness on the basis of core operations, magnitude of accounting miss, and temporal proximity). Moreover, the government's termination of the Lucid contracts *after* the February 1, 2018 press release constitutes a "non-culpable" explanation for Aceto's downturn. *See id.* (discussing alternative explanation for losses).

### III. Plaintiff Fails to State a Claim under Section 20(a) of the Securities Exchange Act

"To state a claim of control person liability under § 20(a), a plaintiff must show . . . a primary violation by the controlled person." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). "Because . . . plaintiff has not done so, plaintiff's claims under § 20(a) must also be dismissed." *E.g.*, *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 42 (S.D.N.Y. 2016).

### CONCLUSION

The motion to dismiss of Salvatore Guccione, William C. Kennally, and Douglas Roth is granted with leave to replead within 21 days of the date of this order.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
August 6, 2019

Edward R. Korman
United States District Judge