**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Aceto Corporation Securities Litigation | Master File No.: 2:18-cv-02425-JFB-AYS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| This Document Relates to:<br><br>ALL ACTIONS | |

## CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Michael Bonine ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's amended complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aceto Corporation ("Aceto" or "Company"), analysts' reports and advisories about the Company, a thorough review of the filings in Aceto's bankruptcy proceedings in the case captioned *In re Aceto Corp.,* No. 19-3448 (VFP), currently pending in the United States Bankruptcy Court for the District of New Jersey, and other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. Plaintiff brings this class action on behalf of a class, consisting of all persons other than Defendants and related parties who purchased or otherwise acquired Aceto securities between August 25, 2017 and February 19, 2019, both dates inclusive ("Class Period"). Plaintiff pursues remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, seeking to recover from Defendants for himself and the Class damages that Defendants' Exchange Act violations caused.

2. After the February 19, 2019 close, Aceto announced that the Company and each of its U.S. subsidiaries had filed voluntary petitions for relief pursuant to Chapter 11 of the U.S. Bankruptcy Code. On this news, investors sent the price of Aceto common stock plummeting by more than 66% in a single trading day, damaging investors.

3. The next day, according to a sworn declaration from its Chief Financial Officer, Rebecca A. Roof ("Roof"), Aceto stated that "certain supply chain challenges in [the Company's] Human Health business for the past several quarters" were a material cause of its insolvency.[1] "Specifically," according to Roof, "certain of [its] distribution agreements contain service level failure to supply penalties or similar provisions that potentially subject [the Company] to charges and penalties in the event that [the Company] fails to meet the supply obligations under such agreements."[2] At the time Aceto and its affiliated entities filed bankruptcy petitions, the Company had already incurred tens of millions of dollars in such penalties.

---

[1] *See In re Aceto Corp.,* No. 19-3448 (VFP) (Bankr. D.N.J.), Declaration of Rebecca A. Roof in Support of First Day Relief (ECF No. 19) (filed 2/20/19) (attached hereto as Exhibit A and incorporated herein by reference), at ¶87.

[2] *Id.*

4. Other documents Aceto filed in its bankruptcy proceedings reveal that the "supply chain challenges" to which Defendant Roof referred had a common source. In 2016 acquisition, through its wholly owned operating subsidiary, Rising Pharmaceuticals, Inc. ("Rising"), Aceto's generic pharmaceutical operating unit, Aceto acquired certain generic products and related assets. In connection with that acquisition, Aceto entered into an agreement with Aurobindo Pharma Ltd. ("Aurobindo"), an Indian pharmaceutical manufacturer, by which Aurobindo agreed to supply Aceto with all of its manufacturing needs for the generic products Rising had purchased. In announcing the acquisition and related agreement Defendants disclosed that "we have exactly what we want," that Aceto had "a good supply agreement," and that Defendants were "satisfied with the manufacturing situation." From before the 2016 acquisition, however, Defendants knew of the risk that Aurobindo, their new manufacturing partner and, itself, a direct competitor of Rising's, would fail to fulfill its contractual obligation to meet Rising's supply requirements.

5. Shortly after the acquisition, Defendants were aware that the risk had materialized into a disaster, materially undermining both Rising's sales and its value on Aceto's balance sheet. Indeed, "shortly following the execution of those agreements," as Aceto, itself, recently alleged in an adversary complaint it filed against Aurobindo in Aceto's bankruptcy proceedings,[3] Aurobindo "leveraged its superior position to wrest market share from Rising in situations where the two companies competed in selling the same products" by, among other things, "deliberately failing to supply product." By disabling Rising from satisfying its obligations to its customers, Aurobindo's

[3] *See In re Aceto Corp. (Aceto Corp., et al. v. P.V. Ramprasad Reddy et al.),* No. 19-13448-VFP (Bankr. D.N.J.), Adversary Complaint, ECF No. 601, filed May 31, 2019 ("Adversary Complaint"), attached hereto as Exhibit B and incorporated herein by reference. In such adversary proceeding, plaintiffs Aceto, Rising, and two of Rising's subsidiaries, Rising Health LLC and Acetris Health LLC, filed the Adversary Complaint, basing their allegations on personal knowledge, except where otherwise noted.

actions directly caused Rising to incur massive failure-to-supply penalties, draining Aceto's cash flow and materially undermining the value Aceto attributed to Rising's acquisitions on its balance sheet.

6. During the Class Period, Defendants failed in any way whatsoever to disclose that Aurobindo had breached its obligation to supply Rising with product, materially harming Aceto's financial condition, reputation, and business prospects. Lying to the market, Defendants instead attributed declines or shortfalls in Aceto's actual or projected sales, revenue, earnings, profit margins, and other financial metrics to other factors, such as "persistent adverse conditions in the generics market." Given Defendants' public statements regarding the significance of the products acquisition and the Aurobindo supply agreement and of Rising's exclusive reliance upon Aurobindo to manufacture the products Rising acquired in 2016, Defendants were duty bound to disclose Aurobindo's failure to supply product pursuant to the supplier agreement.

7. In light of the threat of losing valuable government contracts Rising obtained in the 2016 acquisitions and Aurobindo's breach of its supply obligations, the value of Rising was materially impaired prior to the Class Period. Defendants' failure to impair goodwill and other intangible assets in a timely manner rendered Aceto's balance sheet materially inaccurate, overstating assets and operating income during the Class Period. Defendants knowingly or recklessly failed to conduct a proper goodwill impairment analysis for the fiscal quarter ended June 30, 2017 based on the government's threat to terminate Aceto's valuable government contracts, of which Defendants became aware no later than June 2017. Defendants also knowingly or recklessly failed to perform any interim impairment analysis prior at the end of the 2017 calendar year[4] based on Aurobindo's ongoing breach of its supply obligations that had been

---

[4] Aceto's fiscal year ends June 30.

occurring since early 2017. Thus, Defendants' failure to impair goodwill in a timely manner caused the price of Aceto common stock to be artificially inflated during the Class Period.

8. In addition, Defendants' knowledge that Aurobindo had materially breached the supply agreement, threatening both the loss of valuable government contracts and material penalties for failure to supply product to other customers, the financial projections Defendants issued on February 2, 2018 ("February 2018 Forecast") were knowingly and materially false and misleading at that time.

9. Defendants gradually revealed the fraud to the market through a series of partial corrective disclosures. In a press release issued April 18, 2018, the Company announced that investors should no longer rely upon the February 2018 Forecast and that it was suspending the provision of further financial guidance for the remainder of the fiscal year. In Aceto's quarterly report filed with the SEC on May 7, 2018, the Company disclosed that the U.S. government had notified Aceto that 11 generic drug products it acquired in 2016 were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts. As a result, the Company revealed that it had recognized an impairment charge in the third fiscal quarter of 2018.

10. In reports filed with the SEC in September 2018, the Company revealed that Rising had incurred "higher than expected" failure to supply penalties connected to Aceto's 2016 products acquisition. In February 2019, the Company finally revealed to the market, through its bankruptcy filings, that Rising's "supply chain challenges" and failure-to-supply penalties resulted from Aurobindo's breach of the supply agreement.

11. As a direct and proximate result of Defendants' wrongful conduct and the resulting decline in the market value of the Company's securities in response to Defendants' partial

disclosures of negative information the Aurobindo supply agreement disaster begat, Plaintiff and other Class members have suffered significant damages.

**JURISDICTION AND VENUE**

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

16. Plaintiff Michael Bonine, as set forth in the certification attached to the Memorandum of Law in Support of Motion of Michael Bonino to: (1) Consolidate Related Actions; (2) Appoint Lead Plaintiff; and (3) Approve Lead Plaintiff's Selection of Counsel (ECF No. 14-2), purchased Aceto securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17. But for its filing for protection from creditors under Chapter 11 of the United States Bankruptcy Code Aceto would remain a defendant in this case. The automatic stay prevents

Plaintiff from pursuing its claims against Aceto. Aceto is incorporated in New York, with its principal executive offices located at 4 Tri Harbor Court, Port Washington, New York 11050. Prior to its bankruptcy filing in February 2019, Aceto's securities traded on the NASDAQ under the ticker symbol "ACET."

18. Defendant Salvatore Guccione ("Guccione") served as Aceto's President and Chief Executive Officer ("CEO") from January 2013 through September 27, 2017. About the CEO position, the Company stated, "Our Chief Executive Officer assumes leadership for all aspects of Aceto Corporation's operations. Our Chief Executive Officer concentrates on strategic issues, long range planning, acquisition activity and day-to-day operations." While serving as Aceto's President and CEO, Guccione was listed on Rising Pharmaceuticals, Inc.'s website as a member of Rising's "Management Team."

19. Defendant William C. Kennally ("Kennally") has served as a member of the Company's Board of Directors since September 2016 and was the Company's President and CEO from October 2, 2017 to June 4, 2019. About his service on the Board of Directors, the Company stated that Kennally had "first-hand involvement in crafting strategic direction for the company and in guiding discussions about managing the many issues arising from the changing generic drug distribution environment." About the CEO position, the Company stated, "Our Chief Executive Officer assumes leadership for all aspects of Aceto Corporation's operations. Our Chief Executive Officer concentrates on strategic issues, long range planning, acquisition activity and day-to-day operations." Kennally started his career in 1979 with The Upjohn Company which was later acquired by Pharmacia. During his career, Kennally held positions of increasing responsibility within Pfizer and Pharmacia including President, Greenstone, LLC, a generic and authorized generic pharmaceuticals supplier which became a wholly-owned subsidiary of Pfizer, Inc. In 2010,

Kennally became Regional President North America; Global Established Products for Pfizer, and prior to his retirement in 2015 was Regional President North America Advisor, Global Established Pharma with Pfizer.

20. Defendant Douglas Roth ("Roth") served as the Company's Senior Vice President and Chief Financial Officer ("CFO") from March 2010 to March 31, 2018. He was a Vice President of the Company from May 2001 to March 2010.

21. Defendant Frances P. Scally ("Scally") joined the Company in 2007 as a Director, Financial Reporting and Compliance, became the Company's Vice President, Financial Reporting, Compliance and Risk in October 2014, and served as the Company's Senior Vice President and Chief Accounting Officer since October 27, 2017.

22. Defendant Roof was appointed Interim Chief Financial Officer on April 18, 2018 and has served in that capacity or as the Company's Chief Financial Officer since that date. Roof is employed by, and is Managing Director of AlixPartners LLP, a global business advisory firm. Roof possesses more than 30 years of experience providing advisory and C-suite interim management services for companies in a broad array of industries such as life sciences, healthcare, consumer, chemicals, energy and manufacturing. Roof has previously led complex client engagements and served as Interim Chief Financial Officer of the Eastman Kodak Company, Anchor Glass Corporation, Fleming Foods, and several other privately held entities. Roof also served as Interim Global Controller of Lyondell Basell Industries, the third-largest chemical company globally, where she helped lead the company through one of the largest and most successful restructuring processes. Prior to that, Roof served as Chief Restructuring Advisor of Taro Pharmaceutical Industries, an international generic-drug manufacturer in strengthening its financial controls systems and as Interim Chief Financial Officer of Atkins Nutritionals.

23. Defendant Albert L. Eilender ("Eilender") joined Aceto's Board of Directors in 2000, was the lead independent director from 2005 to September 2009 and served as Chief Executive Officer of the Company from September 2010 to January 2013. Eilender served as Chairman of the Company's Board of Directors from October 2009 and was named Chairman Emeritus in July 2018. Eilender has more than 35 years of diverse senior level experience in the specialty chemicals and pharmaceutical industry and has had direct financial responsibility, and with significant experience in mergers, acquisitions and joint ventures, both domestically and internationally. He also served on the boards of numerous industry trade associations during his career.

24. Defendant Walter J. Kaczmarek ("Kaczmarek") was Aceto's Chief Operating Officer from August 2016 to October 2018, during which period he assumed responsibility for managing day-to-day operations at ACETO's three business segments, reporting to Aceto's Chief Executive Officer. Kaczmarek possesses more than 25 years of experience in the pharmaceutical industry spanning the entire value chain from development to manufacturing to sales and marketing. Immediately preceding his appointment as Aceto's COO, Kaczmarek served as President, Multisource Pharmaceutical Division of Mallinckrodt Pharmaceuticals. Prior to serving at Mallinckrodt, he held various positions of increasing responsibility including Senior Vice President at Fougera Pharmaceuticals, Inc., Vice President, National Accounts, at Nycomed US Inc., and Vice President, National Accounts, at McKesson Corporation.

25. Collectively, Guccione, Kennally, Roth, Scally, Roof, Eilender, and Kaczmarek are referred to herein as "Defendants."

26. Each of the Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

***Background***

27. Aceto touts itself as "an international company engaged in the development, marketing, sales and distribution of finished dosage form generic pharmaceuticals, nutraceutical products, pharmaceutical active ingredients and intermediates, specialty performance chemicals inclusive of agricultural intermediates and agricultural protection products." The Company organizes its business along product lines into three principal segments: Human Health, Pharmaceutical Ingredients, and Performance Chemicals.

28. About its Human Health segment, the Company stated that "[p]roducts that fall within the Human Health segment include finished dosage form generic drugs and nutraceutical

products. Aceto sells generic prescription products and over-the-counter pharmaceutical products to leading wholesalers, chain drug stores, distributors and mass merchandisers." Aceto sells "niche generic prescription products and over-the-counter pharmaceutical products under the Rising label to leading wholesalers, chain drug stores, distributors and mass merchandisers." According to the Company itself, the Human Health segment "operate[d] primarily through Aceto's wholly-owned subsidiary," Rising. Rising's customers include AmerisourceBergen, Cardinal Health, McKesson, CVS, Rite Aid, Walgreens, Costco, Walmart, and Publix.

29. "[I]n 2009 the Company embarked on a new strategic direction. It would make human health the focus of the business, as opposed to the historic specialty chemicals distribution business. Using its global footprint already established for its pharmaceutical ingredients business and to seek overall higher profit margins and growth potential, it would go upstream and enter the finished dosage form generic drug business in the United States."

30. In furtherance of this new strategic direction, "in 2010 the Company acquired Rising Pharma, a small, privately held company who mirrored Aceto in that it did not manufacture its marketed products, but developed a portfolio of products by partnering with suppliers and manufacturers. Rising was the marketing face of these partnerships."

31. Aceto's financial results for the fiscal years preceding the Class Period demonstrate the increasing importance of its Human Health segment and Rising to the Company's business overall. In the fiscal years immediately preceding the Class Period, the Human Health segment's percentages of the Company's net sales and gross profits generally rose each year:

| FISCAL YEAR | NET SALES (%) | GROSS PROFITS (%) |
|---|---|---|
| 2012 | 23.9 | 36.9 |
| 2013 | 25.9 | 39.9 |
| 2014 | 31.4 | 42.3 |
| 2015 | 41.2 | 55.9 |
| 2016 | 40.8 | 54.5 |
| 2017 | 49.4 | 55.5 |

32. Aceto's acquisition in late 2016 of certain generic products and related assets, discussed below, only accelerated the Company's "transformation toward Human Health." According to Defendant Guccione's statement in a press release issued on November 2, 2016 in connection with the Company's announcement of the products acquisition:

> Consistent with our strategy of expanding Rising's portfolio of finished dosage form generic products through product development partnerships and acquisitions of late stage assets, ANDAs and complementary generic drug businesses, this transaction significantly expands our roster of commercialized products and pipeline of products under development. We are increasing the number of commercialized products from 60 to 107, the number of approved products from 8 to 39 and the total number of projects in the pipeline from 100 to 164. Of Citron's 31 products approved for launch, 2 products are expected to be launched before the end of 2016 with the majority of the remaining 29 products expected to be launched by the end of calendar 2017.

33. Through Rising does not, itself, manufacture the products it sells, possessing no manufacturing facilities. Rather, Aceto's Human Health business focuses on the marketing and distribution of the products it sells. Under Aceto's "asset-light model," "products are developed in collaboration with selected pharmaceutical development partners and with networks of finished

dosage form manufacturing partners." Accordingly, the establishment of strong relationships with "capable, reliable manufacturing partners" was integral to Aceto's success.

34. The reliability of Aceto's manufacturing partners has significant financial implications for the Company's financial position, business, and reputation. As Aceto explained in its Annual Report for the fiscal year ended June 30, 2016, filed with the SEC on August 26, 2016, issues with its manufacturing partners may prevent it from fulfilling sales orders from its customers or delivering products to customers "profitably or on time." As a result, the Company "may be subject to significant service level penalties in our generics business. Certain of our distribution agreements in our finished dosage form generics business," Defendants continued, "contain service level penalties ('failure to supply' or 'FTS') or similar provisions that may subject us to charges and penalties in the event we do not meet our supply obligations thereunder." FTS charges and penalties, according to Aceto "may be substantial and may not be adequately reimbursed by our suppliers or at all."

35. The Company also has explained how its disadvantageous position in the product supply chain amplifies the impact of FTS charges upon its business and relationships with its partners:

> Rising's asset-light business model leverages multiple drug development and manufacturing partnerships in the development of its finished dosage form generic products, placing it in an intermediate position in the product supply chain. As industry headwinds have made the supply chain more competitive, FTS charges have impacted intermediate entities such as Rising to a greater degree.
>
> Rising becomes aware of an FTS claim when notified by a customer. Most of Rising's customers and wholesalers can unilaterally deduct amounts claimed for FTS from product payments due Rising. If Rising believes the deduction was improper, it is in the difficult position of seeking a refund from a party that controls the flow of funds in the relationship. In addition, some customers that do not

> have a contractual right to an FTS claim may still take credit against the amount claimed by them for other products supplied by Rising.
>
> On the other end of the supply chain, in order to recover FTS penalties paid, Rising must often seek full or partial reimbursement through deduction or collection from its suppliers, many of whom are also its partners. Thus, Rising is relegated to seeking payment from entities it must continue to rely on for future product supply.
>
> FTS claim calculations vary from customer to customer – some use a replacement cost model and others use a contracted cost amount. The timing of when customer claims are made is also inconsistent; some claims are for prior periods as far back as several months.
>
> Rising reviews all FTS claims and asserts a defense (and rebills the non-justifiable amount) to customers where appropriate. Rising is in continuing negotiations with its customers to recover amounts that Rising believes are not justified.

***Aceto's Acquisitions of Citron and Lucid, and the Supply Agreements***

36. Aceto's "asset-light" business model and its position within the product supply chain made it especially vulnerable to the series of events that unfolded from late 2016 until early 2019.

37. The changing regulatory environment and prevailing conditions in the market for generic pharmaceuticals encouraged Aceto to increase the scale of its operations. From 2014 to 2018, the U.S. Food and Drug Administration ("FDA") made significant changes to its review of ANDA filings for generics. The FDA hired new staff, created a new priority review pathway for priority generics, established a new 6-month period of exclusivity for competitive generics. As a result of these changes, FDA review times declined significantly as more and more generics obtained approval, making their way more quickly into an increasingly flooded market.

