UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>**NOT FOR PUBLICATION**</u>

---

In re Aceto Corporation Securities Litigation

---

This Document Relates to: ALL ACTIONS

<u>**MEMORANDUM & ORDER**</u>

Master File No. 2:18-cv-2425-ERK-AYS

KORMAN, *J*.:

On August 6, 2019, I granted the motion of defendants Salvatore Guccione, William C. Kennally, and Douglas Roth to dismiss the Consolidated Amended Class Action Complaint ("CAC") of plaintiff Michael Bonine ("Plaintiff") accusing them of securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act. *See In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) (hereinafter "*Aceto I*"). Plaintiff was granted leave to replead and did so by timely filing a Consolidated Second Amended Class Action Complaint ("SAC"). The SAC drops Aceto Corporation ("Aceto") as a defendant and adds as defendants four more individuals who were directors or officers at Aceto during the putative class period: Albert L. Eilender, Walter J. Kaczmarek, Rebecca A. Roof, and Frances P. Scally. All seven remaining defendants ("Defendants") now move to dismiss the SAC for failure to state a claim pursuant to FED. R. CIV. P. 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, et seq. (the "PSLRA").

## BACKGROUND

During the putative class period, between August 25, 2017 and February 19, 2019 ("Class Period"), Aceto was engaged in the development, marketing, sale and distribution of pharmaceutical products. Second Am. Compl. ¶¶ 1, 27. At the end of the Class Period, Aceto filed for Chapter 11 bankruptcy. *Id.* ¶ 274. Many of the circumstances to which Plaintiff attributes Aceto's downfall are discussed in *Aceto I*, and I therefore will not repeat that discussion here. The new allegations introduced in the SAC concern Aceto's relationship with one of its suppliers, an Indian pharmaceutical manufacturer called Aurobindo Pharma Ltd. ("Aurobindo"). The following is a summary of these new allegations.

In June 2016, well before the Class Period, Aceto explained in its annual report that it was dependent on its suppliers for its ability to fulfill its customers' orders, and that its suppliers' failure to meet Aceto's needs could result in Aceto being forced to pay its customers failure-to-supply penalties. *Id.* ¶¶ 34–35. Aceto issued similar warnings to investors during the Class Period, explaining that Aceto could suffer material adverse effects from "[a]ny interruption" in its supply, such as its suppliers' lack of "ability to timely provide" the needed materials, a supplier's "quality issue," or a supplier's "unwillingness . . . to supply ingredients or other materials to" Aceto. *Id.* ¶¶ 59, 214.

In November 2016, Aceto acquired certain generic drug products from Citron
Pharma LLC ("Citron") and Lucid Pharma LLC ("Lucid"). *Id.* ¶ 42. Until that time,
those products had been supplied to Citron and Lucid by Aurobindo pursuant to
long-term contracts. *Id.* ¶ 40. So, when Aceto acquired Citron's and Lucid's
products, Aceto also entered a supply agreement with Aurobindo pursuant to which
Aurobindo would supply the products to Aceto (the "Supply Agreement"). *Id.* ¶ 44.
On the day that both transactions were executed, Aceto issued a press release
announcing its acquisition of Citron's and Lucid's assets, in which it noted that
Citron had "manufacturing partnerships" that are "complementary" to Aceto's and
that the acquisition would "expand [Aceto's] partnership networks." *Id.* ¶ 45. In a
Form 8-K released at the same time, Aceto disclosed that it had entered a "supply
and distribution agreement" with Aurobindo that "will govern the manufacture and
supply of 78 of the 81 products" Aceto had acquired from Citron and Lucid. Chiueh
Aff. Ex. A, ECF No. 59-1, at 6.[1] The next day, Aceto explained the same thing at an
earnings conference, and specifically clarified that Aurobindo would be doing "all

---

[1] I may deem this representation in Aceto's 8-K to be part of the SAC. *See Rothman
v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we
have deemed a complaint to include any written instrument attached to it as an
exhibit or any statements or documents incorporated in it by reference, as well as
public disclosure documents required by law to be, and that have been, filed with the
SEC, and documents that the plaintiffs either possessed or knew about and upon
which they relied in bringing the suit." (internal citations omitted)).

the manufacturing" for those products. Second Am. Compl. ¶ 46(l). Aceto stated that it thought Aurobindo is a "great manufacturer" and that the Supply Agreement would "enable supply" of the products acquired from Citron, and potentially additional ones developed later. *Id.* ¶ 46(c), (m).