38. The dynamics of the FDA regulatory regime materially improved the prevailing market conditions and, in turn, the financial condition and business prospects of Aceto and other companies in the generics industry. Prior to the start of the Class Period, Aceto explained that

Rising had been forced to confront "near-term headwinds" in the form of "increased competition and price erosion on certain products at Rising." The impact of these forces had resulted in "reduced sales and profits at Rising," which Aceto explained was merely "part of doing business in the generic pharma space." Rising was experiencing "strong competition, intense competition, and so that started cutting into [its] sales and, more importantly, profits." The best way for Rising to adapt to the increasingly intense nature of competition within the generics market, according to Aceto's management, was to "get some other products approved and launched to offset that." In other words, Aceto believed that it needed to "increase[] our scale to help us more effectively compete in the generic industry."

39. Accordingly, in 2015 Aceto sought opportunities to expand Rising Pharmaceutical's generic pharmaceutical business. Najib Ali, an investment banker working for JPMorgan, introduced Aceto to both Citron Pharma LLC ("Citron") and Lucid Pharma LLC ("Lucid"), and the parties commenced an initial round of discussions to determine whether Rising would purchase Citron's and Lucid's assets.

40. According to Aceto's own allegations in its Adversary Complaint against Aurobindo:

a. "Upon information and belief, in 2013 Citron and Lucid were created as vehicles to capitalize on the United States generic pharmaceutical market with products manufactured by Aurobindo. Citron and Lucid are headquartered in New Jersey." Ex. B, ¶19.

b. "The majority of Citron's and Lucid's equity—indeed, over 60% of it—was owned by Subha Sri Thogarchedu ('Subha'), through various shell companies. Subha is, in fact, [the] so-called 'US wife' [of Aurobindo co-

founder P.V. Ramprasad Reddy ('Mr. Reddy'), who is also a "substantial equity holder, erstwhile chairman, and present board member of Aurobindo"], with whom he has an adult son, a relationship that Mr. Reddy maintained in secrecy given the fact that he has a wife and family in India." Ex. B, ¶¶19-20.

c. "Mr. Reddy co-founded Aurobindo in 1986. Aside from being a co-founder of Aurobindo, Mr. Reddy also is a member of its board of directors and, upon information and belief, a substantial equity holder of the company, through direct and indirect ownership interests. At all relevant times, Mr. Reddy wielded—and continues to wield—considerable influence and power over Aurobindo, its management, and its board of directors." Ex. B, ¶18.

d. "When they were founded, Citron and Lucid acquired certain rights to generic pharmaceutical products in the United States from Pfizer, Inc. After their formation, Citron and Lucid executed long-term contracts with Aurobindo and Aurolife for the supply and distribution of those generic pharmaceutical products. Mr. Reddy, of course, had interests on both sides of that relationship and, upon information and belief, evidently steered the opportunity represented by the Pfizer transaction to a company formed by his "US wife" to allow that company to profit from the distribution of Aurobindo-manufactured products in the United States. Upon information and belief, Mr. Reddy used his considerable influence and power at Aurobindo and Aurolife to ensure that they faithfully and consistently

fulfilled Citron's and Lucid's supply needs, particularly given the equity that Subha held in those companies." Ex. B, ¶21.

e. "Aceto quickly became concerned with the risk posed by the complete dependence that Citron/Lucid had upon Aurobindo which, if the deal closed, would become Rising Pharmaceuticals' principal manufacturing partner. This was so for several reasons: (a) Citron/Lucid licensed the rights to most of the products from Aurobindo, which held the Abbreviated New Drug Applications approved by the United States Food and Drug Administration; (b) Citron/Lucid's contracts made Aurobindo the exclusive company in the world that could manufacture the products, and Aurobindo therefore held a stranglehold over supply; (c) neither Aceto nor its subsidiaries had their own manufacturing capabilities; and (d) Aurobindo had the right to compete in the United States market for the sale of most of the same products to the same customers." Ex. B, ¶24.

f. "In order to assuage Aceto's concerns, Mr. Ali and Citron/Lucid encouraged enhanced contact between Aceto and Mr. Reddy, so that Mr. Reddy could provide assurances intended to allay Aceto's fears concerning Aurobindo's good faith." Ex. B, ¶25.

g. "Aceto's then Executive Chairman, Albert Eilender, discussed the supply relationship between Aurobindo and Citron directly with Mr. Reddy during in-person meetings that took place in the United States and during several phone conversations. Mr. Reddy's clear goal during these meetings was to

allay Aceto's fears and lull it into believing that Aurobindo would be a good partner and committed to the success of the relationship." Ex. B, ¶26.

h. "Mr. Reddy, purporting to speak solely on behalf of Aurobindo, repeatedly assured Mr. Eilender that Aurobindo would be a "true partner" to Rising Pharmaceuticals and a stable source of products, and that Aurobindo would work cooperatively with Rising Pharmaceuticals. In particular, Mr. Reddy touted Aurobindo's extensive production capabilities and represented that Aurobindo would supply all of Rising Pharmaceuticals' product needs. Mr. Reddy represented to Mr. Eilender that Aurobindo had multiple production facilities in India to produce products and avoid any supply problems or disruptions. Mr. Reddy represented that the redundant and excess supply capacity would, for example, protect Rising Pharmaceuticals against the risk of supply disruptions if a problem developed with one facility." Ex. B, ¶27.

i. "Although Mr. Reddy presented himself to Aceto as a neutral third party who was simply providing information relevant to the contemplated transaction, he had his own self interest in the transaction arising from the fact that his "US wife" was the majority owner of Citron and Lucid. Mr. Reddy knew full well that Aurobindo and Aurolife would not cooperate in good faith with Aceto once his "US wife" sold her economic interest in the business. He knew this fact because, in the past, Aurobindo's cooperation with and goodwill towards Citron and Lucid were due to his own personal intercession and influence within Aurobindo, which he intended to

withdraw after the sale of the Citron/Lucid assets. And he did not disclose that fact to Aceto. Ex. B, ¶28.

j. "Aceto attempted to gain clarity on the nature of the relationship between Subha and Mr. Reddy from other sources, including Mr. Najib, but it received differing and contradictory responses; at times, Aceto was told no such relationship existed, and, at other times, Aceto was informed of a personal relationship." Ex. B, ¶28 n.6.

41. Notwithstanding Aceto's unresolved concerns regarding the relationship between Mr. Reddy and Subha, and the implications such relationship may have for Aceto's relationship with Aurobindo once Aceto acquired Citron's and Lucid's assets, "Aceto agreed to proceed with the transaction and formalize the manufacturing partnership with Aurobindo." Ex. B ¶29.

42. On November 2, 2016, according to the Adversary Complaint:

a. "Aceto executed a Product Purchase Agreement (the 'PPA'), pursuant to which Aceto agreed to acquire certain generic products and related assets of Citron and Lucid in exchange for an up-front cash payment of $270 million plus additional consideration." Ex. B, ¶29.

b. In connection with the PPA, "Aceto formed two subsidiaries two subsidiaries under Rising Pharmaceuticals to consummate the product acquisition: Rising Health[, LLC], which acquired certain pharmaceutical products and assets of Citron, and Acetris [Health, LLC], which acquired certain government products and assets of Lucid." Ex. B, ¶29.

c. "Contemporaneous with the execution of the PPA, … Aurobindo executed a Supply and Distribution Agreement with Rising Health (the 'Aurobindo

Supply Agreement'), which obligated Aurobindo to continue supplying products to Rising Health for a significant period of time. In that agreement, Aurobindo represented that it 'desire[d] to supply—and 'will supply'—Rising Health with products. The parties agreed that the Aurobindo Supply Agreement would remain in effect for twelve (12) years and renew automatically for two (2) additional years. During the term of the agreement, Rising Health agreed to 'exclusively' purchase specific products from Aurobindo, and Aurobindo agreed to fulfill Rising Health's purchase orders with respect to those products." Ex. B, ¶30.

43. On December 21, 2016, Aceto and Rising completed the acquisition of certain generic products and related assets of the entities formerly known as Citron and Lucid.

44. According to the Company, "on August 14, 2017, Rising Health and Aurolife executed a Supply and Distribution Agreement [the 'Aurolife Supply Agreement,' and, with the Aurobindo Supply Agreement, collectively, the "Supply Agreements"] that substantially mirrored the terms of the Aurobindo Supply Agreement. … That agreement carried a term of three years." Ex. B, ¶31.

***Post-Acquisitions and Post-Supply Agreements Commentary***

45. In a November 2, 2016 press release, Aceto provided the following commentary on the acquisitions of Citron and Lucid and on the Supply Agreements:

a. "ACETO and Citron possess complementary asset-light business models, drug development and manufacturing partnerships and product portfolios. Citron brings a portfolio consisting of 47 commercialized products; 31 approved but not yet launched products; and a pipeline of 33 projects,

including 3 ANDAs filed with the FDA and 30 products currently under development. Included in the 33 pipeline projects are 29 ANDAs that will be owned by Rising Pharmaceuticals upon closing. Additionally, Lucid provides ACETO with new customers among U.S. Federal Government agencies. For the 12 months ended December 31, 2016, the acquired products and related assets of Citron and Lucid together are expected to generate $40 million of adjusted EBITDA on revenue of $195 million."

b. Albert Eilender, Chairman of Aceto, stated: "Since starting discussions about a year ago, both ACETO and Citron agreed that a transaction would be mutually beneficial to each company's long-term strategic objectives. For ACETO, the acquisition substantially advances the company's transformation toward Human Health. Upon closing the transaction, approximately 80% of the company's revenue will be derived from our human health-related businesses compared to 70% for fiscal 2016."

c. Sal Guccione, CEO of ACETO, added: "Consistent with our strategy of expanding Rising's portfolio of finished dosage form generic products through product development partnerships and acquisitions of late stage assets, ANDAs and complementary generic drug businesses, this transaction significantly expands our roster of commercialized products and pipeline of products under development. We are increasing the number of commercialized products from 60 to 107, the number of approved products from 8 to 39 and the total number of projects in the pipeline from 100 to 164. Of Citron's 31 products approved for launch, 2 products are expected

to be launched before the end of 2016 with the majority of the remaining 29 products expected to be launched by the end of calendar 2017."

d. Guccione also stated: "From an operational perspective, the transaction greatly enhances our size and stature within the generic pharmaceutical industry, expands our partnership network and offers us opportunities to realize meaningful cost and tax efficiencies. … We look forward to a seamless integration of Citron's products into our portfolio and working together to achieve our shared strategic objectives and long-term growth for Rising and ACETO."

46. In an earnings conference call hosted the next day, November 3, 2016, by Aceto, Guccione, Roth, and Chairman Eilender provided further commentary on the acquisitions of Citron and Lucid, as well as on the Supply Agreements:

a. Eilender stated: "Front and center of the strategic rationale for this transaction is the fact that Aceto and Citron are complementary companies with similar asset-light business models, drug development, and manufacturing partners and product portfolios. Importantly, this transaction brings to Rising Pharmaceuticals a much greater degree of scale in expanding Rising's portfolio of commercialized finished dosage form generic products, adding significant value of 47 approved products, 31 approved and yet to be launched products, as well as 33 pipeline products."

b. Eilender added: "Overall, we believe this transaction will catapult Aceto to the next level in its evolution."

c. Guccione stated: "Citron has a manufacturing partnership in place with leading -- with a leading vertically integrated generics manufacturer, Aurobindo. We have negotiated a new long-term agreement with Aurobindo, which will go into effect the day of closing and will enable supply of Citron's 47 commercial products, as well as the 31 products that have already received FDA approval but have not yet been launched."

d. Guccione also stated: "Lucid is a supplier of generic pharmaceuticals to various agencies of the US government, including the VA and the Defense Logistics Agency. Although it's not a large part of the total acquisition, we are pleased to gain through Lucid 18 national contracts, nearly all of which have an average term of about five years. That business is supported by supply contracts with Aurobindo's subsidiary, Aurolife Pharma. Lucid will strengthen Aceto's participation in the government and defense sector."

e. With respect to the impact of the transactions, Guccione stated that "the increased scale of our drug development pipeline as the result of this transaction, with our total pipeline increasing by about two-thirds from 100 projects to 164 projects. The acquisition helps balance our pipeline between products approved for launch and ANDAs filed with the FDA. It also increases our total number of products under development. You'll see that Citron brings us 31 approved products -- approved pending launched products, greatly increasing our approved product list from the current level of eight now up to 39. With respect to filed ANDAs, Aceto is stronger here,

and we will now have a combined total of 49 filed ANDAs upon completion of the acquisition."

f. Guccione added that "the acquisition adds 30 new projects to our overall project development pipeline, thereby increasing the total here by about two-thirds to 79. We believe that with Vamal's focus and leadership in product development, together with Rising's capabilities and resources, we can accelerate the development of future products and build a more robust pipeline, thereby further enhancing our long-term growth opportunities. Overall with this transaction, we are substantially augmenting our scale and evenly spreading our growth opportunities out over the near term, intermediate term, and long term."

g. Roth stated: "We also plan to realize cost synergies of approximately $4 million over the next 12- to 18-month period, albeit any gains in 2017 will be offset by integration and transaction costs. Operational efficiencies are expected to come from combined -- primarily from combining our warehouse facilities and our ERP system."

h. In terms of how Aceto financed the acquisitions, Roth stated: We intend to fund the transaction using fully committed debt, equity, a deferred payment, and cash from our balance sheet. In terms of debt, we plan to draw down $115 million on our $150 million revolving credit facility and a new five-year, $150 million term loan. In addition, we plan to issue 5.1 million shares to the sellers on the third anniversary of closing the transaction. We have also agreed to a $50 million unsecured deferred purchase payment with the

sellers, which will be paid on the fifth anniversary of the closing. Finally, we plan to use about $20 million of cash from our balance sheet to complete this transaction."

i. Guccione stated: "The transaction allows us to continue to operate our asset-light model, but gives us complementary products, supported by a leading vertically integrated manufacturer, and increases our scale to help us more effectively compete in the generic industry. Finally, this places Aceto on a path to enhance our growth prospects in the future."

j. Guccione added: "It's a complementary set to what we go after. So Rising has typically gone after smaller niche products, again looking at the market dynamics around those products. These are a mix -- I'd say a combination of technically complex, as well as some that are not so complex, but again, looking at the market opportunities, these tend to be larger market size products with, in general, if you can generalize, there will be more competitors and the need for vertically integrated, better cost-effective manufacturing is, let's say, more important here than it might be in the Rising portfolio of products. So, it's complementary in that it expands the universe of opportunities that we would go after."

k. In response to an analyst's question regarding Aceto's launch capacity, Guccione stated: "From a manufacturing point of view, the manufacturer is in place. So it will be a question of how we want to meter them out, so to speak, and how the market reacts to them, too. So I think we've got the capabilities and we're going to assess it as calendar-year 2017 goes on."

l. When asked whether "all the manufacturing is going to be done by the one contract relationship that you discussed," Guccione responded: "With respect to the 77 products that were the foundation of the business, yes. With respect to the 30 some odd products that are in development, some of those will be. Some will be with other suppliers."

m. When asked whether he would "expect to move any of your future products from the legacy Aceto to this manufacturer," and whether "this manufacturer [is] necessarily head and shoulders better than the people you've been dealing with that you would want to rely on them more," Guccione responded: "We think they are really a great manufacturer. The existing products that we -- the existing commercial products and even the ones that are pipeline committed, those will stay with the partners we have. I see this as an additional opportunity for future growth, but not for redoing what we have in place. And not for replacing what we have in place, either. As we look to the future, I think our relationship with Aurobindo will add to what we have, but it doesn't mean we are walking away from our existing fine partners."

***Post-Acquisitions and Post-Supply Agreements Developments***

47. As a result of its acquisition of Lucid, Aceto became a party to a number of government supply contracts. These contracts require that Aceto comply with the country-of-origin clauses mandated by the federal Trade Agreements Act ("TAA"), which requires that the products sold to government agencies be made in the United States. At the time of the acquisition,

Lucid had 18 such supply contracts with federal agencies, including the Veterans Administration ("VA") and the Defense Logistics Agency ("DLA").

48. No later than June 2017, the federal government advised the Company that it was reviewing whether the Company's products complied with the country-of-origin provisions, and threatened to terminate those contracts for noncompliance. In its Annual Report on Form 10-K, filed August 25, 2017 ("2017 10-K"), the Company stated:

> In connection with the 2016 acquisition of certain products and related assets by Aceto from Lucid, the government contracting business of Citron, Aceto acquired through the government's novation process Lucid's government contracts. The U.S. government has advised Lucid that it is reviewing whether Lucid's supply of certain products under its government contracts complied with the contracts' country-of-origin clauses as mandated by the federal Trade Agreements Act ("TAA"). Aceto is not named in this matter. If the products are found to not have complied with the country-of-origin clauses, then the government could exercise remedies, including termination of one or more of the subject contracts or other statutory damages. By virtue of Aceto's assumption of these contracts, Aceto could be liable for some of these damages. Aceto is entitled to indemnification under the terms of the product purchase agreement governing that transaction from the sellers for damages it may suffer as a result. In order to protect its position and without commenting on the merits of the U.S. government's claim, Aceto has submitted an indemnification claim to the sellers under the product purchase agreement, covering damages that Aceto may suffer as a result of this matter. Aceto has offset rights under the product purchase agreement with respect to future payment obligations that, in Aceto's view, substantially exceed any damages that Aceto may suffer as a result of this matter.

49. By June 2017, therefore, Defendants knew, or were reckless in not knowing, that the Company risked losing certain of Lucid's federal contracts. The eleven contracts the Company had with the VA, for example, accounted for approximately 10% of the Company's revenue, and approximately 15% of revenue for the Company's Rising subsidiary.

50. In a press release attached as Exhibit 99.1 to the report that Aceto filed with the SEC on Form 8-K on February 27, 2018, Defendants stated that the Company "has been notified

by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary in a product purchase agreement with an entity formerly known as Lucid Pharma LLC are not in compliance with the federal Trade Agreement Act ("TAA") country-of-origin provisions of a clause contained in the government supply contracts. The 11 finished dosage form products purchased by the U.S. government are manufactured by Aurolife Pharma LLC which is located in Dayton, New Jersey using APIs sourced from India. In conjunction with this finding, the U.S. Department of Veterans Affairs ("VA") has requested that ACETO supply new TAA-compliant sources for the referenced products by March 9, 2018 and supply new TAA-compliant drugs to the government purchasers under the contracts by March 26, 2018."[5]

***Aurobindo's Breach of the Supply Agreements***

51. During the Class Period, Defendants failed to disclose that, beginning early in calendar year 2017, Aurobindo was in material breach of its obligations under the Supply Agreements raising material doubt about Rising's ability to continue supplying its customers and, in turn, materially undermining its value on Aceto's balance sheet.