Plaintiff alleges that, by "early in calendar year 2017," Aurobindo was in "material breach of its obligations under the Supply Agreement[]." *Id.* ¶ 51. Plaintiff alleges that, within the Class Period, between 2017 and 2018, Aurobindo's repeated failures to supply the products to Aceto, in breach of the Supply Agreement, prevented Aceto from satisfying its own supply obligations to customers, causing Aceto to owe its customers at least $13 million in failure-to-supply penalties. *Id.* ¶ 52(g). Beginning as early as November 2017, three months into the Class Period, Aceto made several disclosures to investors that it was having "supply challenges," and repeatedly reported supply challenges specifically for the products Aceto acquired from Citron and Lucid. *E.g. id.* ¶¶ 76, 135, 137, 140, 160. It disclosed that the supply challenges were "all on the manufacturing side," and may be due to its suppliers' "potential capacity challenges." *Id.* ¶¶ 150, 152. Aceto told investors that it was proactively working to address these challenges and that it was optimistic that it could do so in a timely manner. *E.g. id.* ¶¶ 76, 108, 144. For example, in May 2018, Aceto reported to investors that it had "made significant progress" in addressing its "supply chain challenges" and "improving [its] overall inventory

4

position," including a "50% improvement in terms of our inventory health" "with one key supplier in India that supplies most of our volume." *Id.* ¶ 144.

Also in May 2018, Aceto disclosed that it incurred over $10 million in failure-to-supply penalties that were "primarily related to supply challenges with regards to products acquired from Citron and Lucid." *Id.* ¶ 173. In September 2018, Aceto disclosed that its failure-to-supply penalties had increased to $27.8 million, of which $14.8 million were "related to supply challenges with regards to products acquired from Citron." *Id.* ¶ 190. When Aceto filed for bankruptcy in February 2019, marking the end of the Class Period, it represented to the bankruptcy court that "certain supply chain challenges" forced Aceto to incur "failure to supply penalties" and were among the reasons for its insolvency. *Id.*, Ex. A, at ¶ 87.

Three months later, Aceto sued Aurobindo for fraud and breach of contract. *Id.*, Ex. B. In its complaint, Aceto accused Aurobindo of having planned all along to breach the Supply Agreement in order to sabotage Aceto and steal its customers. Second Am. Compl. ¶ 52(b). Aceto attributed Aurobindo's breaches of the Supply Agreement to Aurobindo's lack of sufficient production capacity, and accused Aurobindo of having fraudulently induced Aceto to enter the Supply Agreement by fraudulently misleading Aceto to believe such capacity challenges would not occur. *Id.*, Ex. B, at ¶¶ 51–52.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), I must "constru[e] the complaint liberally, accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)). "A complaint alleging securities fraud under § 10(b) of the Exchange Act must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the 'PSLRA')." *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Rule 9(b) requires a party to state "with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). While Rule 9(b) allows a party to plead state of mind with generality, the PSLRA raises the bar: "[T]he complaint shall, with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful, "in connection with the purchase or sale of any security," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. To prove a violation of Rule 10b-5, a plaintiff must establish: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Only the first two elements are at issue.

Plaintiff's position is that the SAC adequately pleads that Defendants' public disclosures omitted material information about Aceto's problem with Aurobindo, and that Defendants' duty to disclose the omitted information was so clear that their failure to do so implies scienter. Defendants argue that their disclosures about Aurobindo—as outlined above—were sufficiently thorough, so Plaintiff has failed

to plead any material omission and has also failed to plead scienter. Because I agree with Defendants regarding scienter, I pass over the issue of materiality.

## I.   Scienter In Aurobindo-Related Omissions

To determine whether scienter is adequately pled in a § 10(b) action, a court must first "accept all factual allegations in the complaint as true," and then "consider the complaint in its entirety" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). Finally, "the court must take into account plausible opposing inferences." *Id.* at 323. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Scienter can be pled by "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Plaintiff tacitly concedes that he has not made allegations regarding "motive and opportunity," and that he is relying solely on other circumstantial evidence that Defendants' omissions were at least reckless. "In the securities fraud context, recklessness must be conduct that is highly unreasonable,

8

representing an extreme departure from the standards of ordinary care, not merely a heightened form of negligence." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal citations and quotation marks omitted).