52. According to the Company's allegations in the Adversary Complaint against Aurobindo:

a. "Once Mr. Reddy induced Rising Pharmaceuticals into executing the Supply Agreements, Aurobindo held all of the cards and, in effect, controlled the most critical components of Rising Pharmaceuticals' vital

[5] Aceto challenged the VA's ruling and later announced, on July 16, 2018, that "the United States Court of Federal Claims issued a decision in *Acetris Health, LLC v. United States*, invalidating the U.S. Department of Veterans Affairs interpretation of the Trade Agreements Clause, which had resulted in the termination of 11 VA contracts with Acetris Health, LLC, Aceto's subsidiary, because the products contained ingredients sourced from India, based on alleged non-compliance with the Trade Agreements Act's 'Buy American" requirements.'"

supply chain from which it generated revenue. Indeed, Aurobindo became Rising Pharmaceuticals' largest and most important manufacturing partner, with an exclusive right to supply over 75 generic drugs to Rising Pharmaceuticals, including at least 12 of its most important and profitable products. Aurobindo's supply chain represented over 50% of Rising Pharmaceuticals' business post-closing." Ex. B, ¶33.

b. "Aurobindo, however, had no intention of allowing Rising Pharmaceuticals to reap the fruits of its bargained-for exchange under the Supply Agreements. To the contrary, shortly following the execution of those agreements, Aurobindo leveraged its superior position to slowly wrest market share from Rising Pharmaceuticals in situations where the two companies competed in selling the same products. Indeed, without Rising Pharmaceuticals as a middleman (and without Mr. Reddy directing Aurobindo to cooperate in order to benefit Subha, his 'US wife'), Aurobindo would have free reign to sell the products directly to customers and reap much larger profit margins." Ex. B, ¶34.

c. "Aurobindo—at the direction and under the control of Mr. Reddy—implemented this plan gradually over time. Aurobindo began by deliberately failing to supply product, which caused massive failure-to-supply liability to Rising Pharmaceuticals that drained Aceto's cash flow and made it difficult for Aceto to service its debt. Aurobindo then implemented arbitrary and capricious caps on the volume of product Rising Pharmaceuticals could purchase from Aurobindo. And then, once

Aurobindo had succeeded in critically wounding Rising Pharmaceuticals, Aurobindo struck the death blow: it began stealing critical customers from Rising Pharmaceuticals." Ex. B, ¶35.

d. "As is customary in the generic pharmaceuticals industry, Rising Pharmaceuticals' customer contracts guaranteed those customers a supply of product in response to purchase orders at a fixed price. If Rising Pharmaceuticals was unable to supply the ordered product, Rising Pharmaceuticals lost not only the revenue it stood to gain on those orders, but it also was assessed failure-to-supply charges by the customer, representing the increased cost incurred by the customer to secure the product from a different supplier. Accordingly, a failure by Aurobindo to supply products could—and, in fact, did—result in very significant losses to Rising Pharmaceuticals. To avoid such losses, Rising Pharmaceuticals secured Aurobindo's agreement to supply the product before accepting customer orders." Ex. B, ¶36.

e. "In 2017 and 2018, however, Aurobindo repeatedly failed to supply Rising Health with product that Rising Pharmaceuticals required to fulfill its own customer orders and contracts, resulting in (a) substantial failure-to-supply penalties imposed by customers as a consequence of its inability to supply them with product, and (b) other losses in the form of lost profits from sales not made. For instance, with respect to a highly-profitable drug called Duloxetine, Aurobindo accepted purchase orders from Rising Health and promised to supply the requested quantities of the drug. Later citing

supposed capacity constraints, however, Aurobindo failed to deliver products in response to those orders. As a result, Rising Pharmaceuticals lost a lucrative new contract with Rite-Aid worth $5 million in revenue." Ex. B, ¶37.

f. "But this was not Aurobindo's only failure to supply Duloxetine. In many other instances, Aurobindo failed to fill Rising Health's orders of this drug, resulting in over $6 million in failure-to-supply exposure with customers—orders that Aurobindo initially told Rising Health that it could and would supply. Rising Pharmaceuticals also lost revenue that it expected to realize on these sales." Ex. B, ¶38.

g. "Between 2017 and 2018, Rising Pharmaceuticals incurred at least $13 million in failure-to-supply liability caused by Aurobindo's calculated efforts to sabotage Rising Pharmaceuticals' supply chain. In addition to Duloxetine, Aurobindo failed to supply Rising Health's multiple orders of drugs such as Mirtazapine, Tamsulosin, Atomoxetine, Clarithromycin, and Valacyclovir, among others." Ex. B, ¶39.

h. "There was no excuse for Aurobindo's failure to supply these drugs. In fact, Aurobindo refused to honor these orders because it chose to favor production for its own account over Rising Pharmaceuticals' needs, thereby allocating production capacity to products that Aurobindo sold directly to customers in competition with Rising Pharmaceuticals. Aurobindo thereby also sought to damage Rising Pharmaceuticals' position as a competitor in marketing the same drugs." Ex. B, ¶40.

i. "Aside from its refusals to supply products to Rising Health, as required under the Supply Agreements, Aurobindo also imposed arbitrary volume constraints on drugs. For instance, with respect to another highly-profitable drug called Rosuvastatin, Aurobindo—for no legitimate reason—limited the active pharmaceutical ingredient available to Rising Health to 250 Kilos per month each for commercial units (which were manufactured by Aurobindo in India), and for government units (which were manufactured by Aurolife in the United States). Aurobindo had the capacity to produce for Rising Health more than 500 Kilos of Rosuvastatin API per month, but it refused to do so because it wanted to produce the API for its own account and shrink Rising Pharmaceuticals' supply. Aurobindo's arbitrary constraint in making available only 250 Kilos per month to manufacture Rosuvastatin for commercial units led to substantial shortfalls during 2017 and 2018, and significant damage to Rising Pharmaceuticals in the form of (a) failure-to-supply charges imposed on it by its largest customer, Walgreens, and (b) loss of revenue on lost sales." Ex. B, ¶41.[6]

j. "Moreover, in mid-2017, Aurobindo shifted production of finished dosages of Rosuvastatin for commercial units to Aurolife, given Aurolife's larger stock of the API, and Aurobindo subsequently determined that this arrangement should become permanent. As a result, Aurolife and Rising Health entered into the Aurolife Agreement discussed above." Ex. B, ¶42.

[6] "API is an acronym for "active pharmaceutical ingredient," which generally refers to the substance used in a pharmaceutical product that produces a medicinal effect.

k. "In February 2018, the government cancelled its contracts with Acetris, thus freeing up the 250 Kilos of API that Aurobindo was previously allocating to Acetris to fulfill the government units. Given the robust commercial market demand for Rosuvastatin, Rising Health asked Aurobindo to re-allocate those 250 kilos of API to the commercial production of the finished dosage form. Aurobindo, however, refused, and instead allocated the 250 Kilos previously earmarked for Acetris' government contracts to manufacture for its own account. Aurobindo did so in order to hobble Rising Health and sell higher volumes of Rosuvastatin for itself." Ex. B, ¶43.

l. "Even worse, when the government put the Rosuvastatin contract out for bid later in 2018, Acetris asked Aurolife to re-guarantee renewal supply, and again, Aurolife refused and thereby terminated all supply for Acetris' government contracts. Consequently, it is clear that Aurobindo decided to allocate the 250 Kilos of API supply previously dedicated to Acetris' government contracts to manufacture finished dosage product for Aurobindo's own account, to sell in competition with Rising Pharmaceuticals and/or Acetris." Ex. B, ¶44.

m. "Another critical blow came in late 2018, when Aurobindo stole the Rosuvastatin business of Rising Pharmaceuticals' largest customer, Walgreens, after wrongfully withholding API from Rising Health. On September 13, 2018, Aurolife abruptly and without warning informed Rising Health that it would no longer supply Rosuvastatin, allegedly due to the loss of the government contracts six months prior in February 2018, and

that it had no API on hand to produce finished dosage product. Aurolife instructed Rising Health to secure future deliveries of the drug from Aurobindo. However, during a call held the next day, Aurobindo professed ignorance of this development and made clear that no transitionary plans had been made." Ex. B, ¶45.

n. "Aurolife intentionally stalled on providing any notice to Rising Health of its decision to stop supplying product, especially given the rolling forecasts and purchase orders submitted by Rising Health and accepted by Aurolife. At a minimum, Aurobindo knew of this development at least 30 days prior to informing Rising Health (and likely well before that), but remained silent during weekly conference calls with the Rising Health supply chain staff devoted to addressing inventory needs." Ex. B, ¶46.

o. "This supply chain disruption seriously harmed Rising Pharmaceuticals' relationship with Walgreens, which ultimately awarded Rising Pharmaceutical's contract to Aurobindo." Ex. B, ¶47.

p. "This conduct proved the falsity of Mr. Reddy's prior representations and assurances. Mr. Reddy's representation that Aurobindo had more than enough production capacity to fulfill all of Rising Pharmaceuticals' needs was plainly false given Aurobindo's multiple failures to supply and cited capacity constraints. His assurance that Aurobindo intended to be a "true partner" were plainly false given Aurobindo's abuse of its stranglehold position over Rising Pharmaceuticals' supply to damage Rising Pharmaceuticals' business and steal its customers." Ex. B, ¶48.

q. Defendants' scheme had a deleterious impact on Rising Pharmaceuticals' cash flow and financial position, crippling Aceto and its subsidiaries and substantially contributing to their bankruptcy filing in February 2019. Without an independent manufacturing partner who actually intended to comply with its contractual obligations to supply product, Rising Pharmaceuticals could not fully monetize its investment or service the debt Aceto assumed to fund the initial $270 million payment to partner with Aurobindo in the first instance. As set forth more fully above, Aceto, through its subsidiaries, lost customer relationships and substantial profits, and suffered irreparable injury to its business reputations and significant failure-to-supply charges. Indeed, due in part to Aurobindo's intentional and calculated supply disruptions, Aceto ultimately was forced to write off substantial goodwill associated with the products acquired from Citron/Lucid—more than $250 million, almost the entirety of the purchase price. And the damage to its cash flow caused by Aurobindo's misconduct substantially contributed to Aceto's insolvency." Ex. B, ¶49.

53. In its Annual Report on Form 10-K for the 2018 fiscal year ("2018 10-K"), filed with the SEC on September 28, 2018, Defendants revealed that "beginning in the third quarter of fiscal 2018, Rising was subjected to an extraordinary magnitude of FTS claims." Defendants stated that, for fiscal year 2018, "Rising incurred approximately $27,778[7] in failure to supply penalties charged by certain customers based upon replacement cost or contractual cost. Approximately

[7] According to the 2018 10-K, "all dollar amounts are expressed in thousands, except share prices and per-share amounts."

$14,756 of the failure to supply penalties related to supply challenges with regards to products acquired from Citron."

**FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

***The 2017 10-K***

54. The Class Period begins on August 25, 2017, when the Company filed the 2017 10-K with the SEC. Guccione and Roth signed the 2017 10-K.

55. In the 2017 10-K, Guccione, Roth, and the Company stated:

> Net sales for the Human Health segment increased by $87,360 for the year ended June 30, 2017, to $315,395, which represents a 38.3% increase over net sales of $228,035 for the prior year. The primary reason for the increase is due to the acquisition of certain products and related assets of Citron and Lucid. Sales from the product acquisition of $122,118 are included in the year ended June 30, 2017. This increase was offset by a decline in sales of Rising products of $30,585 and a decline of $4,173 in sales of nutritional products. ***The decrease in Rising sales was primarily driven by increased competition, price erosion on certain products in our generic drugs portfolio and delays in contribution from new product launches***. (Emphasis added).

56. The foregoing statements were materially false and misleading because Guccione, Roth, and Aceto knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Guccione, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Guccione, Roth, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government

terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

57. In the 2017 10-K, for fiscal 2017, Guccione, Roth, and the Company reported goodwill of $236.970 million, intangible assets of $284.298 million, and total assets of $1.040790 billion. In addition, for fiscal 2017, Guccione, Roth, and the Company reported net operating income of $30.554 million.

58. The foregoing statements were materially false and misleading because Guccione, Roth, and Aceto, in violation of GAAP, knowingly or recklessly failed properly and timely to impair for goodwill and other intangible assets. As a result of a decline of Rising's actual and forecasted earnings due to Aurobindo's material breach of the Supply Agreements, persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreements Act country-of-origin provisions, Guccione, Roth, and the Company knew or recklessly disregarded that Aceto should have impaired goodwill by $235.11 million, or over 99%, and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangible assets, or over 7% of other intangible assets, for a total impairment of $256.3 million. As such, Guccione, Roth, and the Company knew or recklessly disregarded that Aceto's total assets were less than $800 million. Further, had Guccione, Roth, and the Company timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.554 million, Aceto would have reported an operating loss of approximately $225.7 million for fiscal 2017.

59. Defendants also stated in the 2017 10-K the following:

> *Dependence on a limited number of suppliers of Human Health and Pharmaceutical Ingredients products could lead to delays, lost revenue or increased costs.*
>
> Our future operating results may depend substantially on our suppliers' ability to timely provide Human Health and Pharmaceutical Ingredients products in connection with ANDAs and such suppliers' ability to supply us with these ingredients or materials in sufficient volumes to meet our production requirements. A number of the ingredients or materials that we use are available from only a single or limited number of qualified suppliers, and may be used across multiple product lines. If there is a significant increase in demand for an ingredient or other material resulting in an inability to meet demand, if an ingredient or material is otherwise in short supply or becomes wholly unavailable, or if a supplier has a quality issue, we may experience delays or increased costs in obtaining that ingredient or material. If we are unable to obtain sufficient quantities of ingredients or other necessary materials, we may experience production delays in our supply.
>
> *Each of the following could also interrupt the supply of, or increase the cost of, ingredients or other materials:*
>
> • *an unwillingness of a supplier to supply ingredients or other materials to us;*
>
> • *consolidation of key suppliers;*
>
> • *failure of a key supplier's business process;*
>
> • *a key supplier's inability to access credit necessary to operate its business; or*
>
> • *failure of a key supplier to remain in business, to remain an independent supplier, or to adjust to market conditions.*
>
> Any interruption in the supply or increase in the cost of ingredients or other materials provided by single or limited source suppliers could have a material adverse effect on our reputation, business, financial condition, operating results and cash flows. (Emphasis added).

60. The foregoing statements were materially false and misleading because Guccione, Roth, and the Company failed to disclose both the risk that a material manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet

the needs of the Company's customers, and that, at that time, Aurobindo's breach of the Supply Agreements had caused the risk already to have materialized. Guccione, Roth, and the Company knew or recklessly disregarded, but failed to disclose, that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

***The September 2017 Call***

61. On September 12, 2017, Aceto conducted a conference call in conjunction with the Morgan Stanley Healthcare Conference ("September 2017 Call") with analysts and investors. Guccione and Eilender participated for the Company.

62. During the September 2017 Call, when asked by an analyst about "where we are in the process of the integration [of Citron] and what's remaining," Guccione stated that Defendants have "had good feedback in terms of the overall impact [the acquisition of Citron has] had on Rising." Chairman Eilender added that "it's gone well."

63. The foregoing statements were materially false and misleading because Guccione and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Guccione, Eilender, and the Company created a false impression in the minds of investors regarding the success of Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

64. Also during the September 2017 Call, Defendants were asked about "any challenges you're facing with that process of integration there?" Chairman Eilender responded: "[T]he fact that Citron also did not manufacture their products but they partnered predominantly with Aurobindo, a large capable Indian manufacturer. It's really made the transition relatively smooth…."

65. The foregoing statements were materially false and misleading because Guccione, Eilender, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Guccione, Eilender, and the Company created a false impression in the minds of investors regarding the success of Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

***The November 2017 Press Release, Earnings Call, and 10-Q***

66. On November 2, 2017, Aceto issued a press release ("November 2017 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed the next day, announcing financial results for the first quarter of fiscal 2018 ended September 30, 2017. Kennally signed the November 2017 8-K and was quoted in the November 2017 Press Release.

67. In the November 2017 Press Release, Kennally stated: "Human Health segment sales benefited from the addition of the Citron and Lucid products. However, pricing pressure on the more mature products in the legacy Rising portfolio and the inclusion of the Citron and Lucid products, which carry a lower gross margin, contributed to a contraction in segment profitability."

68. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a material factor causing the decline in the Company's profits was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

69. Kennally also stated in the November 2017 Press Release the following: "[O]ur current view of industry conditions is now indicating greater than previously expected headwinds in terms of both competitive intensity and the impact from ongoing customer consolidations. As a result, we are lowering our net sales and profit guidance."

70. The foregoing statements were materially false and misleading because Kennally and the Company knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

71. The November 2017 Press Release also provided the following financial guidance for fiscal year 2018:

> For the fiscal year ending June 30, 2018, at current exchange rates, ACETO is providing financial guidance as follows:

- Total revenues to increase approximately 15% to 20%;
- Reported diluted GAAP earnings per share between $0.23 and $0.33;
- Diluted Non-GAAP earnings per share between $1.05 and $1.15.

The Company's fiscal 2018 financial guidance is based in part on the following assumptions:

- Generic industry headwinds continued in our first fiscal quarter and we are expecting annual price erosion in the low double digits percentage;
- R&D expense of approximately $10 million; and
- Total generic product launches of 15 to 20.

72. The foregoing statements were materially false and misleading because Kennally and the Company knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

73. The next day, on November 3, 2017, Aceto conducted an earnings conference call to discuss with analysts and investors the Company's financial results for the first quarter of fiscal 2018 ended September 30, 2017 ("November 2017 Earnings Call"). Kennally, Roth, Eilender, and Kaczmarek participated in the November 2017 Earnings Call.

74. During the November 2017 Earnings Call, Eilender stated:

> In the last 2 years, a number of external forces have buffeted our generic drug business unit, Rising. The consolidation within the distribution channels, coupled with intense competitive pricing pressures, have been historically unprecedented. As these external

> events were starting to come into focus, we took an important strategic step through the acquisition of Citron and Lucid assets to increase our generic drug commercial offerings, to increase our future pipeline of products, and *to partner with a reputable manufacturer of significant scale*. (Emphasis added).

75. The foregoing statements were materially false and misleading because Eilender and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Eilender and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

76. Also during the November 2017 Earnings Call, Kennally stated: "We're currently experiencing some short-term supply challenges that are largely the result of API constraints, and we're working diligently to ensure uninterrupted supply to our customers, and we anticipate full recovery by the end of the fiscal year."

77. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

78. Later during the November 2017 Earnings Call, an analyst asked about "the API issues that you've faced in the quarter" and whether "those issues [have] been resolved," Kennally responded, "I think the point of the API shortfall now is, we anticipate that that's going to be corrected by the end of the fiscal year. So we have had some technical issues related to that, and maybe Walt can address the specifics on that." Kaczmarek stated:

> So, a couple of different products in particular are being impacted. One is more of an API constraint, where we're not able to get as much of the API as we need to completely fulfill what market share that we have and our market share goals. And the other issue is a technical issue. So it's a combination of those two factors, and as Bill mentioned, we fully anticipate to have both of those issues fully corrected by the end of the fiscal year.

79. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

80. In addition, during the November 2017 Earnings Call, Roth stated:

> Human Health gross margin was 23.2%, compared to 29.7% last year, and is consistent with the gross margin run rates for the prior 2 quarters, which were subsequent to the product acquisition. ***The decline in gross margin was primarily due to the lower gross profitability of the Citron and Lucid products and the lower gross profit on legacy Rising products, reflecting an unfavorable product mix and price erosion on certain products***. (Emphasis added).

81. The foregoing statements were materially false and misleading because Roth and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Roth and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

82. During the November 2017 Earnings Call, Kennally stated:

> But one of the challenges I think that we have, even though we have great partners, is that we're not in control of our business. So it would be really nice if we could be in more control of our business, and that might mean taking a look at having in-house R&D, maybe even in-house manufacturing down the road.

83. Later during the November 2017 Earnings Call, in response to a question from an analyst regarding "improving the gross margin in the Human Health segment," Kennally stated:

> But I think in the longer term, the way we probably need to look at it is, relative to the comments I made about the partners that we work closely with and enjoy that working relationship. Our asset-light model is a primary driver for the lower gross profit as compared to some of our competitors, so what is it that we can do to increase our gross profit when it comes to having more control over our business? And that really relates to looking at bringing on the capabilities inside the company, perhaps on the R&D front and/or perhaps even on the manufacturing front. So these things will help us to -- if we can do those, and execute against those, it will help us improve our situation.

84. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material

breach of the Supply Agreements, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

85. Also on November 3, 2017, the Company filed its Quarterly Report on Form 10-Q for the first quarter of fiscal 2018 ended September 30, 2017 ("November 2017 10-Q") with the SEC. Kennally and Roth signed the November 2017 10-Q.

86. In the November 2017 10-Q, Kennally and Roth stated:

> We caution you that these statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control that may influence the accuracy of the statements and the projections upon which the statements are based. Factors that could cause actual results to differ materially from those set forth or implied by any forward-looking statement include, but are not limited to, our ability to remain competitive with competitors, risks associated with the generic product industry, dependence on a limited number of suppliers, risks associated with healthcare reform and reductions in reimbursement rates, difficulty in predicting revenue stream and gross profit, industry and market changes, the effect of fluctuations in operating results on the trading price of our common stock, risks associated with holding a significant amount of debt, inventory levels, reliance on outside manufacturers, risks of incurring uninsured environmental and other industry specific liabilities, governmental approvals and regulations, risks associated with hazardous materials, potential violations of government regulations, product liability claims, reliance on Chinese suppliers, potential changes to Chinese laws and regulations, potential changes to laws governing our relationships in India, fluctuations in foreign currency exchange rates, tax assessments, changes in tax rules, global economic risks, risk of unsuccessful acquisitions, effect of acquisitions on earnings, indemnification liabilities, terrorist activities, reliance on key executives, litigation risks, volatility of the market price of our common stock, changes to estimates, judgments and assumptions used in preparing financial statements, failure to maintain effective internal controls, and compliance with changing regulations, as well as other risks and uncertainties discussed in our reports filed with the Securities and Exchange

> Commission, including, but not limited to, our Annual Report on Form 10-K for the fiscal year ended June 30, 2017 and other filings.

87. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

88. The November 2017 10-Q also stated:

> The assets acquired in this transaction expand, complement, and strengthen our existing and future product offerings. In what has become a competitive generic drug business environment, one key for long-term success is having an ever-growing commercial portfolio of generic products, a strong internal drug development pipeline and capable, reliable manufacturing partners. This transaction adds significantly to the Rising business platform in all three crucial areas.

89. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roth, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

90. In addition, the November 2017 10-Q stated: "The increase in Human Health's gross profit was partially related to gross profit of $11[.3 million] on sales from the product acquisition, which is included in the three months ended September 30, 2017. This increase was partially offset by the decline of gross profit and gross margin on other Rising products, primarily driven by unfavorable product mix on certain products and increased competition."

91. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roth, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

92. In the November 2017 10-Q, for the first quarter of fiscal 2018 ended September 30, 2017, Kennally, Roth, and the Company reported goodwill of $237.004 million, intangible assets of $277.247 million, and total assets of $1.017973 billion. In addition, for the first quarter of fiscal 2018 ended September 30, 2017, Kennally, Roth, and the Company reported net operating income of $7.219 million.

93. The foregoing statements were materially false and misleading because Kennally, Roth, and Aceto, in violation of GAAP, knowingly or recklessly failed properly and timely to impair for goodwill and other intangible assets. As a result of a decline of Rising's actual and forecasted earnings due to Aurobindo's material breach of the Supply Agreements, persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreements Act country-of-origin provisions, Kennally, Roth, and the Company knew or recklessly disregarded that Aceto should have impaired goodwill by $235.11 million, or over 99%, and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangible assets, or over 7% of other intangible assets, for a total impairment of $256.3 million. As such, Kennally, Roth, and the Company knew or recklessly disregarded that Aceto's total assets were less than $800 million. Further, had Kennally, Roth, and the Company timely and properly impaired goodwill and other intangible assets, instead of operating income of $7.219 million, Aceto would have reported an operating loss of approximately $249 million for the first quarter of fiscal 2018 ended September 30, 2017.

94. The November 2017 10-Q also stated: "In addition to the other information set forth in this report, you should carefully consider the risk factors disclosed under Part I – 'Item 1A. Risk Factors' in our Form 10-K for the year ended June 30, 2017 which could materially adversely affect our business, financial condition, operating results and cash flows. The risks and uncertainties described in our Form 10-K for the year ended June 30, 2017 are not the only ones we face. Additionally, risks and uncertainties not currently known to us or that we currently deem immaterial also may materially adversely affect our business, financial condition, operating results or cash flows."

95. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

***The February 2018 Press Release, Earnings Call, and 10-Q***

96. In its February 2, 2018 press release ("February 2018 Press Release"), Aceto disclosed its financial results for the second quarter of fiscal 2018 ended December 31, 2017. Kennally signed the February 2018 8-K and was quoted in the February 2018 Press Release.

97. In the February 2018 Press Release, Kennally stated: "Our second fiscal quarter results reflect primarily the persistence of generic industry headwinds marked by greater competitive intensity and the impact from customer consolidations. Even as sales benefited from the addition of Citron and Lucid products, pricing pressures on our more mature Rising products and softer than expected contributions from new product launches caused a contraction in Human Health's gross margin."

98. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's

customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

99. Kennally also stated in the February 2018 Press Release the following:

> As we look to the second half of fiscal 2018, our operating assumption is the generic industry headwinds will not ease in the near term and we now have greater clarity on the impact of harmonization from customer consolidations. Adverse market conditions are impacting the sales, profitability and market share of certain Rising products to a greater degree than anticipated and a number of API projects which were scheduled to be monetized in the second half of the year have been discontinued. As a result of these factors, although we remain on track to launch 15-20 generic products this year, we are reducing our outlook for fiscal year sales and profitability and now expect our overall results for the second half of the year to be only modestly better than the first half.

100. The foregoing statements were materially false and misleading because Kennally and the Company knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

101. Also, Kennally stated in the February 2018 Press Release the following:

> Our healthy balance sheet and solid operating cash generation support our ability to weather the generic industry storm. At the same time, we continue to focus on optimizing Rising's commercialized portfolio of products and pipeline of projects to improve profitability in the future; we're advancing operational initiatives designed to enhance efficiencies; and, identifying ways to take costs out of the system. We continue to expect to have our new warehouse facility fully functional and our new ERP system

> implemented by the end of the year, at which point we will realize the full synergy value of $4 million on an annualized basis. With an integrated platform in place at Rising and a healthy flow of products to be launched, we firmly believe we are taking the right steps to ensure ACETO is properly positioned to improve the company's growth rate and profitability.

102. The foregoing statements were materially false and misleading because Kennally and the Company, in violation of GAAP, knew or recklessly disregarded that as result of a decline of the Company's Rising Pharmaceuticals' actual and forecasted revenue and earnings due to the Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million, or over 99%, and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles, or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Kennally and the Company knew or recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had the Company timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

103. In addition, Kennally provided the following guidance in the February 2018 Press Release for fiscal year 2018:

> For the fiscal year ending June 30, 2018, at current exchange rates, ACETO is providing financial guidance as follows:
>
> · Total revenues to increase approximately 10% to 15%;
>
> · Reported diluted GAAP loss per share between $(0.22) and $(0.32);
>
> · Diluted Non-GAAP earnings per share between $1.00 and $1.05.
>
> The Company's fiscal 2018 financial guidance is based in part on the following assumptions:
>
> · Generic industry headwinds continued in our second fiscal quarter and we are expecting annual price erosion in the low double digits percentage;
>
> · Reported diluted GAAP loss per share includes an additional tax expense of $0.39 related to the TCJA
>
> · R&D expense of approximately $9.0 million; and,
>
> · Total generic product launches of 15 to 20.

104. The foregoing statements were materially false and misleading because Kennally and the Company knew that Aceto would not meet the financial forecast the Company had provided to investors as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

105. Also on February 2, 2018, Aceto conducted an earnings conference call to discuss with analysts and investors the Company's financial results for the second quarter of fiscal 2018 ended December 31, 2017 ("February 2018 Earnings Call"). Kennally and Roth participated in the February 2018 Earnings Call.

106. In the February 2018 Earnings Call, Kennally stated the following:

> In Human Health, sales and gross profit were boosted by the addition of the Citron and Lucid products, which more than offset declines in sales and gross profit on the legacy Rising side. Continued competition from new entrants that have launched into the market and harmonization from customer consolidations hit a few products in our portfolio especially hard. … While market conditions in the generics market have been and continue to be challenging, we have a solid portfolio of 140 commercialized products covering diverse therapeutic treatments. … We're optimizing our pipeline of products to give us better returns down the road and adding to the mix more complex, high-value opportunities.

107. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

108. Kennally also stated the following during the February 2018 Earnings Call:

> As we move into the second half of the fiscal 2018, we are focused on executing Rising's operational initiatives as planned, meeting budgets and timetables and taking costs out of the system where we can. … Still, as I mentioned at the beginning of my remarks, we don't expect to see any easing of adverse generic market conditions in the near term. We'll continue to deal with the market dynamics while working through the supply chain challenges we mentioned on last quarter's call. We still expect these challenges to be resolved by fiscal year-end.

109. The foregoing statements were materially false and misleading because Kennally and the Company knew that Aceto would not meet the performance metrics which the Company

had provided to investors as guidance as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

110. In addition, when asked during the February 2018 Earnings Call by an analyst regarding whether Kennally expected to see a repeat of a "seasonally strong quarter for the API business from a revenue perspective," Kennally responded as follows:

> From a surprise standpoint, I think that some of the operational challenges that we are having as a result of the Citron acquisition have presented challenges to the business. And I think the new team, in particular the operations folks, have done a nice job in kind of recognizing some of those challenges and are addressing them. So for example, there's a robust S&OP process that's been established over at Rising, and that really hadn't historically been the case. As a result of that, the new team has also identified lead times and increasing our lead times with some of our partners in terms of getting product over to us so that we can sell it and that our safety stock has and/or will be improved. This is also helping from a freight standpoint. So when we have short supply, the freight costs have been increasing. And as a result of this new S&OP process, we've seen a nice decrease in our freight charges. So it's surprises like that. The operational issues, I think, have probably been the most surprise. Turning to the API, we're experiencing headwinds similar to what we're seeing in the generics industry, and it's kind of crossing over to some degree on the API side. And that's really -- increased competition has really been the result of some of the shortfalls that we're seeing there.

111. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the

minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

112. Further, when asked during the February 2018 Earnings Call by an analyst whether "bringing in your own manufacturing on the generics side" would be a priority for Aceto, Kennally responded as follows:

> Well, it's a high priority for us, and it's one of the reasons why I posted the slide. Because although I think the asset-light model offers some real advantages and we do a good job in that environment, owning our own intellectual property, our ANDA and DMF being a little bit more vertically integrated, those are all things that we're going to be able to increase our control and increase our gross profit. So the assets out there aren't necessarily readily available in accordance with some of the things that we're looking at, but we're looking at trying to bring those assets into the organization to strengthen us. So it's a high priority.

113. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

114. Also on February 2, 2018, the Company filed its Quarterly Report on Form 10-Q for the second quarter of fiscal 2018 ended December 31, 2017 ("February 2018 10-Q") with the SEC. Kennally and Roth signed the February 2018 10-Q.

115. In the February 2018 10-Q, Kennally and Roth stated the following:

> The assets acquired in this transaction expand, complement, and strengthen our existing and future product offerings. In what has become a competitive generic drug business environment, one key for long-term success is having an ever-growing commercial portfolio of generic products, a strong internal drug development pipeline and capable, reliable manufacturing partners. This transaction adds significantly to the Rising business platform in all three crucial areas.

116. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roth, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

117. The February 2018 10-Q also stated:

> We caution you that these statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control that may influence the accuracy of the statements and the projections upon which the statements are based. Factors that could cause actual results to differ materially from those set forth or implied by any forward-looking statement include, but are not limited to, our ability to remain competitive with competitors, risks associated with the generic product industry, dependence on a limited number of suppliers, risks associated with healthcare reform and reductions in reimbursement rates, difficulty in predicting revenue stream and gross profit, industry and market changes, the effect of fluctuations in operating results on the trading price of our common stock, risks associated with holding a significant amount of debt, inventory levels, reliance on outside manufacturers, risks of incurring uninsured environmental and other industry specific liabilities, governmental approvals and regulations, risks associated with hazardous materials, potential violations of government regulations, product liability claims, reliance on Chinese suppliers, potential changes to Chinese laws and regulations, potential changes to laws

> governing our relationships in India, fluctuations in foreign currency exchange rates, tax assessments, changes in tax rules, global economic risks, risk of unsuccessful acquisitions, effect of acquisitions on earnings, indemnification liabilities, terrorist activities, reliance on key executives, litigation risks, volatility of the market price of our common stock, changes to estimates, judgments and assumptions used in preparing financial statements, failure to maintain effective internal controls, and compliance with changing regulations, as well as other risks and uncertainties discussed in our reports filed with the Securities and Exchange Commission, including, but not limited to the Company's Annual Report on Form 10-K for the year ended June 30, 2017, as amended (the "2017 10-K") and other filings.

118. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

119. In addition, the February 2018 10-Q stated the following: "These increases [in net sales over the previous six months] in Human Health were offset in part, by a decline in sales of other Rising products due to continued pricing pressure, consolidation of customers and softer than expected contributions from new product launches."

120. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's

customers, Kennally, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally and Roof violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

121. Further, the February 2018 10-Q stated the following: "This increase [in gross profit over the previous six months] was partially offset by the decline of gross profit and gross margin on other Rising products, primarily driven by unfavorable product mix on certain products, increased competition and consolidation of customers."

122. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the

Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

123. Also, the February 2018 10-Q stated the following: "These increases [in net sales for the previous three months] in Human Health were offset in part, by a decline in sales of other Rising products due to continued pricing pressure, consolidation of customers and softer than expected contributions from new product launches."

124. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

125. In addition, the February 2018 10-Q stated the following: "This increase [in gross profit for the previous three months] was partially offset by the decline of gross profit and gross margin on other Rising products, primarily driven by unfavorable product mix on certain products, increased competition and consolidation of customers."

126. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roth, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

127. In the February 2018 10-Q, for the second quarter of fiscal 2018 ended December 31, 2017, Kennally, Roth, and the Company reported goodwill of $237.019 million, intangible assets of $270.072 million, and total assets of $1.014944 billion. In addition, for the second quarter of fiscal 2018 ended December 31, 2017, Kennally, Roth, and the Company reported net operating income of $3.785 million.

128. The foregoing statements were materially false and misleading because Kennally, Roth, and Aceto, in violation of GAAP, knowingly or recklessly failed properly and timely to impair for goodwill and other intangible assets. As a result of a decline of Rising's actual and forecasted earnings due to Aurobindo's material breach of the Supply Agreements, persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts

for 11 generic drug products for failure to comply with the federal Trade Agreements Act country-of-origin provisions, Kennally, Roth, and the Company knew or recklessly disregarded that Aceto should have impaired goodwill by $235.11 million, or over 99%, and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangible assets, or over 7% of other intangible assets, for a total impairment of $256.3 million. As such, Kennally, Roth, and the Company knew or recklessly disregarded that Aceto's total assets were less than $800 million. Further, had Kennally, Roth, and the Company timely and properly impaired goodwill and other intangible assets, instead of operating income of $3.785 million, Aceto would have reported an operating loss of approximately $252.4 million for the second quarter of fiscal 2018 ended December 31, 2017.

129. Further, the February 2018 10-Q stated the following:

> In addition to the other information set forth in this report, you should carefully consider the risk factors disclosed under Part I - "Item 1A. Risk Factors" in our 2017 10-K which could materially adversely affect our business, financial condition, operating results and cash flows. The risks and uncertainties described in our 2017 10-K are not the only ones we face. Additionally, risks and uncertainties not currently known to us or that we currently deem immaterial also may materially adversely affect our business, financial condition, operating results or cash flows.

130. The foregoing statements were materially false and misleading because Kennally, Roth, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roth, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

***The April 2018 Press Release and 8-K***

131. On April 18, 2018, Aceto issued a press release ("April 2018 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed the same day ("April 2018 8-K"), announcing that, "in light of the persistent adverse conditions in the generics market, it is negotiating with its bank lenders a waiver of its credit agreement with respect to its total net leverage and debt service coverage financial covenants in the fiscal third quarter, and that the financial guidance issued on February 1, 2018, should no longer be relied upon, and that "the Company anticipates recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures." Kennally signed the April 2018 8-K, and Eilender was quoted in the April 2018 Press Release.

132. The April 2018 Press Release stated that, "in light of the persistent adverse conditions in the generics market," "the financial guidance issued on February 1, 2018, should no longer be relied upon."

133. The foregoing statements were materially false and misleading because Kennally, Eilender, and the Company knew that Aceto would not meet the performance metrics which the Company had provided to investors as guidance as a result of Aurobindo's material breach of its supply obligations, the threat of losing valuable government contracts, and persistent adverse industry conditions. The Company's risk disclosures were not meaningful because they failed to warn that Aurobindo had actually refused to supply, rendering any forecast except for guidance that removed the impact from Citron/Lucid products materially false.

***The May 2018 Press Release, Earnings Call, and 10-Q***

134. On May 3, 2018, Aceto issued a press release ("May 2018 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed the next day ("May 2018 8-K"), announcing financial results for the fiscal 2018 third quarter ended March 31, 2018. Kennally signed the May 2018 8-K and was quoted in the May 2018 Press Release.