The absence of motive allegations does not make it impossible to adequately plead scienter, but it does make it more difficult. *See Kalnit*, 264 F.3d at 142; *Advanced Battery Techs., Inc.*, 781 F.3d at 644. Circumstantial evidence that an omission was reckless must include evidence that the defendant had a "clear duty to disclose" what was omitted. *Kalnit*, 264 F.3d at 144. "Some pieces of information are so obviously important to a company's performance, and so clearly in contrast with existing disclosures, that the company cannot reasonably question whether an investor would find the information significant." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *22 (S.D.N.Y. Dec. 2, 2013). But "[w]here a company has already disclosed substantially similar information, . . . its duty to disclose a particular fact may be less clear." *Id.*; *see also In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) ("Given what defendants *did* disclose in the December 1 Release, there was no such obvious duty to disclose the FDA Letter."); *Stratte-McClure v. Morgan Stanley*, 2013 WL 297954, at *8–9 (S.D.N.Y. Jan. 18, 2013) (similar), *aff'd* 776 F.3d 94 (2d Cir. 2015) and 598 F. App'x 25 (2d Cir. 2015).

Plaintiff argues that Defendants had a clear duty to make additional disclosures about Aurobindo. But, ironically, Plaintiff has not clearly explained what additional disclosures he believes Defendants had a clear duty to make. As outlined above, after Aceto publicly identified Aurobindo as its sole supplier of the drugs it acquired from Citron, Aceto repeatedly disclosed that its supplier for those drugs (i.e. Aurobindo) was failing to provide Aceto with sufficient supply to fill its customers' orders. Aceto even kept investors apprised of the amount of failure-to-supply penalties Aceto incurred due to Aurobindo's supply failures. Nevertheless, Plaintiff argues that the Defendants owed a "clear duty" to make additional disclosures, such as that Aurobindo was "at fault" for its failures to meet Aceto's supply needs, that such failures constituted breaches of Aurobindo's obligations under the Supply Agreement, and that Aurobindo was directly competing against Aceto for customers.[2] Plaintiff insists that Defendants' omission of these details prevented investors from understanding the "scope and magnitude" of the problem.

Defendants argue that Plaintiff has failed to explain how the so-called omissions were even material, let alone so clearly material as to imply scienter. Defendants argue that their disclosures about the problem with Aurobindo, as

---

[2] Plaintiff does *not* allege that Defendants apprehended during the Class Period that Aurobindo was engaged in a fraudulent scheme to sabotage Aceto, and does not argue that Defendants are liable for failing to disclose Aurobindo's "ulterior motives" or "ultimate intentions" during the Class Period.

sufficiently alleged in the SAC, were duly candid and thorough. They further argue the SAC fails to allege that the Aceto's dispute with Aurobindo did not escalate during the Class Period to a level requiring Defendants to publicly disclose impending litigation with Aurobindo or that its relationship with Aurobindo was coming to an end. *See River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *8 (S.D.N.Y. Mar. 8, 2019) (citing *Acito*, 47 F.3d at 53, and *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006)); *see also In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017).

I agree with Defendants that in light of the disclosures Aceto made throughout the Class Period about its problem with Aurobindo—not to speak of its disclosures of its other major financial problems, *see Aceto I* , 2019 WL 3606745, at *2, *4–5— any duty to disclose the omitted additional information about Aurobindo was not clear.[3] Defendants could have reasonably assumed that what was material to investors was the fact that Aurobindo was failing to meet Aceto's supply needs, which was preventing Aceto from filling its customers' orders and was forcing Aceto

---

[3] While the SAC attributes allegedly misleading omissions from several specific statements to specific individual Defendants, I see no need to discuss the scienter issue on a Defendant-by-Defendant basis: I hold that the SAC fails to adequately allege that any of the Defendants had a duty to the disclose additional information about the Aurobindo problem that was clear enough to sufficiently imply scienter. For similar analyses that discuss all Defendants as a group, *see Kalnit*, 264 F.3d at 142–44 and *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d at 446.

to pay penalties to those customers. It was not clear that investors would have been interested in further details, such as the legal issue of whether or not Aurobindo's failures to meet Aceto's supply needs amounted to breaches of the Supply Agreement. Accordingly, Defendants' failure to disclose that Aurobindo was in breach of the Supply Agreement and the other information Plaintiffs fault them for omitting does not produce a strong enough inference of recklessness to survive Defendants' motion to dismiss.