135. In the May 2018 Press Release, Kennally stated the following:

> Our third quarter results reflect continued adverse conditions in the generics market partially offset by highly effective portfolio management in our Performance Chemicals segment and a rebound in sales in our Pharmaceutical Ingredients segment. In addition, while we have been proactively addressing supply chain challenges in the generics business for the past few quarters, we received notification of failure to supply penalties during the quarter totaling $10.1 million. We expect that by the end of the fiscal year we will have made significant progress toward resolving these previously identified supply chain challenges.

136. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

137. The May 2018 Press Release also stated:

> Human Health segment sales were $91.9 million, a decrease of 7.9%, compared to $99.8 million for the third quarter of fiscal 2017. The decline was largely due to lower sales at Rising resulting from continued pricing and competitive pressures and softer than expected contributions from new product launches. In addition, Rising incurred approximately $10.1 million in failure to supply

> charges associated with products acquired from Citron and Lucid. Gross profit for the Human Health segment was $9.5 million, a decrease of 62.3%, compared to $25.3 million for the third quarter of fiscal 2017. Gross margin for the third quarter was 10.4%, compared to 25.3% in the prior year period. The decreases in gross profit and gross margin were due to an unfavorable product mix in certain Rising products, continued pricing pressure, intense competition and related consolidation of customers and failure to supply charges.

138. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

139. On May 4, 2018, Aceto conducted an earnings conference call to discuss with analysts and investors the Company's financial results for the fiscal 2018 third quarter ended March 31, 2018 ("May 2018 Earnings Call"). Kennally, Roof, and Kaczmarek participated in the May 2018 Earnings Call.

140. During the May 2018 Earnings Call, Kennally stated: "And in connection with the supply chain challenges we've previously identified, we received notification of failure-to-supply penalties this quarter of $10.1 million," and that In Human Health, the declines in sales and gross profits reflect the challenges at Rising, including the $10.1 million in failure-to-supply penalties."

141. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the

FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

142. Also during the May 2018 Earnings Call, Kennally stated the following:

> In our core business, Rising Pharmaceuticals continues to be batted about by generic industry headwinds, and at the same time, our colleagues have worked hard in solving some important operational issues. We will get through this because Aceto has the right corporate management team in place and the right leadership team at Rising, with the fortitude and experience to navigate through the turbulent waters we have encountered, and because we're making the right portfolio decisions to improve the business' profitability over time, laying in more complex, higher-value opportunities.

143. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

144. In addition, Kennally stated during the May 2018 Earnings Call:

> With respect to the supply chain challenges we've been talking about and the failure-to-supply penalties incurred this quarter, Walt and I, along with our supply chain team, traveled to meet with our key

> partners during the quarter to address the supply issues. Over the last few months, we've made significant progress at improving our overall inventory position. For example, with one key supplier in India that supplies most of our volume, a 50% improvement in terms of our inventory health has been realized, and we expect to improve that to 75% with the inventory rebuild by the end of May. This inventory improvement positively impacts our customer service levels, which in turn lowers our failure-to-supply exposure going forward. And I'm confident that the trajectory of these improvements in our supply position over the past quarter will continue, and we remain focused on our objective to deliver all our products on time to maximize the value of our portfolio.

145. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

146. Further, Kennally stated during the May 2018 Earnings Call: "I'm confident that we either are or soon will be meeting critical endpoints we agree are necessary to good business partnerships."

147. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally and the Company created a false impression in the the

minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

148. During the May 2018 Earnings Call, Roof stated:

> During the quarter, owing to the prolonged adverse conditions in the generics market along with the company's contract issues with the VA, management decided it was necessary to perform an interim goodwill impairment analysis at March 31, 2018. As a result, we recorded pretax noncash impairment charges totaling $256.3 million, consisting of a $235.1 million goodwill impairment charge and impairment charges of other identifiable intangible assets totaling $21.2 million.

149. The foregoing statements were materially false and misleading because Roof and the Company knew or recklessly disregarded that as result of a decline of Rising's actual and forecasted revenue and earnings due to Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Roof and the Company knew or recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had Aceto timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an

of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

150. During the question-and-answer portion of the May 2018 Earnings Call, an analyst asked Kennally whether the FTS penalties were "a function of some price increases that you didn't match," or if they were "all on the manufacturing side." Kennally responded that they were "all on the manufacturing side."

151. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo' persistent breach of the Supply Agreements was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

152. In addition, during the May 2018 Earnings Call, the following exchange took place between an analyst and Kennally:

> Analyst: And then as part of the transaction with Lucid/Citron to acquire those product portfolios, at the time, it was explained that this was going to strengthen the relationship on the manufacturing side and, as a result, would allow ACETO to have a better control over the supply. And it appears that's not the case. Is -- did something go astray over the past quarter? Or

maybe a little bit more detail on what's going on with the manufacturing side.

Kennally: Yes, sure, Matt. So I think previously, we have alluded to, and I mentioned on this call, that we've had some operational issues at our end. And candidly, we kind of rebuilt the entire supply chain team from what was first realized in the acquisition. So I think that was part and parcel of the problem. We've also run into some potential capacity challenges with our partners. And as a result of those 2 things, along with the customers that have really significantly tightened the reins on the failure-to-supply penalties, kind of results in what we've seen that began to really materialize in the -- probably the second quarter of this year, resulting in the failure-to-supply penalties that came later, which we continue to expect to see in the fourth quarter.

153. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

154. Another analyst questioned Kennally about the FTS penalties during the May 2018 Earnings Call, revealing that analysts, and therefore the market generally, remained unaware that there was a single source—Aurobindo—behind all, or nearly all, of the FTS penalties:

Analyst: And then a similar question for the failure to supply product. Was it just one product or a limited basket of products? Or is it sort of wide-ranging in terms of the number of products that were involved in it?

Kennally: Yes. We had a number of products that were impacted, and we've been focusing on the top 5 products to recover

155. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

156. The same analyst then followed up during the May 2018 Earnings Call in the following exchange, revealing that analysts, and the market generally, remained unaware of any of the material facts underlying Aurobindo's breach of the Supply Agreements:

Analyst: And do you have any remedies in place with your suppliers? Is it an issue that was sort of their fault? Or is it your supply chain team that you've now [bolstered] that was responsible for the failure to supply?

Kennally: Well, as I mentioned earlier, Dewey, I think it's probably a combination of factors that kind of contributed to it. What I can say is that we have rebuilt our entire supply chain team, put in a sales and S&OP process that I think is inclusive of all the necessary stakeholders. And the remediation plan that we have actually has demonstrated great progress in our overall ability to get supply from our partners. And we plan to expand what we've done in a couple of situations across our partner category so that we can have state-of-the-art S&OP process that'll help us to ensure that we can stay ahead of the curve as it comes to future failure to supplies.

157. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

158. Later in the May 2018 Earnings Call, Kennally was asked whether he anticipated any FTS penalties in the fourth fiscal quarter. Kennally responded:

> Yes, we do anticipate continued failure to supply, and we have forecasted that in our numbers. However, we do believe that we are at the tail end of this situation. So yes, in answer to your question, we do anticipate to get some failure-to-supply in the fourth quarter. Keep in mind that our failure-to-supply penalties that we get from customers is based on past performance, so they run about a quarter behind.

159. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

160. Later still, during the May 2018 Earnings Call, the following exchange occurred between an analyst and Kennally regarding FTS penalties:

> Analyst: And then just with respect to the failure-to-supply issue, you'd mentioned in an earlier response that those charges are 1 quarter delayed. So the $10.1 million that you incurred in the third quarter was from a second quarter penalty? Do I understand that correctly?
>
> Kennally: Yes. Look, it kind of lapses and wanes. So when I use a quarter as an example, don't hold me to the full 90 days. It's just the delayed response from things that have happened in the past. So I can't really tell you if everything was just from the second quarter or if some bled into the first part of the third quarter. I think the key is that it's just -- it occurs in the past, and then they reconcile and then bill us for it at a period of time in the future.
>
> Analyst: Okay. I guess it's my way of, I think, getting at maybe the question that was asked by some others, which is to say, if it's winding down in the fourth, and that reflects the third quarter that's past, then we can comfortably say that as of today, presuming you're not going to see anything in the first quarter of fiscal '19, that, that situation is officially resolved. If you understand kind of what I'm trying to confirm with you.
>
> Kennally: I do, I do, Steve. And look, it's difficult to give you a yes or a no on that. So first of all, there's quality issues, there's API issues that may lead -- there's product recall issues that may lead to failure to supply. So there are a number of factors that can impact that. And unfortunately for us, we've actually experienced all of those. What we do believe is that we haven't completely fixed the supply issues with some of our key partners, but we've made great strides. So we do think that we will have them going forward, but it won't be of the magnitude that we've had them in the third quarter and in the past.

161. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the

FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

162. On May 7, 2018, the Company filed its Quarterly Report on Form 10-Q for the third quarter of fiscal 2018 ended December 31, 2017 ("May 2018 10-Q") with the SEC.[8] Kennally and Roof signed the May 2018 10-Q.

163. In the May 2018 10-Q, Kennally and Roof stated:

> The assets acquired in the product purchase transaction expanded, complemented, and strengthened our existing and future product offerings. In what has become a competitive generic drug business environment, one key for long-term success is having an ever-growing commercial portfolio of generic products, a strong internal drug development pipeline and capable, reliable manufacturing partners. This transaction added significantly to the Rising business platform in all three crucial areas.

164. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was

---

[8] On October 12, 2018, the Company filed an amended version of the May 2018 10-Q ("May 2018 10-Q/A"). Aceto filed the May 2018 10-Q/A to "amend and restate the Company's unaudited consolidated condensed financial statements and related notes for the three and nine months ended March 31, 2018 and 2017, as discussed below and in Notes 2 and 12 to the accompanying restated consolidated condensed financial statements, as well as to amend certain other Items within the Original Filing as listed in 'Items Amended in this Filing' below, as a result of the restatement of the Company's consolidated condensed financial statements." The restatement arose from the Company's determination that its "unaudited consolidated condensed financial statements for the three and nine months ended March 31, 2018 incorrectly accounted for a valuation allowance related to deferred tax assets and should be restated to reflect this allowance."

not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

165. Also, the May 2018 10-Q stated the following: "During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market."

166. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's financial performance was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

167. In addition, the May 2018 10-Q stated:

> Based on these indicators [i.e., the decline in actual and forecast revenue for Rising's operating unit and the government's finding of noncompliance with TAA country-of-origin provisions], the Company determined that it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit.
>
> …
>
> The total impairment charges for goodwill and intangibles recorded in the third quarter of fiscal 2018 was $256,266, all of which related to the Rising reporting unit which is part of the Human Health segment.

168. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that as result of a decline of Rising's actual and forecasted revenue and earnings due to Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Kennally, Roof, and the Company or

recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had Aceto timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

169. The May 2018 10-Q also stated: "These increases [in net sales for the previous nine months] in Human Health were offset in part, by a decline in sales of certain currently marketed and pipeline generic products as a result of continued pricing pressure, intense competition and related consolidation of customers and softer than expected contributions from new product launches. In addition, Rising incurred approximately $12,903 in failure to supply penalties primarily related to supply challenges with regards to products acquired from Citron and Lucid."

170. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and

prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

171. In addition, the May 2018 10-Q stated the following: "The decline in gross margin is primarily driven by unfavorable product mix on certain Rising products, continued pricing pressure, intense competition and related consolidation of customers and failure to supply charges."

172. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

173. Further, the May 2018 10-Q stated as follows: "The primary reason for the decrease [in net sales for the previous three months] is due to $8[.2 million] decline in sales of Rising products as a result of continued pricing pressure, intense competition and related consolidation of customers and softer than expected contributions from new product launches. ... In addition, Rising incurred approximately $10,132 in failure to supply penalties primarily related to supply challenges with regards to products acquired from Citron and Lucid."

174. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and

the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

175. The May 2018 10-Q also stated the following: "The decline in gross profit and gross margin [for the previous three months] was primarily driven by unfavorable product mix on certain Rising products, continued pricing pressure, intense competition and related consolidation of customers and failure to supply charges."

176. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds

of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligations to disclose Aurobindo's material breach of the Supply Agreements and the risk of the government terminating the eleven contracts Aceto had with the VA, both of which were known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

177. In addition, the May 2018 10-Q stated as follows:

> We caution you that these statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control that may influence the accuracy of the statements and the projections upon which the statements are based. Factors that could cause actual results to differ materially from those set forth or implied by any forward-looking statement include, but are not limited to, our ability to remain competitive with competitors, risks associated with the generic product industry, dependence on a limited number of suppliers, risks associated with healthcare reform and reductions in reimbursement rates, difficulty in predicting revenue stream and gross profit, industry and market changes, the effect of fluctuations in operating results on the trading price of our common stock, risks associated with holding a significant amount of debt, inventory levels, reliance on outside manufacturers, risks of incurring uninsured environmental and other industry specific liabilities, governmental approvals and regulations, risks associated with hazardous materials, potential violations of government regulations, product liability claims, reliance on Chinese suppliers, potential changes to Chinese laws and regulations, potential changes to laws governing our relationships in India, fluctuations in foreign currency exchange rates, tax assessments, changes in tax rules, global economic risks, risk of unsuccessful acquisitions, effect of acquisitions on earnings, indemnification liabilities, terrorist activities, reliance on key executives, litigation risks, volatility of the market price of our common stock, changes to estimates, judgments and assumptions used in preparing financial statements, failure to maintain effective internal controls, and compliance with

> changing regulations, as well as other risks and uncertainties discussed in our reports filed with the Securities and Exchange Commission, including, but not limited to this Quarterly Report on Form 10-Q, the Company's Annual Report on Form 10-K for the year ended June 30, 2017, as amended (the "2017 10-K") and other filings.

178. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

179. Further, the May 2018 10-Q stated as follows:

> In addition to the other information discussed in this report, the factors described in Part I, Item 1A. "Risk Factors" in our 2017 Annual Report on Form 10-K for the fiscal year ended June 30, 2017, as amended, should be considered as they could materially adversely affect our business, financial condition, liquidity or future results.
>
> The risk factors set forth below update and, to the extent inconsistent, supersede the risk factors associated with our business previously disclosed in Part I, Item 1A. "Risk Factors" in our 2017 Annual Report on Form 10-K for the fiscal year ended June 30, 2017, as amended.
>
> The risk factors identified by the Company in this and other filings may not describe all of the risks facing our company. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may adversely affect our business, financial condition or operating results.

180. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet

its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

181. The May 2018 10-Q stated the following:

> The material impairment charge that we recorded as of March 31, 2018 was based on several adverse factors, certain of which could materially adversely impact the Company in subsequent fiscal quarters.
>
> In the third quarter of fiscal 2018, we recorded impairment charges for goodwill and intangible assets of $256,266, all of which related to the Rising Pharmaceuticals reporting unit which is part of the Human Health segment. During the third quarter of fiscal 2018, our Rising Pharmaceuticals reporting unit had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, the U.S. government made a determination (which we are appealing) that 11 generic drug products we acquired through our Acetris Health subsidiary (part of the Rising Pharmaceuticals reporting unit) in a product purchase agreement with Lucid are not in compliance with the TAA country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. As a result of the foregoing, we conducted an impairment test and recognized a significant goodwill and intangible asset impairment charge.
>
> *Many of the market and industry factors that led to the March 31, 2018 impairment charges could continue to impact us in future fiscal periods. Such factors could materially and adversely impact our business, financial condition, results of operations, liquidity and cash flows and could lead to additional impairment charges in the future.* (Emphasis added).

182. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that as result of a decline of Rising's actual and forecasted revenue and earnings due to Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Kennally, Roof, and the Company knew or recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had Aceto timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

***The September 2018 Press Release and Earnings Call, and the 2018 10-K***

183. On September 28, 2018, Aceto issued a press release ("September 2018 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed the same day ("September 2018 8-K"), announcing financial results for the fiscal 2018 fourth quarter and fiscal

year ended June 30, 2018. Kennally signed the September 2018 8-K and was quoted in the September 2018 Press Release.

184. In the September 2018 Press Release, Kennally stated as follows:

> Fourth quarter net sales and gross profit were negatively impacted by sustained generic industry headwinds and higher than expected failure to supply (FTS) penalties at our Rising business. Since February 2018, we initiated several process improvements in our supply chain management that resulted in an 80% recovery in our inventory with most of our impacted business reaching forecasted safety stock levels today.

185. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

186. Kennally also stated in the September 2018 Press Release the following:

> At Rising, we enter the new fiscal year with a re-built, experienced management team and a significantly improved supply chain position with our customers and partners. We plan to launch between 15-20 generic products after launching 18 in fiscal 2018. A new warehouse facility is on track to be fully functional by the end of calendar 2018 and a new state of the art ERP system has replaced 3 disparate systems. We have created a platform to return to top-line growth which in turn will allow us to balance our asset-light business model with more intellectual property ownership, restoring profitability.

187. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

188. With respect to the fourth fiscal quarter of 2018, the September 2018 Press Release stated:

> Human Health segment sales were $73.1 million, a decrease of 35.7%, compared to $113.7 million for the fourth quarter of fiscal 2017. The decline was due to lower sales at Rising resulting from continued pricing and competitive pressures and softer than expected contributions from new product launches. In addition, Rising incurred approximately $14.9 million in failure to supply charges. Gross profit for the Human Health segment was a negative $8.3 million, compared to $21.7 million for the fourth quarter of fiscal 2017. Gross margin for the fourth quarter was a negative 11.3%, compared to 19.1% in the prior year period. The negative gross profit and gross margin for the 2018 period reflect continued pricing pressure, intense competition and related consolidation of customers, unfavorable product mix and failure to supply charges at Rising partially offset by gross profit and gross margin gains in the company's Nutritionals business.

189. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of

Aceto's customers, Kennally created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

190. With respect to fiscal year 2018, the September 2018 Press Release stated:

> Human Health segment sales were $374.5 million, an increase of 18.7% compared to $315.4 million for the prior year. The increase reflects the acquisition of certain products and related assets of Citron and Lucid on December 21, 2016 and higher nutritional product sales of $4.4 million, offset in part by a decline in sales of certain currently marketed and pipeline generic products as a result of continued pricing pressure, intense competition and related consolidation of customers and softer than expected contributions from new product launches. Sales from the acquired products were $197.5 million for the year ended June 30, 2018 compared to $122.1 million for the prior year. In addition, Rising incurred approximately $27.8 million in failure to supply penalties charged by certain customers based upon replacement cost or contractual cost, of which approximately $14.8 million related to supply challenges with regards to products acquired from Citron.
>
> Gross profit for the Human Health segment was $48.8 million, a decrease of 37.5%, compared to $78.1 million for the prior year. Gross margin was 13.0% compared to 24.8% for the prior year. The decline in gross margin is primarily due to unfavorable product mix on certain Rising products, continued pricing pressure, intense

> competition and related consolidation of customers and failure to supply charges. In addition, costs were incurred due to certain of the company's partners that have not performed in accordance with the agreements with such partners.

191. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

192. Also on September 28, 2018, Aceto conducted an earnings conference call to discuss with analysts and investors the Company's financial results for the fiscal 2018 fourth quarter ended June 30, 2018 ("May 2018 Earnings Call"). Kennally and Roof participated in the September 2018 Earnings Call.

193. During the September 2018 Earnings Call, Kennally stated: "Failure-to-supply penalties had an unfavorable impact on revenue and gross profit in the quarter as we continue to recover from supply interruptions with some of our products, although I will note that we have made significant progress here since earlier this year when we began to track this closely."

194. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period and that the Company had not made "significant progress" in resolving its "supply chain challenges." By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

195. Kennally also stated during the September 2018 Earnings Call the following: "In Human Health, much like what has been seen in earlier quarters, competitive pressures and failure-to-supply claims with our Rising business negatively impacted revenue and gross profit."

196. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's revenue and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors

regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

197. In addition, Kennally stated during the September 2018 Earnings Call the following:

> While generic industry headwinds have a negative impact on Rising's financial results, operationally, we accomplished a great deal during the fourth quarter and put in place procedures and disciplines that will help us to improve our performance and results for fiscal 2019. We have built robust procedures and processes around the failure-to-supply notifications we get from customers, while significantly improving our product safety stock levels, which will put us in a much better position to adjudicate and reduce claims. The failure-to-supply claims we are getting from our customers are providing a significant revenue stream for them and are complicated to reconcile.

198. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

199. With respect to Aceto's supply-chain problems, Kennally said the following during the September 2018 Earnings Call:

> Of course, the best fix to the problem is to eliminate backorders; and as previously stated, we have made significant progress to that end goal. We previously communicated our expectations that supply

> penalties would be reduced in the fourth quarter. Capacity constraints, which we are managing through, along with the quality issue with 1 partner that led to 2 product discontinuations slowed our progress with our supply continuity in the quarter. Recent analytics have shown approximately an 80% improvement in our safety stock since earlier this year, and we have forecasted 25% of what we paid out in fiscal year 2018 in failure-to-supply claims, most of which we expect to realize in the first half of this fiscal year. And barring additional partner issues related to either capacity or quality, we feel very confident that we have a handle on our future. Failure-to-supply claims we receive from our customers because of the procedures and disciplines that have been put in place are really the reason for that.
>
> Understanding that, eliminating backorders in a business of our scale is nearly impossible. A healthy supply chain turns failure-to-supply claims from being a significant drain on profitability to a less significant financial issue, and we are clearly moving in that direction.

200. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

201. During the September 2018 Earnings Call, Roof stated the following:

> On a reporting segment basis, Human Health segment sales were \$73.1 million, a decrease of \$40.6 million or 35.7% from the fourth quarter of fiscal 2017 almost entirely due to lower sales at Rising that reflect pricing and competitive pressures; approximately \$14.9 million in failure-to-supply charges, of which, \$4.2 million was rebilled back to partners and partner reserves of approximately \$9.2 million.

> Gross profit was a negative $8.3 million compared to gross profit of $21.7 million last year, and gross margin was a negative 11.3% compared to 19.1% in the prior periods due to the factors I just mentioned.

202. The foregoing statements were materially false and misleading because Roof and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Roof and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

203. In addition, Kennally stated the following during the September 2018 Earnings Call:

> [O]ur failure-to-supply has been a significant negative factor in our revenue and profitability. As I outlined earlier, we have taken several steps to improve failure-to-supply issues, including improving our inventory position by about 80%, instituting enhanced tracking, developing a robust supply and demand forecast and increased communications with suppliers. In addition, the company is accelerating the review on resolution of failure-to-supply claims. The great strides we have made here will be evident in forward quarters.

204. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors

regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

205. Further, on the September 2018 Earnings Call, the following exchange occurred between an analyst and Kennally:

> Analyst: And it sounds like you've taken a number of steps to resolve the [FTS] issues there, but as you look at those, and I am sure it's a case-by-case basis, but as you look at those different amounts, how much of those can you look at your partner, whether it's on the manufacturing side or whatever, and look at those and say okay, we had no control over this? And why wouldn't you be able to bill them a greater amount than the -- what is effectively, what, a quarter or so of the amount?
>
> Kennally: Yes, so 2 things there, Matt. First of all, the -- each of the contracts that we have differ. So in some cases, we would bill the partner the entire amount if the fault lied completely with them. In many of our partner agreements, we have a 50-50 partner share, and that has to just basically do with the agreements that we have with our partners. So I think if you think through how we manage this whole process, the burden of proof really lies with Rising because we get hit by our customers. And then during that reconciliation process, we hand certain percentages over to our partners. Now it could also be that some additional monies out of that $14 million will come back our way. But at this point in time, we have, as you said, probably about 35% of that going back to our partners.

206. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's

customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

207. Kennally also stated during the September 2018 Earnings Call as follows:

> And I would want to add that we've made a lot of changes on the Rising side over the last year. We've essentially rebuilt this business. We have suffered from failure to supply, but as I stated on the call earlier, and you'll be able to see in the prepared comments online that we really feel we got a handle on this and we're poised for growth. So I think going forward, the businesses are stable and we are ready to go.

208. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

209. Also on September 28, 2018, Aceto filed the 2018 10-K that Kennally and Roof signed.

210. The 2018 10-K stated as follows:

> The assets acquired in the product purchase transaction expanded, complemented, and strengthened our existing and future product offerings. In what has become a competitive generic drug business environment, one key for long-term success is having an ever-growing commercial portfolio of generic products, a strong internal

> drug development pipeline and capable, reliable manufacturing partners. We believe that this transaction added significantly to the Rising business platform in all three crucial areas.

211. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

212. The 2018 10-K also stated the following:

> *The material impairment charge that we recorded in fiscal 2018 was based on several adverse factors, certain of which could materially adversely impact the Company in subsequent fiscal quarters.*
>
> In the third quarter of fiscal 2018, we recorded impairment charges for goodwill and intangible assets of $256,266, all of which related to the Rising Pharmaceuticals reporting unit which is part of the Human Health segment. During the third quarter of fiscal 2018, our Rising Pharmaceuticals reporting unit had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, the U.S. government made a determination (which was subsequently reversed) that 11 generic drug products we acquired through our Acetris Health subsidiary (part of the Rising Pharmaceuticals reporting unit) in a product purchase agreement with Lucid were not in compliance with the country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. As a result of the foregoing, we conducted an impairment test and recognized a significant goodwill and intangible asset impairment charge.
>
> *Many of the market and industry factors that led to the March 31, 2018 impairment charges could continue to impact us in future fiscal periods. Such factors could materially and adversely impact our business, financial condition, results of operations, liquidity and*

> *cash flows and could lead to additional impairment charges in the future.* (Emphasis added).

213. The foregoing statements were materially false and misleading Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors that "market and industry factors," rather than Aceto's acquisition of Lucid and Citron as well as the Supply Agreements binding Aceto to Aurobindo for a 14-year term, caused Rising's financial problems, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

214. In addition, the 2018 10-K stated the following:

> *Dependence on a limited number of suppliers of Human Health and Pharmaceutical Ingredients products could lead to delays, lost revenue or increased costs.*
>
> Our future operating results may depend substantially on our suppliers' ability to timely provide Human Health and Pharmaceutical Ingredients products in connection with ANDAs and such suppliers' ability to supply us with these ingredients or materials in sufficient volumes to meet our production requirements. A number of the ingredients or materials that we use are available from only a single or limited number of qualified suppliers, and may be used across multiple product lines. If there is a significant increase in demand for an ingredient or other material resulting in an inability to meet demand, if an ingredient or material is otherwise in short supply or becomes wholly unavailable, if a supplier fails to supply the ingredients or materials, or if a supplier has a quality issue, we may experience delays or increased costs in obtaining that ingredient or material. If we are unable to obtain sufficient quantities of ingredients or other necessary materials, we may experience production delays in our supply. We may also incur substantial liability to our customers for failing to supply the product to them. (See "We may be subject to significant level service penalties in our generics business.").

> Each of the following could also interrupt the supply of, or increase the cost of, ingredients or other materials:
>
> · an unwillingness of a supplier to supply ingredients or other materials to us;
>
> · consolidation of key suppliers;
>
> · failure of a key supplier's business process;
>
> · a key supplier's inability to access credit necessary to operate its business; or
>
> · failure of a key supplier to remain in business, to remain an independent supplier, or to adjust to market conditions.
>
> Any interruption in the supply or increase in the cost of ingredients or other materials provided by single or limited source suppliers could have a material adverse effect on our reputation, business, financial condition, operating results, cash flows and liquidity.

215. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

216. Further, the 2018 10-K stated the following:

> *We may be subject to significant service level penalties in our generics business.*
>
> Certain of our distribution agreements in our finished dosage form generics business contain service level penalties ("failure to supply") or similar provisions that may subject us to charges and penalties in the event we do not meet our supply obligations thereunder. Such charges and penalties may be substantial and may not be adequately reimbursed by our suppliers or at all. We incurred

> approximately $27,778 in gross failure to supply penalties during the year ended June 30, 2018 of which we anticipate approximately $9,445 will be reimbursed to us by our suppliers responsible for our inability to supply product. Additionally, we are disputing many of these charges and working with our customers to reverse some of these charges. The level of failure to supply penalties is difficult for us to predict and thus we can provide no assurance with respect to the level of these penalties in future periods. A continuation of these supply challenges could have a material adverse effect on our reputation, business, financial condition, operating results, cash flows and liquidity.

217. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period, and that such risk had already materialized. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

218. The 2018 10-K also stated the following:

> *Failure to obtain products from outside manufacturers could adversely affect our ability to fulfill sales orders to our customers.*
>
> We rely on outside manufacturers to supply products for resale to our customers. Manufacturing problems, including, among other things, manufacturing delays caused by plant shutdowns, regulatory issues, damage or disruption to raw material supplies due to weather, including, among other things, any potential effects of climate change, natural disaster or fire, could occur. If such problems occur, we cannot assure you that we will be able to deliver our products to our customers profitably or on time. Such factors could exacerbate our exposure to failure to supply penalties. See "We may be subject to significant service level penalties in our generics business."

219. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period, and that such risk had already materialized. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

220. Also, the 2018 10-K stated:

> Goodwill is calculated as the excess of the cost of purchased businesses over the value of their underlying net assets. Other indefinite-lived intangible assets principally consist of trademarks. Goodwill and other indefinite-lived intangible assets are not amortized.
>
> The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"). ASC 350 requires that goodwill and other intangibles with indefinite lives be tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of an asset has decreased below its carrying value. *During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market.* In addition, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary (part of the Rising reporting unit which is part of the Human Health segment) in a product purchase agreement with an entity formerly known as Lucid Pharma LLC were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on these indicators, the Company determined that it was necessary to perform an interim goodwill

> impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit. (Emphasis added).

221. The foregoing statements were materially false and misleading Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors that "persistent adverse conditions in the generics market," rather than Aceto's acquisition of Lucid and Citron as well as the Supply Agreements binding Aceto to Aurobindo for a 14-year term, caused Rising's financial problems, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

222. In addition, the 2018 10-K stated: "These increases [in net sales for fiscal 2018] in Human Health were offset in part, by a decline in sales of certain currently marketed and pipeline generic products as a result of continued pricing pressure, intense competition and related consolidation of customers and softer than expected contributions from new product launches. In addition, Rising incurred approximately $27,778 in failure to supply penalties charged by certain

customers based upon replacement cost or contractual cost. Approximately $14,756 of the failure to supply penalties related to supply challenges with regards to products acquired from Citron."

223. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

224. The 2018 10-K also stated that "[t]he decline in gross margin [for fiscal 2018] is primarily driven by unfavorable product mix on certain Rising products, continued pricing pressure, intense competition and related consolidation of customers and failure to supply charges. In addition, certain of our partners have not performed in accordance with their agreements with such partners, which have caused us to incur additional costs."

225. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

226. Further, the 2018 10-K stated the following: "During the year ended June 30, 2018, the Company recorded impairment charges of $256,266, all of which related to the Rising business segment. The impairment charges consisted of $235,110 of goodwill impairment charges and a $21,156 write-down of other identifiable intangible assets. For additional information regarding these impairment charges, see Note 6 to the Company's Consolidated Financial Statements. There were no impairment charges recorded in the year ended June 30, 2017."

227. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that as result of a decline of Rising's actual and forecasted revenue and earnings due to Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Kennally, Roof, and the Company knew or recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had Aceto timely and properly impaired goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

***The November 2018 Press Release, Earnings Call, and 10-Q***

228. On November 8, 2018, Aceto issued a press release ("November 2018 Press Release"), which the Company attached as Exhibit 99.1 to the Form 8-K it filed the next day ("November 2018 8-K"), announcing financial results for the fiscal 2019 first quarter ended

September 30, 2018. Kennally signed the November 2018 8-K and was quoted in the November 2018 Press Release.

229. In the November 2018 Press Release, Kennally stated: "With regards to our Rising business, sales declined year-over-year in part because of the loss of revenue from government entities and the continuing challenges we face in the generics market. Nevertheless, the steps we have taken to improve our supply chain position with our customers and partners and to increase our inventory safety stock levels resulted in decreased Failure to Supply charges during the first quarter as compared to each of the previous two quarters."

230. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's sales was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements

binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

231. The November 2018 Press Release also stated:

> Human Health segment sales were $80.8 million, a decrease of 23.7%, compared to $106.0 million for the first quarter of fiscal 2018. The decline was primarily due to lower sales at Rising resulting from persistent adverse conditions in the generics market, and the loss of revenue from government entities. In addition, Rising incurred approximately $6.5 million in failure to supply charges. Gross profit for the Human Health segment was $8.5 million, compared to $24.6 million for the first quarter of fiscal 2018 due primarily to lower sales as well as to the failure to supply penalties. Gross margin for the first quarter was 10.5%, compared to 23.2% in the prior year period. The decline in gross margin for the 2019 period reflects continued pricing pressure, intense competition and related consolidation of customers, unfavorable product mix and failure to supply charges at Rising.

232. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the declines in the Company's sales and profit was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

233. Also on November 9, 2018, Aceto conducted an earnings conference call to discuss with analysts and investors the Company's financial results for the fiscal 2019 first quarter ended September 30, 2018 ("November 2018 Earnings Call"). Kennally and Roof participated in the November 2018 Earnings Call.

234. During the November 2018 Earnings Call, Kennally stated:

> Revenue and gross profit were also negatively impacted by failure to supply penalties of $6.5 million, a portion of which may be recoverable in the next fiscal quarter from customers. We talked last quarter about the disciplines and procedures we instituted to improve our supply chain with our customers and partners and increased our inventory safety stock levels. In this quarter, we began to see the benefit of those operational improvements materialize. Failure to supply claims have decreased for the third consecutive quarter, and our forward projections represent a healthy supply chain with minimal customer back orders. Our team has worked extremely hard in all areas of the supply chain, and I'm highly confident we now have this fully under control.

235. The foregoing statements were materially false and misleading because Kennally and the Company knew or recklessly disregarded that a substantial factor causing the decline in the Company's revenue was Aurobindo's material breach of the Supply Agreements. By failing to disclose that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding the factors that were causing the Company to underperform, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, source of the "supply chain challenges" confronting Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements

binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

236. Also during the November 2018 Earnings Call, Roof stated the following: On a reporting segment basis, Human Health segment sales were $80.8 million, a decrease of $25.2 million or 23.7% from the first quarter of fiscal 2018, due to lower sales at Rising that reflect ongoing adverse generic market conditions, delayed product launches and approximately $6.5 million in failure to supply charges."

237. The foregoing statements were materially false and misleading because Roof and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Roof and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

238. In addition, Roof stated during the November 2018 Earnings Call the following: "Gross profit was $8.5 million compared to gross profit of $24.6 million last year, and gross margin was 10.5% compared to 23.2% last year. The declines in gross profit and gross margin reflect primarily an unfavorable product mix on certain Rising products, continued pricing pressure, intense competition, and related consolidation of customers and the failure to supply charges."

239. The foregoing statements were materially false and misleading because Roof and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS

penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Roof and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

240. Further, Roof stated the following during the November 2018 Earnings Call:

> With respect to the failure to supply penalties, as reported for fiscal year 2018, Rising reported $27.8 million in FTS Claims. Approximately $9 million of this amount was rebilled to Rising partners. In fiscal Q1 2019, Rising recorded $6.5 million in FTS claims, with $3 million of this amount rebilled to Rising partners. Rising has continued to go through a review and adjudication process to validate customer FTS Claims and has disputed a number of these claims. Depending on the results of negotiations with customers, Rising estimates that it could potentially reverse up to $13.3 million of these claims. If this happens, Rising expects to credit back to its Rising partners the amount of the partner's share of FTS claims originally billed to such partner, which typically is in the range of 50%.

241. The foregoing statements were materially false and misleading because Roof and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Roof and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

242. During the November 2018 Earnings Call, when questioned by an analyst regarding the FTS penalties, Kennally responded as follows: "And what you've heard me say in the past or what I have said in the past in the event that you haven't heard me is that the goal is to get this to a level where it's nonmaterial and nonsignificant. And we are not quite there yet but I anticipate that we're going to get there shortly. So I would expect next quarter's failure to supply barring any major or unforeseen issue that we are not aware of, will be a fraction of what we're paying today."

243. The foregoing statements were materially false and misleading because Kennally and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

244. In addition, on November 9, 2018, the Company filed its Quarterly Report on Form 10-Q for the first quarter of fiscal 2019 ended September 30, 2018 ("November 2018 10-Q") with the SEC. Kennally and Roof signed the November 2018 10-Q.

245. The November 2018 10-Q stated as follows:

> The assets acquired in the product purchase transaction expanded, complemented, and strengthened our existing and future product offerings. In what has become a competitive generic drug business environment, one key for long-term success is having an ever-growing commercial portfolio of generic products, a strong internal drug development pipeline and capable, reliable manufacturing partners. We believe that this transaction added significantly to the Rising business platform in all three crucial areas.

246. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

247. The November 2018 10-Q also stated the following:

> We caution you that these statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control that may influence the accuracy of the statements and the projections upon which the statements are based. Factors that could cause actual results to differ materially from those set forth or implied by any forward-looking statement include, but are not limited to, our ability to remain competitive with competitors, risks associated with the generic product industry, dependence on a limited number of suppliers, risks associated with healthcare reform and reductions in reimbursement rates, difficulty in predicting revenue stream and gross profit, industry and market changes, the effect of fluctuations in operating results on the trading price of our common stock, risks associated with holding a significant amount of debt, inventory levels, reliance on outside manufacturers, risks of incurring uninsured environmental and other industry specific liabilities, governmental approvals and regulations, risks associated with hazardous materials, potential violations of government regulations, product liability claims, reliance on Chinese suppliers, potential changes to Chinese laws and regulations, potential changes to laws governing our relationships in India, fluctuations in foreign currency exchange rates, tax assessments, changes in tax rules, global economic risks, risk of unsuccessful acquisitions, effect of acquisitions on earnings, indemnification liabilities, terrorist activities, reliance on key executives, litigation risks, volatility of the market price of our common stock, changes to estimates, judgments and assumptions used in preparing financial statements, failure to maintain effective internal controls, and compliance with

> changing regulations, as well as other risks and uncertainties discussed in our reports filed with the Securities and Exchange Commission, including, but not limited to, this Quarterly Report on Form 10-Q, our Annual Report on Form 10-K for the fiscal year ended June 30, 2018 and other filings.

248. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company  failed to disclose the risk that a manufacturer may be unwilling to meet its contractual obligation to supply the Company with product sufficient to meet the needs of the Company's customers, and that, at the time, such risk had already materialized. Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, causing harm to Aceto's financial condition, reputation, and business prospects.

249. In addition, the November 2018 10-Q stated:

> Net sales for the Human Health segment decreased by $25,169 for the three months ended September 30, 2018, to $80,846, which represents a 23.7% decrease over net sales of $106,015 for the prior period. Sales of Rising products decreased $26,348 from the prior year as the persistent adverse conditions in the generics market have continued including continued pricing pressure, intense competition and related consolidation of customers, delays in receiving supplies and delayed product launches. Although Rising sales have declined, the number of units sold has increased; however, the additional revenue associated with the increase in the number of units is reduced by an increase in chargebacks. Rising incurred approximately $6,491 in failure to supply penalties charged by certain customers based upon replacement cost or contractual cost.

250. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of

Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

251. Also, the November 2018 10-Q stated:

> Human Health segment's gross profit of $8,476 for the three months ended September 30, 2018 decreased $16,171 or 65.6%, over the prior period. The gross margin of 10.5% was lower than the prior period's gross margin of 23.2%. The decrease in Human Health's gross profit was primarily related to the decline of $16,618 in gross profit on Rising's products, due to the sales decline. The decline in gross margin is primarily driven by unfavorable product mix on certain Rising products, continued pricing pressure, intense competition and related consolidation of customers and failure to supply charges. In addition, certain of our partners have not performed in accordance with their agreements with such partners, which have caused us to incur additional costs.

252. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a

proper assessment of the Company's financial condition, business, and prospects. In addition, Kennally, Roof, and the Company violated their affirmative obligation to disclose Aurobindo's material breach of the Supply Agreements, which was known to the Company's management and would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

253. Further, the November 2018 10-Q stated:

> In addition to the other information set forth in this report, you should carefully consider the risk factors disclosed under Part I - "Item 1A. Risk Factors" in our Form 10-K for the year ended June 30, 2018 which could materially adversely affect our business, financial condition, operating results and cash flows. The risks and uncertainties described in our Form 10-K for the year ended June 30, 2018 are not the only ones we face. Additionally, risks and uncertainties not currently known to us or that we currently deem immaterial also may materially adversely affect our business, financial condition, operating results or cash flows. We have revised the second risk factor in our Form 10-K to read as follows:
>
> *The material impairment charge that we recorded in fiscal 2018 was based on several adverse factors, certain of which have continued to materially adversely impact the Company beyond year-end.*
>
> In the third quarter of fiscal 2018, we recorded impairment charges for goodwill and intangible assets of $256,266, all of which related to the Rising Pharmaceuticals reporting unit which is part of the Human Health segment. During the third quarter of fiscal 2018, our Rising Pharmaceuticals reporting unit had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, the U.S. government made a determination (which was subsequently reversed) that 11 generic drug products we acquired through our Acetris Health subsidiary (part of the Rising Pharmaceuticals reporting unit) in a product purchase agreement with Lucid were not in compliance with the country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. As a result of the foregoing, we conducted an impairment test and recognized a significant goodwill and intangible asset impairment charge.
>
> *Many of the market and industry factors that led to the March 31, 2018 impairment charges have continued to impact us. The difficult conditions in the generic drug market have been compounded by the*

> *continuing impact of failures to supply and other negative market factors*. We also continue to spend heavily on financial and legal professionals retained by us to deal with ongoing negative factors in the market and pending legal proceedings. As a result, our cash position declined from $100,874 at June 30, 2018 to $51,547 at September 30, 2018. While our operating businesses continue to generate substantial cash, the current demands upon the Company and its liquidity remain significant. If current conditions persist, we may be reliant upon our previously announced strategic alternatives initiative to supplement our cash, liquid assets and operating cash flows, and to retire debt. (Emphasis added).

254. The foregoing statements were materially false and misleading Kennally, Roof, and the Company knew or recklessly disregarded that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers. By failing to disclose Aurobindo's material breach of the Supply Agreements, Kennally, Roof, and the Company created a false impression in the minds of investors that "market and industry factors," rather than Aceto's acquisition of Lucid and Citron as well as the Supply Agreements binding Aceto to Aurobindo for a 14-year term, caused Rising's financial problems, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects.

***The February 2019 12b-25***

255. After the market closed on February 12, 2019, the Company filed a report on Form 12b-25 ("February 2019 12b-25"), explaining why it could not file its Quarterly Report for the fiscal quarter ended December 31, 2018 "without reasonable effort or expense." Kennally signed the February 2019 12b-25.

256. The February 2019 12b-25 stated, among other things, the following:

> During the third quarter of fiscal 2018 (which ended on March 31, 2018), the Registrant recognized pre-tax non-cash impairment charges of $256.3 million, consisting of $235.1 million of a goodwill impairment charge and a $21.2 million write-down of other identifiable intangible assets for its Rising reporting unit.

> Many of the market and industry factors that led to the impairment charges have continued to impact the Registrant. The difficult conditions in the generic drug market have been compounded by the continuing impact of failures to supply and other negative market factors. The Registrant also spent heavily on financial and legal professionals retained by the Registrant to deal with ongoing negative factors in the market and pending legal proceedings.

257. The foregoing statements were materially false and misleading because Kennally, Roof, and the Company failed to disclose that Aurobindo was the primary, if not the sole, cause of the FTS penalties charged to Aceto during the Class Period. By knowingly or recklessly disregarding that Aurobindo had not fulfilled, and was not fulfilling, its obligations under the Supply Agreements to supply the Company with generic drug products to meet the needs of Aceto's customers, Kennally, Roof, and the Company created a false impression in the minds of investors regarding Aceto's acquisition of Lucid and Citron as well as of the Supply Agreements binding Aceto to Aurobindo for a 14-year term, depriving the market of information crucial to a proper assessment of the Company's financial condition, business, and prospects. Further, the foregoing statements were materially false and misleading because Kennally, Roof, and the Company knew or recklessly disregarded that as result of a decline of Rising's actual and forecasted revenue and earnings due to Aurobindo's material breach of the Supply Agreements, the persistent adverse conditions in the generics market, and the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions, Aceto should have impaired goodwill by $235.11 million or over 99% and other intangible assets by $15.411 million for Rising customer relationships and $5.745 million for certain other intangibles or over 7% of other intangible assets, for a total impairment of over $256.3 million. As such, Kennally, Roof, and the Company knew or recklessly disregarded that the Company's total assets were less than $800 million and not over one billion, as the Company reported. In addition, had Aceto timely and properly impaired

goodwill and other intangible assets, instead of operating income of $30.6 million in FY 2017, Aceto would have reported an operating loss of $225.7 million for FY 2017. Instead of operating income of $7.2 million, Aceto would have posted an operating loss of $249 million in the quarter ended September 30, 2017, if it recognized the impairment charges on September 30, 2017. Finally, instead of an of operating income of $3.785 million, Aceto would have disclosed a loss of over $252.4 million for the quarter ended December 31, 2017, if it recognized the impairment charges on December 31, 2017.

## THE TRUTH EMERGES

258. On April 18, 2018, after the market closed, Aceto issued the April 18 Press Release, in which it disclosed that "the financial guidance issued on February 1, 2018 should no longer be relied upon," and that the Company had suspended the provision of "further financial guidance for at least the balance of the fiscal year." The April 18 Press Release stated in relevant part:

> PORT WASHINGTON, N.Y., April 18, 2018 (GLOBE NEWSWIRE) -- ACETO Corporation (Nasdaq: ACET), an international company engaged in the development, marketing, sale and distribution of Human Health products, Pharmaceutical Ingredients and Performance Chemicals, announced, in light of the persistent adverse conditions in the generics market, it is negotiating with its bank lenders a waiver of its credit agreement with respect to its total net leverage and debt service coverage financial covenants in the fiscal third quarter, and that the financial guidance issued on February 1, 2018, should no longer be relied upon. In addition, the Company anticipates recording non-cash intangible asset impairment charges, including goodwill, in the range of $230 million to $260 million on certain currently marketed and pipeline generic products as a result of continued intense competitive and pricing pressures.
>
> Al Eilender, Chairman, said, "Given continued headwinds in the generics market, the Board has taken decisive action by bolstering the Company's senior leadership, engaging in proactive discussions with its secured lenders, and initiating a thorough evaluation of strategic alternatives. The Board looks forward to working with and supporting management throughout this process and appreciates the

continued dedication of its employees and other stakeholders while it navigates this difficult industry environment."

ACETO's Board of Directors has taken several immediate and proactive steps to address these developments:

- The Company is having productive discussions with its secured lenders regarding implementation of a covenant waiver for the third fiscal quarter of 2018.

- To provide appropriate assurances to its lenders, to fortify the balance sheet and to preserve the Company's liquidity position, the Board anticipates a significant reduction of the Company's dividend going forward.

- The Board announced the appointment of Rebecca Roof as Interim CFO and the resignation of CFO Edward Borkowski, who has decided to pursue another opportunity. Ms. Roof is a highly experienced finance professional and a Managing Director at AlixPartners LLP. While at AlixPartners, Ms. Roof has served as Interim Chief Financial Officer of the Eastman Kodak Company, Atkins Nutritionals, Anchor Glass Corporation, Fleming Foods, and several privately held entities. Her pharmaceutical and specialty chemicals experience includes leadership roles at Taro Pharmaceuticals and LyondellBasell, also while at AlixPartners.

- The Board has named Director Alan Levin as Non-Executive Vice Chairman of the Board effective today. Alan Levin first joined the ACETO Board in December 2015 and became Lead Independent Director in July 2016. Prior to joining the ACETO Board, Mr. Levin held various financial positions of increasing responsibility with Pfizer, Inc. including Chief Financial Officer (2005-2007), and was Chief Financial Officer at Endo Health Solutions from 2009-2013.

- The Board is directing that the Company suspend providing further financial guidance for at least the balance of the fiscal year.

- The Board has initiated a process to identify and evaluate a range of strategic alternatives. Strategic alternatives to be considered may include the sale of a key business segment(s), a merger or other business combination with another party, continuing as a standalone entity or other potential alternatives.

> - The Company has retained PJT Partners as its financial advisor and Lowenstein Sandler LLP as its legal counsel to assist in this strategic review process.
>
> ACETO cautions that there can be no assurance that the strategic review process will result in any transaction. The Company has not set a timetable for completion of the review of strategic alternatives, and it does not intend to make any further announcements related to its review unless and until the Board has approved a transaction or otherwise has determined that further disclosure is appropriate or required by law.
>
> The Company is in the process of finalizing the actual amount of the impairment charges. The Company expects that the analysis supporting the impairment will be completed in time to allow for its recording in the third quarter of FY18.

259. At the same time, Aceto announced that its newly hired CFO, Edward Borkowski ("Borkowski"), had resigned after only two months on the job. Despite innocuous statement that Borkowski had "decided to pursue another opportunity," Borkowski resigned after just over two months as Aceto's CFO. Meanwhile, the Company did not revise or issue new guidance. Rather, Aceto failed to provide any further guidance whatsoever for fiscal 2018 – even though less than two months remained in the fiscal year – and failed to explain its suspending of guidance.

260. On this news, shares of ACET fell $4.71 per share, or over 64%, to close at $2.64 per share on April 19, 2018, damaging investors.

261. In the May 2018 Press Release, filed with the SEC before the market opened on May 4, 2018, Kennally stated: "[W]hile we have been proactively addressing supply chain challenges in the generics business for the past few quarters, we received notification of failure to supply penalties during the quarter totaling $10.1 million. We expect that by the end of the fiscal year we will have made significant progress toward resolving these previously identified supply chain challenges."

262. On May 7, 2018, the Company filed the May 2018 10-Q. Regarding goodwill and the Company's impairment of goodwill and intangible assets, in the May 2018 10-Q the Company stated:

> The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"). ASC 350 requires that goodwill and other intangibles with indefinite lives be tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of an asset has decreased below its carrying value. During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary (part of the Rising reporting unit which is part of the Human Health segment) in a product purchase agreement with an entity formerly known as Lucid Pharma LLC are not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on these indicators, the Company determined that it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit.
>
> Long-lived assets and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If it is determined such indicators are present and

> the review indicates that the assets will not be fully recoverable, based on undiscounted estimated cash flows over the remaining amortization periods, their carrying values are reduced to estimated fair value. Measurements based on undiscounted cash flows are Level 3 inputs. As noted above, during the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings and therefore the Company performed an impairment test on the related intangibles. The projected undiscounted cash flows for certain intangibles were determined to be less than the carrying value, and as a result, the Company recognized an impairment charge of $5,745 in the third quarter of fiscal 2018. Additionally, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary in a product purchase agreement with an entity formerly known as Lucid Pharma LLC are not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on this, the Company performed an impairment test on the related intangible asset and recognized an impairment charge of $15,411 on the customer relationships intangible asset in the third quarter of fiscal 2018.
>
> The total impairment charges for goodwill and intangibles recorded in the third quarter of fiscal 2018 was $256,266, all of which related to the Rising reporting unit which is part of the Human Health segment.

263. After the market closed on September 13, 2018, the Company filed a report on Form 12b-25, explaining why it could not file its Annual Report for the 2018 fiscal year "without reasonable effort or expense." Defendants explained that "[r]esults for both the three and twelve months ended June 30, 2018 reflect the fact that the Company's net sales and gross profit were negatively impacted by sustained generic industry headwinds and higher-than-expected failure to supply penalties at the Registrant's Rising business segment. The Registrant's results also reflect substantial expenses incurred by the Registrant to address the issues that led to the above-mentioned impairment charges taken as of March 31, 2018."

264. On this news, shares of ACET fell $0.20 per share, or over 6.5%, to close at $2.87 per share on September 14, 2018, damaging investors.

265. In the September 2018 Press Release accompanying the Company's filing of its 2018 10-K, filed with the SEC before the market opened on September 28, 2018, Defendants stated: "Rising incurred approximately $27.8 million in failure to supply penalties charged by certain customers based upon replacement cost or contractual cost, of which approximately $14.8 million related to supply challenges with regards to products acquired from Citron."

266. In the 2018 10-K, also filed with the SEC on September 28, 2018, the Company stated about the impairment of goodwill and long-lived assets:

> *The material impairment charge that we recorded in fiscal 2018 was based on several adverse factors, certain of which could materially adversely impact the Company in subsequent fiscal quarters.*
>
> In the third quarter of fiscal 2018, we recorded impairment charges for goodwill and intangible assets of $256,266, all of which related to the Rising Pharmaceuticals reporting unit which is part of the Human Health segment. During the third quarter of fiscal 2018, our Rising Pharmaceuticals reporting unit had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, the U.S. government made a determination (which was subsequently reversed) that 11 generic drug products we acquired through our Acetris Health subsidiary (part of the Rising Pharmaceuticals reporting unit) in a product purchase agreement with Lucid were not in compliance with the country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. As a result of the foregoing, we conducted an impairment test and recognized a significant goodwill and intangible asset impairment charge.
>
> Many of the market and industry factors that led to the March 31, 2018 impairment charges could continue to impact us in future fiscal periods. Such factors could materially and adversely impact our business, financial condition, results of operations, liquidity and cash flows and could lead to additional impairment charges in the future.

***

Goodwill and Other Indefinite-Lived Intangible Assets

Goodwill is calculated as the excess of the cost of purchased businesses over the value of their underlying net assets. Other indefinite-lived intangible assets principally consist of trademarks. Goodwill and other indefinite-lived intangible assets are not amortized.

The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles – Goodwill and Other ("ASC 350"). ASC 350 requires that goodwill and other intangibles with indefinite lives be tested for impairment annually or on an interim basis if events or circumstances indicate that the fair value of an asset has decreased below its carrying value. During the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals reporting unit (which is part of the Human Health segment) had a decline in actual and forecasted revenue and earnings due to the persistent adverse conditions in the generics market. In addition, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary (part of the Rising reporting unit which is part of the Human Health segment) in a product purchase agreement with an entity formerly known as Lucid Pharma LLC were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on these indicators, the Company determined that it was necessary to perform an interim goodwill impairment analysis at March 31, 2018 for its Rising reporting unit. The Company elected to early adopt Accounting Standards Update ("ASU") 2017-04, Intangibles- Goodwill and Other (Topic 350), during the third quarter of fiscal 2018 which eliminated the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, the amount of an impairment charge is recognized if the carrying amount of a reporting unit is greater than its fair value. The fair value of the Rising reporting unit was estimated using many assumptions and estimates and a market participant approach that directly impacts the results of the testing. In making these assumptions and estimates, the Company used industry accepted valuation models and set criteria that were reviewed and approved by various levels of management. Accordingly, with respect to the third quarter of fiscal 2018, the Company recognized a pre-tax non-cash goodwill impairment charge of $235,110 related to the Rising reporting unit.

Long-Lived Assets

> Long-lived assets and certain identifiable intangible assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If it is determined such indicators are present and the review indicates that the assets will not be fully recoverable, based on undiscounted estimated cash flows over the remaining amortization periods, their carrying values are reduced to estimated fair value. Measurements based on undiscounted cash flows are Level 3 inputs. As noted above, during the third quarter of fiscal 2018, the Company's Rising Pharmaceuticals subsidiary had a decline in actual and forecasted revenue and earnings and therefore the Company performed an impairment test on the related intangibles. The projected undiscounted cash flows for certain intangibles were determined to be less than the carrying value, and as a result, the Company recognized an impairment charge of $5,745 in the third quarter of fiscal 2018. Additionally, as noted above, the Company was notified by the U.S. government that 11 generic drug products it acquired through its Acetris Health subsidiary in a product purchase agreement with an entity formerly known as Lucid Pharma LLC were not in compliance with the federal Trade Agreement Act country-of-origin provisions of a clause contained in the government supply contracts acquired from Lucid. Based on this, the Company performed an impairment test on the related intangible asset and recognized an impairment charge of $15,411 on the customer relationships intangible asset in the third quarter of fiscal 2018.

267. On this news, shares of ACET fell $0.13 per share, or over 5%, to close at $2.26 per share on September 28, 2018, damaging investors.