The cases on which Plaintiff relies are all distinguishable. In *Hall v. The Children's Place Retail Stores, Inc.*, the defendant company painted a consistently positive picture of its relationship with the Walt Disney Company throughout the class period without disclosing pervasive problems with that relationship, even after "Disney notified [the defendant] that [the defendant] had committed one hundred and twenty breaches of [their] License Agreement." 580 F. Supp. 2d 212, 221 (S.D.N.Y. 2008). Similarly, in *Hi-Crush*, the defendant "aggressively promoted" its relationship with a key customer without disclosing a dispute with that customer, even after the customer had "asserted a breach of contract and tried to terminate [its] contract" with the defendant. 2013 WL 6233561, at *15, 23. Unlike the defendants in *Hall* and *Hi-Crush*, the Defendants in this case disclosed the problem with Aurobindo and did not conceal any concrete steps taken toward litigation. In *Hutchins v. NBTY, Inc.*, the court's inference of scienter was based largely on the

12

allegation that, while the defendant company was concealing a serious threat to its relationship with its largest customer, the company's insiders made unusually large sales of the company's stock. 2012 WL 1078823, at *6–7 (E.D.N.Y. Mar. 30, 2012). In this case, there are no allegations that any of the Defendants sold their Aceto shares while concealing any details about the problem with Aurobindo.

Finally, in *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, the Second Circuit held that there was a sufficiently strong inference of scienter where a defendant knew that it "faced serious, ongoing criminal and civil investigations that exposed it to potential criminal and civil liability" which "jeopardized [its] existing or future relationships with other governmental entities that accounted for a significant amount of its revenue," and omitted this information from its Form 10–K in violation of SEC and GAAP requirements. 818 F.3d 85, 93–97 & n.8 (2d Cir. 2016). The present case is distinguishable because, again, Aceto did describe to investors Aurobindo's failures to meet its supply needs, the harm Aceto suffered as a consequence, and the risk that the problem would cause additional harm in the future.

In sum, the caselaw does not suggest Defendants owed investors a duty to make additional disclosures about the Aurobindo problem that was clear enough to imply scienter.[4]

---

[4] Because I conclude that any duty to disclose the omitted information was not clear enough to imply scienter, I need not decide whether Plaintiff adequately pled that such a duty existed at all, *cf. In re Societe Generale Sec. Litig.*, 2010 WL 3910286,

## II.      Previously Dismissed Allegations

The remaining allegations in the SAC are no different from those in the CAC dismissed in *Aceto I*. Contrary to Defendants' position, the law of the case doctrine does not preclude the reinstatement of those allegations. *United States v. Brown*, 623 F.3d 104, 111 (2d Cir. 2010) ("The law of the case doctrine does not rigidly bind a court to its former decisions." (internal quotation marks omitted)). Nevertheless, Plaintiff has provided no reason for those allegations to be reinstated, so they remain dismissed for the reasons provided in *Aceto I*.

## III.     Claim under Section 20(a) of the Securities Exchange Act

"To state a claim of control person liability under § 20(a), a plaintiff must show . . . . a primary violation by [a] controlled person." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). "Because . . . [P]laintiff has not done so, [P]laintiff's claims under § 20(a) must . . . be dismissed." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 42 (S.D.N.Y. 2016).

---

at *8 n.8 (S.D.N.Y. Sept. 29, 2010), which might be a somewhat closer question, *see ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 197 ("[A] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." (internal quotation marks and alterations omitted)).

14

IV.     **Request For Leave To Amend**

Plaintiff requests leave to amend the SAC in the event Defendants' motion is granted, but offers no explanation of what new allegations they would include in what would be a third amended complaint. Since Plaintiff "fail[s] to identify" what new allegations "might redress the [SAC's] noted deficiencies," leave to amend is denied. *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011).

## CONCLUSION

The motion to dismiss of defendants Albert L. Eilender, Salvatore Guccione, Walter J. Kaczmarek, William C. Kennally, Rebecca A. Roof, Douglas Roth, and Frances P. Scally is granted, and the SAC is dismissed with prejudice.

**SO ORDERED**.

*Edward R. Korman*

Brooklyn, New York                      Edward R. Korman
August 3, 2020                          United States District Judge

15