268. Before the market opened on November 9, 2018, Aceto filed the November 2018 Press Release, in which Kennally stated: "With regards to our Rising business, sales declined year-over-year in part because of the loss of revenue from government entities and the continuing challenges we face in the generics market. Nevertheless, the steps we have taken to improve our supply chain position with our customers and partners and to increase our inventory safety stock levels resulted in decreased Failure to Supply charges during the first quarter as compared to each of the previous two quarters."

269. In addition, the November 2018 Press Release attributed declines in gross profits and gross margin, in part, to failure-to-supply penalties:

> In addition, Rising incurred approximately $6.5 million in failure to supply charges. Gross profit for the Human Health segment was $8.5 million, compared to $24.6 million for the first quarter of fiscal 2018 due primarily to lower sales as well as to the failure to supply penalties. Gross margin for the first quarter was 10.5%, compared to 23.2% in the prior year period. The decline in gross margin for the 2019 period reflects continued pricing pressure, intense competition and related consolidation of customers, unfavorable product mix and failure to supply charges at Rising.

270. Also on November 9, 2018, the Company filed the November 2018 10-Q, in which the Company stated: "Many of the market and industry factors that led to the March 31, 2018 impairment charges have continued to impact us." "The difficult conditions in the generic drug market," the Company continued, "have been compounded by the continuing impact of failures to supply and other negative market factors. We also continue to spend heavily on financial and legal professionals retained by us to deal with ongoing negative factors in the market and pending legal proceedings."

271. On this news, shares of ACET fell $0.23 per share, or over 11%, to close at $2.26 per share on November 9, 2018, damaging investors.

272. After the market closed on February 12, 2019, the Company filed the February 2019 12b-25, explaining why it could not file its Quarterly Report for the fiscal quarter ended December 31, 2018 "without reasonable effort or expense." Defendants explained that "[d]uring the third quarter of fiscal 2018 (which ended on March 31, 2018), the Registrant recognized pre-tax non-cash impairment charges of $256.3 million, consisting of $235.1 million of a goodwill impairment charge and a $21.2 million write-down of other identifiable intangible assets for its Rising reporting unit." "Many of the market and industry factors that led to the impairment charges have continued to impact the Registrant." "The difficult conditions in the generic drug market,"

the Company continued, "have been compounded by the continuing impact of failures to supply and other negative market factors. The Registrant also spent heavily on financial and legal professionals retained by the Registrant to deal with ongoing negative factors in the market and pending legal proceedings."

273. On this news, shares of ACET fell $0.23 per share, or over 15%, to close at $1.25 per share on February 13, 2019, damaging investors.

274. After the market closed on February 19, 2019, Aceto announced that the Company and each of its U.S. subsidiaries, had filed voluntary petitions for relief pursuant to Chapter 11 of the U.S. Bankruptcy Code, stunning the market.

275. On this news, shares of ACET fell $0.68 per share, or over 66%, to close at $0.35 per share on February 20, 2019, damaging investors.

276. On February 20, 2019, in connection with its bankruptcy petitions, Aceto filed the sworn declaration authored by Defendant Roof. In her declaration, Roof attributed the cause of the Company's bankruptcy filings to, among other things, "certain supply chain challenges in [the Company's] Human Health business for the past several quarters."[9] "Specifically," according to Roof, "certain of [its] distribution agreements contain service level failure to supply penalties or similar provisions that potentially subject [the Company] to charges and penalties in the event that [the Company] fails to meet the supply obligations under such agreements."[10] At the time its bankruptcy petitions were filed, the Company had incurred tens of millions of dollars in such penalties.

---

[9] Ex. A at ¶87.

[10] *Id.*

277. On May 31, 2019, Aceto filed the Adversary Complaint against Aurobindo and Aurolife, among others (Ex. B hereto). The Adversary Complaint revealed that the "supply chain challenges" to which the Company had referred throughout the Class Period can be traced to a single source: Aurobindo.

278. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES AND REGULATIONS

***GAAP and SEC Rules and Regulations - Generally***

279. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

280. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1. Changes to the Codification are made by FASB via Accounting Standard Updates ("ASUs"). ASC 105-10-05-5.

281. SEC rules and regulations require that publicly traded companies such as Aceto include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X.

282. The Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental financial reporting principles and objectives:

a. The objective that financial reporting should provide financial information that is useful to existing and potential investors, lenders and other creditors in making investment, credit and similar decisions was violated (FASB Statement of Concepts No. 8, ¶OB2);

b. The objective that financial reporting should provide information about the financial position of a reporting entity and effects of transactions and other events that change a reporting entity's economic resources and claims against it was violated (FASB Statement of Concepts No. 8, ¶OB12);

c. The objective that information about a reporting entity's financial performance should help financial statement users to understand the return the entity has produced on its economic resources was violated. Information about the return the entity has produced provides an indication of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources. Information about the variability and components of that return also is important, especially in assessing the uncertainty of future cash flows. Information about a reporting entity's past financial performance and how its management discharged its responsibilities usually is helpful in predicting the entity's future returns on its economic resources. (FASB Statement of Concepts No. 8, ¶OB16);

d. The principle that a reporting entity's accrual accounting should depict the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period, was violated. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period. Information about a reporting entity's financial performance during a period, reflected by changes in its economic resources and claims other than by obtaining additional resources directly from investors and creditors, is useful in assessing the entity's past and future ability to generate net cash inflows. That information indicates the extent to which the reporting entity has increased its available economic resources, and thus its capacity for generating net cash inflows through its operations rather than by obtaining additional resources directly from investors and creditors.(FASB Statement of Concepts No. 8, ¶¶OB17 – OB18);

e. The principle that financial information should be useful, which means that it must be relevant and faithfully represent what it purports to represent, was violated. Relevance and faithful representation are fundamental qualitative characteristics of useful financial information. (FASB Statement of Concepts No. 8, ¶¶QC4 – QC5);

f. The principle of relevance was violated in that material information of predictive or confirmatory value capable of making a difference in the decisions made by financial statement users was misrepresented (FASB Statement of Concepts No. 8, ¶¶QC6 – QC7, QC11);

g. The principle of faithful representation was violated in that financial information was not complete, neutral, or free from error (FASB Statement of Concepts No. 8, ¶QC12);

h. The principle of completeness, which means including all information necessary for a financial statement user to understand the phenomenon being depicted, was violated (FASB Statement of Concepts No. 8, ¶QC13;

i. The principle on neutral depiction, meaning selection or presentation of financial information without bias, was violated. (FASB Statement of Concepts No. 8, ¶QC14); and

j. The principle of faithful representation was violated due to errors and omissions in selecting and applying appropriate processes to produce the reported information and in its presentation (FASB Statement of Concepts No. 8, ¶QC15).

283. Aceto's financial statements failed to comply with GAAP for its failure properly and timely to impair for goodwill and other intangible assets.

***Aceto Violated SEC Regulations and GAAP by Failing to Impair Goodwill***

284. Throughout the entire Class Period, Defendants violated GAAP by knowingly or recklessly failing to impair goodwill. First, Defendants knowingly or recklessly failed to conduct a proper goodwill impairment test during the fourth quarter of fiscal 2017 and, second, Defendants

knowingly or recklessly failed to perform any goodwill impairment testing during the first two quarters of fiscal 2018.

285. ASC 350-20 addresses GAAP as it applies to financial accounting and reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets in a business combination. ASC 350-20-20.

286. Goodwill is tested for impairment at the reporting unit level. ASC 350-20-35-01. Aceto recorded $169 million in goodwill attributable to the Lucid and Citron acquisitions in its Rising reporting unit, according to the 2017 10-K.

287. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of goodwill exceeds its implied fair value." ASC 350-20-35-2.

288. Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28. It was Aceto's policy to perform this evaluation during the fourth quarter of each fiscal year.

289. "[G]oodwill of a reporting unit," however, "shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-3. GAAP lists the following factors to consider when evaluating whether an event or a change in the circumstances would trigger an interim goodwill impairment test:

a. Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

b. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

c. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

d. Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy or litigation; and

e. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit. ASC 350-20-35-3C.

290. The above list is not all-inclusive and GAAP requires the "totality" of events and circumstances to be evaluated when determining whether to test goodwill for impairment between annual tests. ASC 350-20-35-3C -3G.

291. Aceto violated GAAP by knowingly or recklessly failing to consider obvious triggering events it admits existed from at least the beginning of the Class Period, by failing to conclude that an interim goodwill impairment analysis was required, and by knowingly or recklessly failing to impair goodwill.

292. By no later than August 25, 2017, Defendants knew or recklessly disregarded the Aurobindo issues from the acquisition of Lucid and Citron, or were reckless in not knowing of the persistent adverse conditions in the generics market and the likely loss of U.S. government supply

contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions.

293. Prior to testing goodwill for impairment, an entity has an option of performing a qualitative impairment assessment. If, after assessing the totality of events or circumstances, an entity determines that it is not more likely than not (a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill, than further quantitative impairment testing is unnecessary. ASC 350-20-35-3 – 3G. In its 2017 10-K, Aceto disclosed that it performed the qualitative test in fiscal 2016 but not in fiscal 2017. The quantitative test for goodwill impairment is a two-step process. In the first step, the fair value of a reporting unit is compared to its carrying amount, also known as the net book value, including goodwill. ASC 350-20-35-4. The fair value of the reporting unit is assumed to be the price that the company would receive if it were to sell the unit in an orderly transaction (i.e., not a rushed sale) between market participants. ASC 350-20-35-22. If the carrying amount, recorded on the books, exceeds the fair value of the reporting unit, then goodwill is considered impaired and the second step of the impairment test is performed. If the fair value of a reporting unit exceeds its carrying amount, goodwill is not impaired and the second step of the impairment test is unnecessary. ASC 350-20-35-6 and 8.

294. In the 2017 10-K, Aceto wrote that it performed the first step in the test, found no impairment, and did not move on to the second step, stating that "In fiscal 2017, the Company performed step one of the two-step process and in fiscal 2016 the Company performed a qualitative assessment. There was no impairment of goodwill and other intangible assets in fiscal 2017 and fiscal 2016."

295. GAAP required valuation techniques used to measure fair value to be applied consistently. ASC 820-10-35-25. With respect to determining fair values for goodwill and other intangible assets at the time of the Lucid and Citron acquisition, Aceto's 2017 10-K states that the "fair values of the net assets acquired were determined using discounted cash flow analyses and estimates made by management." The Adversary Complaint (¶35) disclosed that the Aurobindo issues "drained Aceto's cash flow and made it difficult for Aceto to service its debt," yet Defendants' fair value analysis, which should have included a discounted cash flow model knowingly or recklessly ignored, the negative impact on future cash flows projections of the persistent adverse market conditions discussed above, as well as Aurobindo issues (including cash flow issues) and the notification from the Veterans Administration that eleven supply contracts were at risk of termination.

296. Defendants violated GAAP by knowingly or recklessly failing to conclude that the carrying amount of the reporting unit exceeded its fair value, by failing to proceed to the second step of the impairment test,[11] and by knowingly or recklessly failing to impair goodwill.

297. The second step of the two-step process, which Aceto never conducted, is to determine the amount of impairment. Aceto should have subtracted the "implied fair value of goodwill" (discussed below) from the carrying amount of goodwill. The difference is the amount of goodwill impairment. To determine the implied fair value of goodwill, Aceto should have assigned the fair value of the Rising reporting unit to all of Rising's assets and liabilities (in the same manner as would be done in a hypothetical business acquisition). The excess amount, if any,

---

[11] As a result of the change in accounting rules, Aceto was not required to proceed to the second step of the impairment test after December 31, 2017.

of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of the goodwill. ASC 350-20-35-9 – 16.

298. As described in detail above, the persistent adverse market conditions, the Aurobindo issues, and the and country-of-origin issues in the Lucid VA contracts caused the fair value of Aceto's Rising reporting unit to significantly decline causing the implied fair value of its goodwill to be significantly lower than the goodwill recorded on Aceto's books, requiring Aceto to impair goodwill.

299. Defendants violated GAAP by knowingly or recklessly failing to perform the second step of the goodwill impairment test, failing completely to consider the adverse conditions discussed above in its goodwill evaluation process, and by knowingly or recklessly failing to impair goodwill.

***Aceto Violated SEC Regulations and GAAP by Failing to Impair Intangible Assets***

300. During the Class Period, Defendants knowingly or recklessly violated GAAP by failing to impair its intangible assets.

301. According to the 2017 10-K, Aceto recorded a total of $224.85 million in intangible assets attributable to the Lucid and Citron acquisitions in its Rising reporting unit: "approximately [$135.7 million] of product rights, amortizable over a period of approximately ten years; approximately [$88.8 million] of customer relationships, amortizable over approximately eleven years; and approximately $350 [thousands] of trademarks, amortizable over a period of approximately six months."

302. As with goodwill, an impairment analysis for intangible assets subject to amortization must be conducted if there is a triggering event. GAAP provides a non-exclusive list of the types of issues considered triggering events such as change in the way an asset is utilized or

"a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset …, including an adverse action or assessment by a regulator." ASC 360-10-35-21.

303. GAAP requires that an impairment loss be recognized when the carrying amount of an intangible asset subject to amortization is not recoverable and exceeds its fair value. The carrying amount of an intangible asset subject to amortization is not recoverable if it exceeds the sum of undiscounted cash flows expected to result from the use and eventual disposition of the asset. An impairment loss shall be measured as the amount by which the carrying amount of an intangible asset subject to amortization exceeds its fair value. ASC 350-30-35-14 and ASC 360-10-35-17.

304. Here, the Company's knowledge of the country-of-origin issues in the Lucid VA supply contracts, were triggering events requiring an impairment analysis as early as the fourth quarter of the 2017 fiscal year. Had Defendants conducted such a review of "customer relationships," it would have indicated that the assets would not be fully recoverable, as the Company determined when it belatedly conducted an impairment assessment during the third quarter of the 2018 fiscal year. When the Company finally conducted an impairment assessment during the third quarter of 2018, the Company recognized an impairment charge of $15.411 million on the customer relationships intangible asset, based on the Company's noncompliance with the TAA country-of-origin requirements in the Lucid VA supply contracts.

305. Defendants violated GAAP and filed false and misleading financial statements by failing, knowingly or recklessly, to impair the intangible asset of "customer relationships.".

306. Defendants also violated GAAP by failing to conduct an impairment analysis of other intangible assets prior to the third quarter of 2018. Defendants knew, or were reckless in not

knowing, events or changes in circumstances indicated that the carrying amount of those Lucid and Citron intangible assets may not be recoverable.

307. Had Defendants conducted such a review, it would have indicated that the assets would not be fully recoverable, as the Company determined when it belatedly conducted an impairment assessment during the third quarter of the 2018 fiscal year. No later than the fourth quarter of 2017, the Company's Rising Pharmaceuticals subsidiary was experiencing Aurobindo issues and persistent adverse conditions in the generics market and had the knowledge of the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions. All of these factors required the Company to perform an impairment test on the related intangibles as early as the fourth quarter of 2017 fiscal year. When the Company finally acknowledged during the third quarter of 2018 that the aforementioned issues caused a decline in Aceto's actual and forecasted revenue and earnings and conducted an impairment assessment, the Company recognized an impairment charge of $5.745 million for certain intangible assets based on the decline in projected cash flows.

308. Had Defendants conducted such a review, it would have indicated that the assets would not be fully recoverable, as the Company determined when it belatedly conducted an impairment assessment during the third quarter of the 2018 fiscal year. No later than the fourth quarter of 2017, the Company's Rising Pharmaceuticals subsidiary was experiencing Aurobindo issues and persistent adverse conditions in the generics market and had the knowledge of the likely loss of U.S. government supply contracts for 11 generic drug products for failure to comply with the federal Trade Agreement Act country-of-origin provisions. All of these factors required the Company to perform an impairment test on the related intangibles as early as the fourth quarter of 2017 fiscal year. When the Company finally acknowledged during the third quarter of 2018 that

the aforementioned issues caused a decline in Aceto's actual and forecasted revenue and earnings and conducted an impairment assessment, the Company recognized an impairment charge of $5.745 million for certain intangible assets based on the decline in projected cash flows.

**THE COMPANY'S OBLIGATIONS UNDER ITEM 303**

309. The SEC has promulgated specific rules governing the contents of public companies' disclosures in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

310. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

311. The Instructions to Regulation S-K provide that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that

would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. §229.303 ("Instructions," (3)).

312. As set forth above, Defendants violated the affirmative duties imposed by Regulation S-K, and thus Sections 10(b) of the Exchange Act, by failing to disclose the following material information in the quarterly and annual reports identified above that were filed during the Class Period: (i) the risk of the government terminating the eleven contracts Aceto had with the VA, accounting for approximately 10% of the Company's revenue and approximately 15% of revenue for the Company's Rising subsidiary; and (ii) Aurobindo's material breach of its obligations under the Supply Agreements with Rising.

313. The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

314. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired Aceto securities publicly traded on the NASDAQ during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

315. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aceto securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Aceto shares were traded publicly during the Class Period on the NASDAQ. As of January 22, 2019, Aceto had approximately 30,766,000 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Aceto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

316. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

317. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

318. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Defendants caused the Company to make false and misleading statements in the Company's press releases and other public statements issued during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

319. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

320. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g) Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h) unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

321. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

322. The market for Aceto securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose, Aceto securities traded at artificially inflated prices during the Class Period. On February 1, 2018, the Company's stock price closed at a Class Period adjusted high of $10.75 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Aceto securities and market information relating to the Company, and have been damaged thereby.

323. During the Class Period, the material misrepresentations and/or omissions Plaintiff alleges herein artificially inflated the price of Aceto stock, causing Plaintiff and members of the Class to suffer damages. As described herein, during the Class Period, Defendants made or caused others to make a series of materially false and/or misleading statements about Aceto's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Aceto and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

324. At all relevant times, the market for Aceto securities was an efficient market for the following reasons, among others:

(a) Aceto stock met the requirements for listing, and was listed and actively traded on the NASDAQ;

(b) As a regulated issuer, Aceto filed periodic public reports with the SEC; the Company regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(c) Aceto was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

325. As a result of the foregoing, the market for Aceto securities promptly digested current information regarding Aceto from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Aceto securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

326. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

327. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aceto who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

328. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

329. This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

330. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aceto securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Aceto securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

331. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aceto securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

332. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

333. Defendants, who are or were senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

334. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity or of the misleading nature of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

335. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

336. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

337. By reason of the foregoing, the Company and the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against All Defendants

338. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

339. During the Class Period, Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's current financial position and future business prospects.

340. As officers and/or directors of a publicly owned company, the Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

341. Because of their positions of control and authority as senior officers, the Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Defendants, therefore, were "controlling persons"

of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

342. Each of the Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

343. By reason of the above conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*

Jacob A. Goldberg (admitted *pro hac vice*)
Keith Lorenze (KL 0216)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: klorenze@rosenlegal.com

and

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2019, I electronically filed the foregoing ***Consolidated Second Amended Class Action Complaint*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

/s/ *Jacob A. Goldberg*
Jacob A. Goldberg